**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

SAILORMEN, INC.,[1]                          Case No: 26-10451-RAM

        Debtor.                          Chapter 11

_____/

**DECLARATION OF DAVID M. BAKER**
**IN SUPPORT OF FIRST-DAY MOTIONS**

    I, David M. Baker, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the contents of this Declaration in Support of First-Day Motions are true and correct.

**BACKGROUND**

    1.    I, David M. Baker, am over 21 years of age and am competent to testify to the matters set forth herein.  I am the Managing Partner of Aurora Management Partners Inc., a Georgia Corporation ("Aurora").  Aurora is a financial consulting and advisory firm that specializes in providing crisis and turnaround management consulting to distressed companies.

    2.    Aurora has extensive experience working with distressed restaurant franchisees, as evidenced by its recent work in the *In re: Premier Kings, et al.* (Case No. 23-02871) and *In re: Premier Cajun* (Case No. 23-00656) chapter 11 cases in the United States Bankruptcy Court for the Northern District of Alabama, which involved the same franchisor as this case.

    3.    On or about December 12, 2025, Aurora was appointed as the Debtor's Chief Restructuring Officer ("CRO").  Since Aurora's engagement, I have been actively involved in evaluating the Debtor's liquidity, cash management system, financial forecasting, and

---

[1]  The Debtor in this Chapter 11 case and the last four digits of its federal tax identification is Sailormen, Inc. (5214).  The Debtor's corporate headquarters is located at 9200 South Dadeland Blvd., Suite 600, Miami, FL 33156.

contingency planning.  In my capacity as CRO, I am intimately familiar with the day-to-day operations of the Debtor, its business and financial affairs, and books and records.  I am a graduate of the University of North Carolina at Chapel Hill with a degree in accounting.  I have over forty years of diversified business experience in restructuring, financial management, and accounting.  I have extensive experience in the development of reorganization plans, creditor negotiations, business plan preparation and long-term forecasting, developing and implementing cost reduction programs, and financial management of public and privately held companies.  I have advised companies, boards, investors, and lender groups and served in interim management roles and led assignment in numerous districts.

4.      I submit this Declaration in support of the Debtor's chapter 11 petition, first-day applications, and motions described below (collectively, the "First-Day Motions").  To enable the Debtor to operate effectively and minimize potential adverse effects in this chapter 11 case, the Debtor has requested certain relief in the First-Day Motions.  The First Day Motions, summarized below, seek, among other things, to (a) obtain the Court's authorization to use its secured lender's cash collateral to continue operations and administer this chapter 11 case; (b) ensure the continuation of the Debtor's cash management system and other business operations without interruption, (c) maintain employee morale and confidence, and (d) implement certain administrative procedures that will promote a seamless transition into chapter 11.

5.      Gaining and maintaining the support of the Debtor's employees, vendors, customers, and other key constituents, as well as maintaining the day-to-day operations of the Debtor's business with minimal disruption, will be critical to the Debtor's efforts in chapter 11 and its ability to maximize the recovery prospects for all interested parties.  The relief requested

2

in the First-Day Motions is in the best interests of the Debtor and its creditors and is necessary to avoid immediate and irreparable harm.

6.       Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information, and belief, and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtor's management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtor's industry, operations, and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtor.

7.       This Declaration is intended to provide a summary overview of the Debtor's business and the need for its restructuring pursuant to chapter 11 of the Bankruptcy Code. Section I provides a brief overview of the Debtor's business.  Section II describes the Debtor's pre-petition capital structure.   Section III describes the circumstances that precipitated the commencement of the chapter 11 case and the Debtor's objectives in the chapter 11 case. Section IV provides a summary of the First-Day Motions and the factual bases for the relief requested therein.

**I.       The Debtor's Business.**

      **A.       Corporate Structure and Governance.**

8.       The Debtor is corporation formed under the laws of Florida.  It has a three-member Board of Directors which includes an independent board member.

      **B.       Overview of the Debtor's Business Operations.**

9.       Founded in 1984 for the purpose of owning and operating Popeyes restaurants (collectively, the "Restaurants" and, each, a "Restaurant") as franchisee pursuant to a franchise agreement with Popeyes Louisiana Kitchen, Inc. ("PLKI"), Sailormen, Inc. was acquired by Bob

Berg and Steve Wemple in July 1987.  At the time, Sailormen operated 11 Popeyes stores in the Miami, Florida area.

10.     Through relocations and organic growth, Sailormen grew its portfolio to 15 stores by the end of 1995.  In late 1995, Sailormen acquired 5 underperforming stores in Birmingham, Alabama.

11.     From 1996 until the end of 2000, Sailormen successfully completed eight additional acquisitions during this period, ranging in size from a single unit to as high 72 units, and established itself within several new markets, operating in seven states: (i) Florida, (ii) Alabama, (iii) Georgia, (iv) Illinois, (v) Louisiana, (vi) Missouri, (vii) Mississippi.

12.     Between 2012 and 2018, Sailormen sold off its markets in Alabama, Illinois, Louisiana, Missouri and Mississippi to concentrate on new store development in Florida and Georgia.

13.     Currently, Sailormen operates 136 Popeyes restaurants in Florida and Georgia.

14.     Interfoods of America, Inc, a Nevada Corp., owns 100% of the outstanding capital stock of Sailormen.

**C.      The Debtor's Employees.**

15.     As of the Petition Date, the Debtor has 3306 employees (the "Employees"), 34 of whom are on salary (the "Salaried Employees") and 3272 of whom are paid hourly (the "Hourly Employees").   The Debtor's employee workforce is comprised of 3272 restaurant-level employees, who perform functions necessary to prepare and serve food, receive and stock inventory, and handle daily upkeep.  An additional 29 employees are Area Directors or Directors of Operation.  746 Employees work full time.  Full-time Employees are those who are regularly scheduled to work at least 35 hours per week (the "Full-Time Employees").   2526 of the

4

Employees work part time.  Part-time Employees are those who are regularly scheduled to work less than 30 hours per week (the "Part-Time Employees").

> **D.     The Debtor's Recent Financials.**

16.     For the fiscal year ending 2025 (which is based on 13 four-week periods, and ends on the Sunday closest to December 31st), the Debtor had sales of $233,458,379 and suffered a net operating loss of $18,769,243.

17.     As of January 12, 2026, the Debtor's balance sheet reflects assets of approximately $232,501,487 and liabilities of approximately $342,621,358.

**II.     The Debtor's Prepetition Capital Structure.**

18.     On or about September 3, 2020, Sailormen and BBVA USA, formerly known as Compass Bank (the "Original Administrative Agent"), and the Lenders (as defined in the Credit Agreement) entered into that certain Sixth Amended and Restated Credit Agreement dated September 2, 2020 (as amended, modified, restated, and/or supplemented from time to time, the "Credit Agreement"), which set forth the modified terms of the loan agreements between the Debtor and the Lenders. The Lenders and Sailormen are also parties to that certain Security Agreement dated March 27, 2014 (as amended, modified, restated, and/or supplemented from time to time) (the "Security Agreement").

19.     On or about March 15, 2024, the Debtor and BMO Bank N.A., as the Administrative Agent replacing the Original Administrative Agent ("BMO"), and the Bank of Montreal (the "Lenders") entered into that certain Seventh Amendment to Sixth Amended and Restated Credit Agreement (the "Seventh Amendment" and with the Credit Agreement, Security Agreement, and Loan Documents (as such term is defined in the Credit Agreement), the "Prepetition Loan Documents"), pursuant to which, among other things, the Lenders waived

certain events of default and the parties agreed to certain amendments to the Prepetition Loan Documents as set forth in the Seventh Amendment.

20.     As security for payment of all obligations the Debtor owed under the Credit Agreement (the "Prepetition Secured Obligations"), the Debtor assigned and granted to BMO, for itself and the ratable benefit of the Lenders a continuing security interest and lien in and to all of the Debtor's right, title, and interest in and to substantially all of the Debtor's then-existing and after-acquired property, consisting of: (a) all of its personal property, including without limitation, its inventory, accounts, equipment, licenses, contracts, leases, other contracts, intangibles furniture and fixtures, and (b) all Proceeds and products of any of the foregoing (collectively, the "Collateral").

21.     The Lenders have a first-priority security interest in substantially all of the Debtor's assets, including cash and accounts receivable (the "Collateral Liens").   As of November 28, 2025, the unpaid principal loan balance owed to the Lenders totaled $112,363,525.64, and there was $17,619,113.36 in accrued interest and fees.

III.    **The Need for Chapter 11 Relief and the Events Leading to the Commencement of the Chapter 11 Case.**

A.      **Events Leading to Chapter 11 Filing.**

22.     Like many other businesses, and particularly restaurants, the Debtor has faced significant challenges over the past 12 months.  Various macroeconomic factors have caused tremendous uncertainty and disruption within the business.  Those factors include, among others, the trailing national impact of the COVID-19 pandemic on restaurant operations, consumer choice, high inflation, increased borrowing rates, and an increasingly limited qualified labor force.

70949/0001-52191983v5

23.     Due to low performance and increasing losses, the Debtor made the difficult decision to sell 16 restaurants in an attempt to improve its financial performance and to stabilize the business, but the purchaser subsequently closed and the Debtor remained liable on the lease guarantees.  Unfortunately, these cost-cutting measures have not been sufficient to stabilize the Debtor's financial situation.  The Debtor has now fallen behind on rent payments to several landlords as well.

24.     In addition, on December 8, 2025, BMO filed a Complaint against the Debtor in the United States District Court for the Southern District of New York styled *BMO Bank, N.A., as administrative agent v. Sailormen, Inc*. (Case No. 1:25-cv-10146-AS) (the "New York Case"). BMO also filed a motion seeking the appointment of a federal receiver in the New York Case which would, among other things, displace management of Sailormen and provide the appointed receiver with the sole right to control the business and assets of the Debtor.  Sailormen believes that the Debtor, creditors and estate will fare far better in a chapter 11 case with the Debtor remaining a debtor-in-possession acting as a fiduciary for the benefit of all creditors and parties in interest, and not just for the benefit of the Lenders.

25.     Facing increased pressure from landlords, vendors, and BMO, the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code in this Court to preserve the value of the Debtor's business and assets as a going concern and to maximize its value for the benefit of creditors and other parties in interest. Due to the potential of a ruling in the New York Case appointing a receiver, the Debtor had to file this case under exigent circumstances.  It will cure any deficiencies in its filings quickly.

26.     As reflected in the Debtor's cash flow forecast, the Debtor's business can remain operational as a going concern as long as the Debtor is permitted to use the Lenders' cash

collateral and the franchisor makes certain concessions through the closing of a sale. The Debtor believes that those funds, along with cash-on-hand and revenue generated from its ongoing business, will provide the stability and liquidity needed to achieve a successful result in this Chapter 11 Case through a sale process. Without use of Cash Collateral, however, the Debtor would be unable to pay its payroll or purchase supplies and would be prevented from operating its business long enough to market and sell the assets, thus impairing the Debtor's ability to preserve the value of its business and the estate for the benefit of all stakeholders.

27.    The Debtor intends to operate its business during this Chapter 11 Case while seeking to conduct a prompt sale process.

**B.    Proposed Course of the Chapter 11 Case.**

28.    As reflected in the Debtor's cash flow forecast, the Debtor's business can remain operational as a going concern as long as the Debtor is permitted to use its secured lender's cash collateral. This will provide a runway for the Debtor to stabilize the business long enough to conduct an orderly marketing and sale process for the benefit of creditors.

**IV.    The Debtor's First-Day Motions.[2]**

29.    Concurrently with the filing of this chapter 11 case, the Debtor filed a number of First-Day Motions. The Debtor anticipates that the Court will conduct a hearing soon after the commencement of this case (the "First-Day Hearing") to consider the First-Day Motions.

30.    An important and critical element to the success of this chapter 11 case will be the entry of orders granting the relief requested in each of the First-Day Motions. Generally, the First-Day Motions are designed to facilitate: (a) the continuation of business operations without interruption, and to approve Debtor's use of its secured creditors' cash collateral; (b)

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the respective First-Day Motions.

70949/0001-52191983v5

preservation of customer and vendor relationships; and (c) maintenance of employee morale and confidence.  The factual background in support of each First-Day Motion is provided below:

> a) **Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Lenders, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "<u>Cash Collateral Motion</u>").**

31.     By this motion, the Debtor is seeking interim authorization to use the Cash Collateral (as defined in the Cash Collateral Motion) in order to fund the Debtor's ongoing business operations, as well as the fees and expenses of administering this Chapter 11 case, to the extent approved by the Court.

32.     Entry of the Cash Collateral Orders will significantly contribute to the success of this case by providing the Debtor with the liquidity necessary to preserve its business as a going concern and allow for a sale process to maximize the value of its assets for the benefit of the Debtor, creditors and estate.  The Debtor requires immediate authority to use the Cash Collateral to (a) fund the orderly continuation of the Debtor's business, (b) maintain the confidence of the Debtor's customers and vendors, (c) pay the Debtor's operating expenses and the fees and costs of administering this case, and (d) preserve existing jobs and the going-concern value of the enterprise, among other things.

33.     The Debtor seeks authority to use $8,831,095 of cash that is included in the Lenders' Cash Collateral upon entry of the Interim Order, for use during the interim period prior to entry of the Final Order.  Without immediate access to this cash, the Debtor lacks the ability to maintain and continue its business operations and the value of its estate will be irreparably harmed.  The use of the Cash Collateral, however, allows the Debtor to generate revenue which results in a positive net cash flow of $3,435,665 during the interim period through February 8, 2025.

9

34.     Subject only to the terms of the Interim Order, pursuant to sections 361, 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the Debtor proposes to grant to the Lenders an additional and replacement valid, binding, enforceable, non-avoidable, and automatically perfected, effective as of the Petition Date, postpetition security interest in and first priority senior lien ("Adequate Protection Lien") on the Debtor's post-petition accounts receivable, inventory and the proceeds thereof which, but for the commencement of the Chapter 11 Case, would constitute Collateral in which the Lenders had a valid and perfected security interest as of the Petition Date, and (ii) to the extent of any diminution in the value, from and after the Petition Date, of the Lenders' interest in the Collateral ("Diminution in Value") resulting from: (A) any postpetition use of Cash Collateral; (B) the use, sale, or lease of the Prepetition Collateral; and (C) the imposition of the automatic stay (collectively, "Adequate Protection Obligations"), on all of the rights, titles, and interests of the Debtor and its "estate" (as created pursuant to section 541(a) of the Bankruptcy Code) in, to, and under all property and rights and interests in property of the Debtor of any kind or nature, excluding (i) the Debtor's avoidance powers and rights under Sections 544 through 551 of the Bankruptcy Code ("Avoidance Claims") and (ii) the "Carve-Out Reserve Account", as defined below. The Adequate Protection Lien is subject and subordinate only to the Carve-Out and prepetition permitted liens, if any.

35.     The Lenders are also granted, subject only to the Carve-Out, an allowed superpriority administrative expense claim (the "Adequate Protection Superpriority Claim") as provided for in section 507(b) of the Bankruptcy Code, payable from and having recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof, excluding Avoidance Claims and the Carve-Out Reserve Account. Subject only to the Carve-Out and excluding Avoidance Claims and the proceeds thereof, the Adequate Protection Superpriority

Claim shall have priority over any and all other administrative expenses pursuant to the Bankruptcy Code (including the kinds specified in or arising or ordered pursuant to sections 105(a), 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507, 546(c), 552(b) (subject to the entry of a Final Order), 726, and 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment) and all other claims against the Debtor or its estate in the Chapter 11 Case at any time existing or arising, of any kind or nature whatsoever.

36.     In addition to, and without limiting, whatever rights to access the Lenders have under the Prepetition Loan Documents, upon reasonable advance notice and at reasonable times, the Debtor shall permit representatives, agents, and employees of the Lenders to have reasonable access to: (i) inspect the Debtor's assets and properties; (ii) examine the Debtor's books and records, and (iii) discuss the Debtor's affairs, finances, and condition with the Debtor's officers, management, financial advisors, attorneys and consultants, provided, however, that the Debtor shall not be required to disclose to the Lenders information protected by the work product doctrine, the attorney-client privilege or any similar privileges.

37.     The Adequate Protection Lien, and Adequate Protection Superpriority Claim shall be subject only to the right of payment of the following expenses (collectively, "Carve-Out"), to the extent provided herein:

(a) upon entry of the Interim Order, statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) with respect to the Debtor ("Statutory Fees"); and

(b) the allowed fees and costs of the Debtor's claims and noticing agent, if any, subject in all respects to the terms of the Interim Order; and

70949/0001-52191983v5

(c) the allowed fees and expenses actually incurred by persons or firms retained by the Debtor or any Official Committee of Unsecured Creditors on or after the Petition Date pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code (each a "Professional" and collectively, "Professionals") in a cumulative sum for the period prior to the occurrence of the delivery of a Carve-Out Trigger Notice (as defined herein), an amount not to exceed the lesser of (A) the aggregate weekly amounts budgeted for each such Professional for such week in accordance with the Budget (to the extent a Carve-Out Trigger Notice is delivered mid-week, pro-rated for such week) and (B) the actual amount of such Allowed Professional Fees for each Professional incurred on or after the Petition Date up through and including the date a Carve-Out Trigger Notice is delivered ("Allowed Professional Fees"), subject in all respects to the terms of the Interim Order and the Budget. The Carve-Out shall include all Allowed Professional Fees that are incurred or earned (1) at any time before delivery of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, subject and limited in all respects to the amounts set forth in the Budget for payment of such Professionals; and (2) beginning the first day after the delivery by the Prepetition Secured Party of written notice (which for the avoidance of doubt may be by electronic mail) of the occurrence of an Event of Default ("Carve-Out Trigger Notice") to the Debtor, the Debtor's counsel, the United States Trustee, and counsel for any Committee, the fees and expenses incurred by the Professionals retained by the Debtor in an aggregate amount not to exceed $200,000 ("Post-EOD Carve-Out Amount") (the aggregate amount of clauses (1) and (2), collectively, "Carve-Out Cap");

(d) For the avoidance of doubt, to the extent the budgeted amounts for a Professional for any Budget period exceed the actual fees and expenses incurred by such

Professional for that period, the excess may be carried forward to later Budget periods or backward to prior Budget periods to be applied to any fees or expenses that exceeded the budgeted amounts for such prior or later periods.

38.    Notwithstanding anything to the contrary herein, neither the Carve-Out, nor the proceeds of any of the Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the Prepetition Secured Obligations or the Lenders' liens on and security interests in any of the Prepetition Collateral, (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the Prepetition Secured Obligations, the Lenders' liens on and security interests in the Collateral, or (iii) preventing, hindering or delaying the Lenders' assertion or enforcement of any lien, claim, right, or security interest or realization upon any of the Collateral, in accordance with the terms and conditions of the Interim Order, (b) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Bankruptcy Code section 364(c), (c) without the prior written consent of the Lenders, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against the Lenders, or any of their respective officers, directors, employees, agents, attorneys, financial advisors, consultants, affiliates, successors, or assigns, including, without limitation, any attempt to avoid any claim, lien, or interest of, or obtain any recovery from the Lenders under Chapter 5 of the Bankruptcy Code; provided, however, that, subject to the Carve-Out Cap, an amount not to exceed $25,000 in the aggregate of Cash Collateral may be used to pay the Allowed

Professional Fees of any Committee to investigate (but not prosecute) claims against and possible objections with respect to the Prepetition Secured Obligations, and the pre-petition liens and security interests of, or the Lenders (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of such parties). Nothing herein shall be construed as a consent to the allowance of the fees and expenses of any Professional or shall affect the right of the Lenders to object to the allowance and payment of such fees and expenses. The Debtor shall be permitted to pay fees and expenses allowed and payable pursuant to an Order of the Bankruptcy Court under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, solely to the extent set forth in the Budget and not to exceed the amounts set forth in the Budget and the provisions of the Interim Order, provided that any such payment shall be subject to entry of a final order of the Bankruptcy Court of each Professional's final application for allowance of such fees and expenses.

39.     The Debtor shall maintain a segregated account for the payment of Allowed Professional Fees (the "Carve-Out Reserve Account"), which account shall be funded from cash receipts or on behalf of the Debtor in accordance with the Budget on a weekly basis, in advance, until the occurrence of a Carve-Out Trigger Notice. After the Carve-Out Trigger Notice, the Carve-Out Reserve Account may continue to be funded, up to the Carve-Out Cap. From funds in the Carve-Out Reserve Account, the Debtor shall pay the Professionals the Allowed Professional Fees in compliance with any interim compensation procedures and in the manner set forth in the Interim Order in accordance with the Budget; provided, however, that, prior to payment in full of the Prepetition Secured Obligations and termination of the Carve-Out, to the extent that Allowed Professional Fees that have accrued from the Petition Date through and including the Carve-Out Trigger Notice are less than the amounts funded into the Carve-Out Reserve Account, the excess

14

amounts in the Carve-Out Reserve Account shall be (a) first, applied to fund the Carve-Out Cap; (b) second, remitted to the Lenders to apply to reduce the Prepetition Secured Obligations.

40.    Nothing in the Interim Order shall be construed as a consent to the allowance of the fees and expenses of any Professional or shall affect the right of the Lenders to object to the allowance and payment of such fees and expenses. The Debtor shall be permitted to pay fees and expenses allowed and payable pursuant to an order of the Court, including any order approving interim compensation procedures, under Bankruptcy Code sections 330 and 331, as the same may be due and payable, solely to the extent set forth in the Budget and not to exceed the amounts set forth in the Budget, provided that (i) any such payment shall be subject to entry of a final order of the Court of each Professional's final application for allowance of such fees and expenses and (ii) unused amounts set forth in the Budget may be carried forward until the Carve-Out Trigger Notice, if any, and used to fund such item in any subsequent week.

41.    Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Collateral Motion should be approved.

**b)    Motion of the Debtor and Debtor-In-Possession for Entry of Order Authorizing Payment of Prepetition Payroll Obligations and Employee Benefits (the "<u>Employee Wages Motion</u>").**

42.    By the Employee Wages Motion, the Debtor seeks entry of an Order (i) authorizing, but not requiring, the Debtor to pay outstanding Prepetition Payroll Obligations and Employee Benefits, and (ii) authorizing the Debtor to continue to honor in the ordinary course of its business and perform its obligations under the Health Insurance Plans, and 401(k) Plan.

43.    As of the Petition Date, the Debtor has 3306 employees (the "<u>Employees</u>"), 34 of whom are on salary (the "<u>Salaried Employees</u>") and 3272 of whom are paid hourly (the "<u>Hourly Employees</u>").    The Debtor's employee workforce is comprised of 3272 restaurant-level employees, who perform functions necessary to prepare and serve food, receive and stock

15

inventory, and handle daily upkeep.  An additional 29 employees are Area Directors or Directors of Operation 746 Employees work full time.  Full-time Employees are those who are regularly scheduled to work at least 35 hours per week (the "Full-Time Employees").  2526 of the Employees work part time.  Part-time Employees are those who are regularly scheduled to work less than 30 hours per week (the "Part-Time Employees").

44.    The Employees have not been paid all of their prepetition wages.  Of the 3,306 Employees currently employed by the Debtor, for January 12, 2026 through the Petition Date, the Debtor owes an estimated $637,000 (collectively, the "Prepetition Payroll Obligations"). None of the Employees the Debtor seeks to pay will receive more than the cap under 11 U.S.C. § 507(a)(4)(A).  Through this Motion, the Debtor seeks authority to pay the Prepetition Payroll Obligations. None of the Employees the Debtor seeks to pay will receive more than the cap under 11 U.S.C. § 507(a)(4)(A).  A schedule of the Prepetition Payroll Obligations is attached to the Employee Wages Motion as **Exhibit B**.

45.    The Debtor also provides certain Employee Benefits such as healthcare, vision, and dental insurance (the "Health Insurance Plans") and a 401(k) with no company match (the "401(k) Plan" and together with the Health Insurance Plans, the "Employee Benefits"). The estimated prepetition amount due for the Employee Benefits is $80,000.

46.    I have been advised that the Prepetition Payroll Obligations and Employee Benefits that the Debtor seeks to pay with respect to the Prepetition Payroll Obligations and Employee Benefits are entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, to the extent they do not exceed $17,150.00 per Employee.  The Debtor would therefore be required to pay these claims in full in order to confirm a chapter 11 plan.

47.     The Debtor operates its business with roughly 3,300 Employees.  The Employees'
skills, knowledge, and understanding of the Debtor's business are the Debtor's most valuable
asset.  Any disruption in the Debtor's operations from Employee resignations or poor morale
could have significant negative effects on the Debtor's reorganization efforts.  Most of the
Debtor's Employees (and their families) are dependent upon the wages, salaries, reimbursements
and other benefits they receive from the Debtor.

48.     If amounts owed are not paid, insurance reimbursements not made, or other
benefits delayed, Employees may suffer extensive personal hardship and, in some cases, will be
unable to meet the "basic living" needs.  This could cause significant harm to Employees and
their families and potentially make it difficult or impossible for them to continue working for the
Debtor.

49.     I believe that, to avoid the risk of such Employee resignations and to maintain
Employee morale, it is critical that the Debtor be authorized to pay the Employees certain
compensation amounts (subject to the statutory cap) that have been earned under the Debtor's
prepetition contractual obligations or practices.  It is also essential that the Debtor continue the
employee programs and policies discussed in the Employee Wages Motion in the ordinary
course of business and on an uninterrupted basis.  Payment of these obligations and the
continuation of the related programs and policies are essential to maintain employee morale and
ensure that the Debtor retains its employees during this critical period.

50.     In sum, the Employees' skills, knowledge, and understanding of the Debtor's
operations and customer relations are essential to the continued operations and reorganization of
the Debtor's business.  Without the continued services of the Employees, I believe an effective
reorganization of the Debtor would not be possible.

70949/0001-52191983v5

51.     Accordingly, on behalf of the Debtor, I respectfully submit that the Employee Wages Motion should be approved.

### c)    Motion to Maintain Prepetition Bank Accounts and Cash Management  (the "Cash Management Motion")

52.     By this Motion, the Debtor respectfully requests the entry of an interim and a final Order authorizing the Debtor to continue using the Bank Accounts, Credit Cards, and existing Cash Management System,

### Description of Debtor's Cash Management System (the "Cash Management System")

53.     Prepetition, the Debtor maintained eight (8) bank accounts: five at Synovus Bank ("Synovus"), two at Citizens Bank ("Citizens") and one at BMO Bank ("BMO"). The Synovus accounts (together, the "Synovus Accounts") include: an operating account ending in x8566 (the "Operating Account"); an account for the payment of royalties and advertising ending in x9134 (the "RBI Account"); a payroll account ending in x8574 (the "Payroll Account"); an account for the deposit of sales collections paid via credit cards from point of sale transaction providers ending in x8590 (the "CC Account"); and an account which receives store deposits ending in x8616 (the "Cash Deposits Account").

54.     The Debtor also makes use of two of credit card programs through Citizens Bank (the "Citizens Cards"). One program houses operating cards used daily by operations, corporate, and management for day-to-day use. The second program houses a virtual card used by the accounts payable department.

55.     The Debtor maintains petty cash in a safe at each location accessible only by the General Manager for pre-approved emergency purchases or small vendor expenses. The Debtor refreshes petty cash through bi-weekly cash exchange via armored truck.

70949/0001-52191983v5

56.     Sales revenue collected in cash is deposited in the Cash Deposits Account. Sales revenue collected through credit card payments is deposited into the CC Account. Sales revenue collected from third parties is deposited into the Operating Account. Those Cash Deposits Account and CC Account are swept into the Operating Account which is used to make payments for general vendors and to fund payroll and brand expenses. Funds for payroll are swept from the Operating Account into the Payroll Account. For advertising and royalties, funds are swept from the Operating Account to the RBI Account. The Debtor makes payments on the Citizens Card from the Citizens Accounts, which receive funding from the Operating Account.

57.     The Debtor also maintained a de minimis money market account at BMO which the Debtor will close.

58.     The Debtor's 136 stores receive deposits through highly complex processes with significant transactions that clear on a daily basis from deposits made in cash, through POS systems, and through credit card processors. Any change to the structure of the Accounts would significantly disrupt the Debtor's ability to utilize cash leading to missed payments to vendors and failure to timely fund payroll. Those interruptions would threaten the continued relationships between the Debtor and its vendors and employees. The disruption of those relationships would end the Debtor's business and this chapter 11 case.

59.     The Debtor will work with Synovus and the United States Trustee to have the Synovus Accounts re-designated as debtor-in-possession accounts to ensure protection of the Debtor's cash.

60.     Notably, the Debtor may file the following motions as well in advance of the First-Day Hearing:

> (a)     Motion of the Debtor and Debtor-In-Possession for Entry of Interim and Final Orders (I) Approving the Adequate Assurance of Payment for Future Utility

Services Proposed by Debtor, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (III) Approving Procedures by Debtor for Resolving Additional Assurance Requests, and (IV) Setting a Final Hearing Related Thereto (the "Utilities Motion").

(b)      Motion of the Debtor and Debtor-In-Possession for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Schedules and SOFA Motion").

(c)      Motion of the Debtor and Debtor-In-Possession for an Order (I) Authorizing Debtor to Pay Prepetition Claims of Certain Critical Vendors (the "Critical Vendor Motion").

## CONCLUSION

61.      Approval of the Debtor's First-Day Motions is crucial to the Debtor's ability to continue its business.  Without the relief requested, the Debtor would be forced to cease operations and would be unable to pursue its reorganization efforts.  The requested relief will also assist the Debtor in maintaining employee morale, retaining employees, and establishing certain other administrative procedures to promote a smooth transition into, and eventually out of, chapter 11.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 15, 2026

_David Baker_
David Baker (Jan 15, 2026 13:40:58 EST)
_____
David M. Baker, Chief Restructuring Officer

# First Day Declaration

**Final Audit Report**                                        2026-01-15

| | |
|---|---|
| Created: | 2026-01-15 |
| By: | Martha Ortman (mortman@slp.law) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAzilGKoIQKKFbQgYn-VoNxsVbhIivlRcA |

## "First Day Declaration" History

📄 Document created by Martha Ortman (mortman@slp.law)
2026-01-15 - 6:29:06 PM GMT

📧 Document emailed to David Baker (dbaker@auroramp.com) for signature
2026-01-15 - 6:29:17 PM GMT

📄 Email viewed by David Baker (dbaker@auroramp.com)
2026-01-15 - 6:29:52 PM GMT

✒️ Document e-signed by David Baker (dbaker@auroramp.com)
Signature Date: 2026-01-15 - 6:40:58 PM GMT - Time Source: server

✅ Agreement completed.
2026-01-15 - 6:40:58 PM GMT