UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

SAILORMEN, INC.,                                   Case No. 26-10451-RAM

      Debtor.                                   Chapter 11

_____/

**OBJECTION AND RESERVATION OF RIGHTS OF POPEYES LOUISIANA
KITCHEN, INC. TO THE DEBTOR'S (I) PROPOSED FINAL CASH COLLATERAL
ORDER, AND (II) PROPOSED CASH COLLATERAL BUDGET**

      Popeyes Louisiana Kitchen, Inc. ("Popeyes"), by and through its undersigned counsel, files

this Objection and Reservation of Rights (this "Objection") to the Debtor's (i) proposed final cash

collateral order [ECF No. 169], and (ii) proposed final cash collateral budget [ECF No. 170], and

respectfully states as follows:

**RELEVANT BACKGROUND**

      1.      On January 15, 2026 (the "Petition Date"), Sailormen, Inc. (the "Debtor") filed a

voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor operates its

business and manages its properties as a debtor-in-possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

      2.      Popeyes is the Debtor's franchisor.  As of the Petition Date, the Debtor operated

136 POPEYES® restaurants (the "Restaurants") in the states of Florida and Georgia under separate

franchise agreements (the "Franchise Agreements") with Popeyes.  Subsequent to the Petition

Date, the Debtor closed 17 of its Restaurants.

      3.      On January 15, 2026, the Debtor filed its *Emergency Motion for Interim and Final*

*Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to*

*the Lenders, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [ECF Nos. 4 and

5] (the "Cash Collateral Motion").[1]

4.      On January 20, 2026, Popeyes filed its *Limited Objection and Reservation of Rights to the Cash Collateral Motion* [ECF No. 32].

5.      Prior to the hearing on the Cash Collateral Motion, counsel to the Debtor, Popeyes and the Administrative Agent collaborated and reached agreement on the terms of a proposed interim order granting the Cash Collateral Motion on an interim basis.

6.      On January 28, 2026, the Court entered an *Amended Interim Agreed Order* [ECF No. 99] granting the Cash Collateral Motion on an interim basis pursuant to the terms thereof, including the interim budget attached thereto (the "Agreed Interim Order"), and setting a final hearing for February 23, 2026 (the "Final Hearing").  Pursuant to the Agreed Interim Order, the Court set February 12, 2026 as a deadline for the Debtor to file a proposed final cash collateral order (the "Proposed Final Order") and an updated proposed final cash collateral budget (the "Proposed Budget")

7.      On February 12, 2026, the Debtor filed its Proposed Final Order (which included a clean and a redlined version) [ECF No. 169] and its Proposed Budget [ECF No. 170].   Pursuant to the Agreed Interim Order, the Court set a deadline of February 17, 2026 for all parties in interest to file an objection to the Proposed Final Order and/or the Proposed Budget.

8.      For the reasons set forth below, Popeyes objects to the terms of the Proposed Final Order and the Proposed Budget and requests that the Court condition the Debtor's continued use of Cash Collateral on making the revisions to the Proposed Final Order and the Proposed Budget set forth herein so as to address and resolve Popeyes' objections.[2]

---

[1] All capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Cash Collateral Motion.
[2] Based on the significant issues presented by the Debtor's Proposed Final Order and the Proposed Budget, and pending the Court's ruling on this Objection, Popeyes is filing contemporaneously herewith its

## POPEYES' OBJECTIONS

9.     Despite Popeyes' efforts to engage with the Debtor in connection with the preparation of the Proposed Final Order and the Proposed Budget, the Debtor failed to involve or obtain the consent of Popeyes to the changes that the Debtor made to the Proposed Final Order, including inexplicably the changes that the Debtor made to Paragraph 15 of the Proposed Final Order that specifically deal with the "*Reservation of Rights of Popeyes Louisiana Chicken, Inc.*" Moreover, despite Popeyes providing the Debtor with information on critical capital expenditures that the Debtor needs to make to replace the "point of sale" system currently in the Restaurants during the period covered by the Proposed Budget and requesting that the Debtor engage with Popeyes in connection therewith, the Debtor ignored Popeyes and failed to include any proposed expenditures to deal with this critical operational issue.  As outlined below, the Debtor's failure to address this critical capital expenditure will be value destructive to the entire enterprise,[3] and Popeyes is at a complete loss as to why the Debtor would proceed down that path.

10.     Still further, despite Popeyes preparing and sharing with the Debtor a proposed Debtor-in-Possession Loan Commitment Term Sheet (the "DIP Loan Term Sheet") pursuant to which Popeyes would agree to defer the payment of royalty and advertising charges under its Franchise Agreements, which approximate $1.6 million per month or approximately $9.2 million during the period covered by the Proposed Budget, the Debtor has not engaged with Popeyes on those issues.[4]  Instead, the Debtor filed the Proposed Budget and did not include any payments

---

*Expedited Motion for Entry of an Order (1) Compelling Payment of Post-petition Obligations Under Franchise Agreements or Alternatively (2) for Relief from the Automatic Stay.*

[3] In addition, pursuant to the Debtor's Franchise Agreements with Popeyes, the Debtor is required to have in place a "point of sale" system approved by Popeyes.  The failure to satisfy this requirement is a material event of default under the Franchise Agreements.

[4] Popeyes also requested that the Debtor list the accumulating royalty and advertising charges in the operating expense section of the Proposed Budget and then show such charges as being deferred at the end of the Proposed Budget (assuming the Debtor and Popeyes reach agreement on the terms of the DIP Loan

whatsoever to Popeyes in the Proposed Budget through June 28, 2026.[5]

11.     Turning to Popeyes' specific objections to the Proposed Final Order, Popeyes objects to several provisions of the Proposed Final Order and the Proposed Budget.  First, Popeyes objects to the Debtor's failure to include in the Proposed Budget the payment of on-going post-petition royalties, advertising and other charges due to Popeyes under the Franchise Agreements. In connection therewith, the Debtor's failure to account for such charges prevents the Court from making certain findings of fact that have been requested by the Debtor in the Proposed Final Order. For example, the Debtor seeks a finding that the Debtor has a need to fund and "pay their operating expenses," yet one of the most important of those operating expenses is not included in or otherwise appropriately dealt with by the Proposed Final Order or the Proposed Budget.  *See* Proposed Final Order at Recital ¶ K.  The Debtor also asks the Court to find that the Debtor's proposed use of Cash Collateral is "fair and reasonable" and the terms "reflect the Debtor's exercise of prudent business judgment …." *Id*.  The Debtor also seeks a finding from the Court that the continued use of Cash Collateral as set forth in the Proposed Final Order is "in the best interest of the Debtor and its estate, its creditors and other parties in interest." *Id.*  It is incomprehensible that the Debtor would request (or that the Court could make) the above findings in the face of the Debtor not dealing with or proposing to pay one of the most important (and substantial) ordinary and necessary administrative obligations of the Debtor's estate, namely the obligations to Popeyes.

12.     Second, the Debtor proposes to grant the Administrative Agent a waiver of the

---

Term Sheet.  By doing this, the Court and all parties in interest will be able to see the accumulation and quantum of such amounts.

[5] The assumptions attached to the Proposed Budget merely state that the Debtor "[a]ssumed royalty and advertising payments are deferred and paid in kind "PIK'D" as debt to Popeyes corporate."  As outlined herein, Popeyes has made clear to the Debtor that it will not agree to any such deferral unless it obtains the protections set forth in the DIP Loan Term Sheet.

Debtor's surcharge rights under section 506(c) of the Bankruptcy Code. *Id.* at Recital ¶ J and Ordered ¶ 5. While Popeyes does not have an issue with secured lenders receiving a section 506(c) surcharge waiver, Popeyes does not believe that granting such a waiver is appropriate in light of the Debtor's admitted accumulation and non-payment of millions of dollars of post-petition ordinary and necessary obligations of the Debtor's estate.

13.     The focus of section 506(c) is to prevent secured creditors from receiving a windfall while requiring the estate and unsecured creditors to bear the cost. *In re NETtel Corp.*, 2017 Bankr. LEXIS 3363, at *10 (Bankr. D.D.C. Sep. 29, 2017)("the purpose of § 506(c)… 'is to prevent a windfall to a secured creditor at the expense of the estate.'"); *Southwest Sec., FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 696 (5th Cir. 2015) ("a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost" (citation omitted)); *Kivitz v. CIT Group/Sales Fin.*, Inc., 272 B.R. 332, 334 (D. Md. 2000) (stating that "[t]he reason for [section 506(c)] is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs"). Any recovery under 506(c) is for the benefit of the estate. *Ungaretti & Harris, LLP v. Steinberg (In re Res. Tech. Corp.)*, 356 B.R. 435, 446 (Bankr. N.D. Ill. 2006) (506(c) recovery is for the benefit of the estate); *In re Dinsmore Tire Ctr., Inc.*, 81 B.R. 136, 138 (Bankr. S.D. Fla. 1987) (same); *see In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 484 (4th Cir. 1994) ("When a trustee recovers post-petition costs and expenses from a secured creditor pursuant to § 506(c), the recovered funds become available as an unencumbered asset for distribution to the unsecured creditors."). Because section 506(c) protects unsecured creditors from being forced to carry the cost of preserving collateral for a secured creditor and any recovery under section 506(c) is for the benefit of the estate, permitting a surcharge waiver in the context of an administratively insolvent estate is particularly harmful as the unsecured creditors are already

facing a significant reduction in payment of any amounts that they are owed and doing so goes against the purpose underlying section 506(c).

14.     The Debtor has not offered any legitimate reason that would support such a waiver without addressing the existing and on-going unpaid post-petition obligations to Popeyes.  *In re Sports Authority Holdings, Inc. et al.*, Case No. 16-10527(MFW), Hr'g Tr. (Docket No. 1463) at 194-195 (Bankr. D. Del. Apr. 26, 2016) (In "a case where the landlords and other administrative claims are clearly not budgeted or being paid…while the secured lenders' collateral is being liquidated and their secured claim is being paid, I have a serious problem with that. I think the fix is no 506(c) waiver for anybody.").

15.      In fact, it appears as though the Debtor has agreed to this waiver because the Administrative Agent has agreed to "carve-out" from its collateral in excess of $2.3 million for the payment of the Debtor's professional fees.  Popeyes is very concerned about and questions the Debtor's business judgment on this issue.

16.     Third, the Debtor has agreed to grant the Administrative Agent an Adequate Protection Superpriority Claim and in connection therewith the Proposed Final Order states "[o]ther than the Carve-Out, no cost of expense of administration of the Chapter 11 Case shall be senior to, or *pari passu* with, the Adequate Protection Superpriority Claim.  *Id*. at Ordered ¶ 3(b). Once again, Popeyes does not have a general objection to granting an Adequate Protection Superpriority Claim to a secured lender, but as drafted, such Adequate Protection Superpriority Claim, combined with the proposed section 506(c) surcharge waiver, is inappropriate and should not be granted when the Debtor is admittedly not paying a substantial amount of on-going post-petition ordinary and necessary administrative expense claims.

17.     Fourth, the Carve-Out set forth in the Proposed Final Order includes more than $2.3

million in professional fees for the Debtor's professionals during the term of the Proposed Budget. *Id.* at Ordered ¶ 7(c). In addition, the Proposed Final Order contains provisions for the on-going deposit into a Carve-Out Reserve Account of such budgeted professional fees. *Id.* at Ordered ¶ 9(a). Lastly, the Proposed Final Order provides that "[f]or avoidance of doubt, the Carve-Out Reserve Account and Carve-Out, and the rights to pay Allowed Professional Fees from the Carve-Out Reserve Account and Carve-Out, shall be senior to the Administrative Agent's Adequate Protection Liens and Adequate Protection Superpriority Claim." *Id*. at Ordered ¶ 9(c).

18.     The effect of the Carve-Out provisions set forth above is to grant priority to the Debtor's professionals in and to, and for the payment of, in excess of $2.3 million in proposed fees over the payment of post-petition ordinary and necessary obligations that the Debtor owes to Popeyes and that pursuant to the Proposed Budget will continue to accumulate through the end of June. This chapter 11 case should not, and cannot, be run for the benefit of the Debtor's professionals while legitimate and important post-petition administrative expense claims are unabashedly accumulating. As a result, these Carve-Out provisions should not be approved by the Court, or in the alternative the obligations owed to Popeyes should have priority over the rights of the Debtor's professionals in and to such Carve-Out (although $2.3 million will only cover a fraction of the post-petition amounts that are expected to be owed to Popeyes and that will be accumulating under the Proposed Budget).

19.     Fifth, Popeyes objects to certain of the revisions that the Debtor made (without input from Popeyes) in Recital paragraph G(iii) and Ordered paragraph 15 of the Proposed Final Order. Each of these provisions improperly grants to the Administrative Agent liens and rights in and to the "Franchise Assets" that (i) the Administrative Agent and the Debtor previously agreed were not granted to the Administrative Agent, (ii) are actually owned by Popeyes and not the

Debtor, and (iii) violate applicable law, namely Section 9-408 of the Uniform Commercial Code.[6]

20.     In Ordered paragraph 15 of the Proposed Final Order, the Debtor inserted a definition of the term "Franchise Assets," which definition is taken from that certain Amended and Restated Tri-Party Agreement, dated as of October 18, 2026, by and among Popeyes, the Debtor and the Administrative Agent, as successor (the "Tri-Party Agreement").  A copy of the Tri-Party Agreement is attached hereto as Exhibit A.

21.     For purposes of clarity, the definition of "Franchise Assets" in the Proposed Final Order is the same as the definition of "Excluded Assets" in the Tri-Party Agreement.  *See* Recital paragraph F of the Tri-Party Agreement.   For ease of reference, the definition of "Excluded Assets" in the Tri-Party Agreement – which matches the definition of "Franchise Assets" in the Proposed Final Order - is as follows:

> Notwithstanding the foregoing, **the following intellectual property and other assets are specifically excluded from and shall not constitute any part of the Collateral**: (i) **the Franchise Agreements**, and (ii) the names, trade name, service marks, logos, copyrights, trade secrets, formulae, recipes, franchise rights, copyrights, patents, permits and other intellectual property licenses, governmental authorizations and other marks, in each case under this clause (ii), **owned or licensed by Franchisor** under the Franchise Agreements **or any other property constituting the proprietary system licensed by Franchisor under the Franchise Agreements,** which includes, without limitation, the Marks and certain distinctive exterior and interior layouts, designs and color schemes, special recipes, menus and food and beverage items, and operating procedures of the Popeye's system and any and all features and components thereof **and all similar rights and interests applied for, issued to or owned by Franchisor or used in the operation of the Popeye's restaurants and which are owned by Franchisor or licensed by Franchisor** to Borrower under the Franchise Agreements.

(emphasis added).

22.     First, at the beginning of Recital paragraph F of the Tri-Party Agreement, the Debtor, the Administrative Agent and Popeyes agreed that the Debtor was granting to the

---

[6] Section 9-408 of the Uniform Commercial Code limits a lender's rights in connection with the enforcement of a security interest in a franchise agreement.

Administrative Agent a first priority security interest in a litany of the Debtor's assets described therein.  Specifically, in subclause (ii) of Recital paragraph F of the Tri-Party Agreement, the grant of a security interest to the Administrative Agent references the Debtor's general intangibles and included the phrase: "proceeds derived from the Franchise Agreements under section 9-408 of the Uniform Commercial Code…."  However, in that same Recital paragraph F, the parties to the Tri-Party Agreement included the definition of Excluded Assets set forth above, which made clear that "*Notwithstanding the foregoing*" – which referred back to the grant of a first priority security interest in the Debtor's assets – the Administrative Agent's "Collateral" specifically ***does not include a lien*** on the Franchise Agreements (set forth in subclause (i) above) or the litany of assets set forth in subclause (ii) above (which are actually owned by Popeyes).

23.     Despite the above clear recitation in the Tri-Party Agreement that the Administrative Agent does not have a lien on the Franchise Agreements or the other Franchise Assets (also defined as the Excluded Assets), the Debtor added a clause to the Proposed Final Order that actually improperly expands the scope of the Pre-Petition Liens of the Administrative Agent where the Debtor states: "including without limitation, all proceeds and products of the **Franchise Assets** (as defined in Paragraph 15 below) …." *Id*. at Recital ¶ G(iii) (emphasis added). This newly added clause to the Proposed Final Order is factually incorrect because the Administrative Agent was only granted a lien on the ***proceeds*** derived from the "Franchise Agreements" as clearly set forth in the above-referenced provisions of the Tri-Party Agreement and not on the broader group of assets included in the definition of the "Franchise Assets."  The Debtor's effort here to expand the Pre-Petition Liens granted to the Administrative Agent is improper and needs to be clarified and revised.

24.     Second, in Ordered paragraph 15(a) of the Proposed Final Order, the Debtor

attempts to limit the scope of the Prepetition Liens and the Adequate Protection Lien in favor of the Administrative Agent in two places so that they do not apply to "Popeyes' rights, title and interests in and to the Franchise Assets." While that statement is technically correct, it is too limiting. Specifically, as is evident from the above provisions of the Tri-Party Agreement, the Administrative Agent does ***not have a lien on any*** of the Franchise Assets, including the Franchise Agreements or any of Popeyes' rights therein. Rather, the only Pre-Petition Lien that the Administrative Agent has in the Franchise Assets is limited to the "proceeds" derived from the Franchise Agreements. As a result, this provision of the Proposed Final Order needs to be clarified and revised.

25.    In addition, the Adequate Protection Superpriority Claim proposed to be granted to the Administrative Agent should not be "payable from [or] having recourse to"[7] any of the Franchise Assets.

26.    Third, at the end of Ordered paragraph 15(a), the Debtor added the following sentence: "For avoidance of doubt, the Adequate Protection Lien shall attach to, and the Adequate Protection Superpriority Claim shall be payable from, all proceeds of the Franchise Assets." As set forth above, this provision grants to the Administrative Agent liens and claims against assets on which it does not have a Pre-Petition Lien as well as on assets actually owned by Popeyes. To be clear, the Administrative Agent only has a lien on the "proceeds" of the Franchise Agreements and not on the Franchise Agreements themselves or any of the other assets included in the definition of Franchise Assets, many of which are actually owned by Popeyes. As a result, this provision in Ordered paragraph 15(a) needs to be clarified and revised.

---

[7] In Ordered paragraph 3(b) of the Proposed Final Order, the Debtor provides that the Adequate Protection Superpriority Claim is "payable from and having recourse to" all pre-petition and post-petition assets of the Debtor.

27.     Moreover, as it relates to the Administrative Agent's lien on the proceeds derived from the Franchise Agreements, such lien and the rights of the Administrative Agent are subject to the rights of Popeyes to be paid its cure claims under Section 365 of the Bankruptcy Code in connection with and as a condition to the assumption and/or assumption and assignment of the Franchise Agreements.  The Proposed Final Order should be clarified on this issue so that the Administrative Agent is not improperly granted rights in the Proposed Final Order vis-à-vis Popeyes in respect of its cure claim rights.

28.     Fourth, in Ordered paragraph 15(c), the Debtor added a clause to the beginning of the reservation of rights provision in respect of the Tri-Party Agreement that states: "Except as expressly set forth in Paragraphs 15(a) and (b) above, …."  This clause is improper for several reasons, including because the Proposed Final Order cannot and should not affect the rights of the parties under the Tri-Party Agreement.  The addition of this clause suggests that the Debtor is in fact seeking to affect the rights of the parties thereto, namely Popeyes.

29.     Lastly, as previewed above, the Proposed Budget fails to include the post-petition costs that the Debtor will be required to incur in connection with replacing its current "point of sale" system in each of the Restaurants by the target date of the end of June 2026.  Popeyes advised the Debtor on several occasions about the critical need to replace this system and to budget the costs associated therewith in the Proposed Budget.  The Debtor is aware that the contract for the existing vendor supporting the "point of sale" system that is currently being used by the Debtor expires in the late summer.   If the Debtor does not replace this system in a timely manner, which Popeyes understands requires a 12-week lead time, then the Debor will effectively not be able to operate its Restaurants and will be in default of its Franchise Agreements.  To be clear, Popeyes is not the one dictating the timing for the replacement of the "point of sale" system and does not have

the power to extend that deadline.  The obvious impact of not replacing this system will be, among other things, a loss of significant value in the upcoming sale process.  The Debtor has ignored Popeyes on this issue and, as a result, there is a significant and critical issue not covered by the Proposed Budget.

30.     Popeyes has advised the Debtor that the cost of replacing the "point of sale" system is estimated to be about $14,695 per Restaurant, or the approximate aggregate amount of $1.7 million for the Debtor's remaining Restaurants.  Moreover, the timeline to order and receive the equipment for such replacement, as well as to install the systems in time to make sure they work properly, requires that the Debtor commence the process immediately and work on it through the period covered by the Proposed Budget.  In fact, Popeyes is concerned that the Debtor is already behind in advancing this timeline and has advised the Debtor of that concern.

31.     Despite the above adverse ramifications that will flow from the Debtor's failure to pay for and install the new "point of sale" system, the Debtor's Proposed Budget does not contain any expenditures for the replacement of such system.   And despite repeated inquiries from Popeyes, the Debtor has not offered any explanation to Popeyes as to how it will deal with this issue.  The Debtor's failure to account for and deal with this significant issue is reckless and jeopardizes the value of this entire enterprise.

32.     As a result, the Court should not approve the Proposed Budget until the Debtor revises it to address and deal with the replacement of the "point of sale" system.

33.     Popeyes reserves its rights to raise further objections at the final hearing on the Cash Collateral Motion, including to supplement this Objection prior to and at the final hearing on the Cash Collateral Motion.

**WHEREFORE**, Popeyes Louisiana Kitchen, Inc., as the Debtor's franchisor, respectfully

requests that this Court require that the Proposed Final Order and the Proposed Budget be revised in accordance with the terms hereof, and for such further relief as the Court deems appropriate.

Dated: February 17, 2026.

**VENABLE LLP**
*Attorneys for Popeyes Louisiana Kitchen, Inc.*
801 Brickell Avenue, Suite 1500
Miami, Florida 33131
Telephone: 305.349.2300
Facsimile: 305.349.2310

By: */s/ Glenn D. Moses*
    Paul J. Battista, Esq.
    Florida Bar No. 884162
    Email: PJBattista@venable.com
    Glenn D. Moses, Esq.
    Florida Bar No. 174556
    Email: GMoses@venable.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 17, 2026, a true and correct copy of the foregoing document has been furnished via electronic mail by virtue of the Court's CM/ECF Filing System upon all interested parties registered to receive electronic notice on this matter.

By: */s/ Glenn D. Moses*
    Glenn D. Moses, Esq.

13

# **EXHIBIT A**

# **TRI-PARTY AGREEMENT**

## AMENDED AND RESTATED TRI-PARTY AGREEMENT

THIS AMENDED AND RESTATED TRI-PARTY AGREEMENT ("**Agreement**") is made as of October 18, 2016, by and between COMPASS BANK, as administrative agent for itself and certain other lenders (the "**Lenders**") to the extent and in the manner provided for within the hereinafter defined Loan Documents (in such capacity, together with its and their respective participants, successors and assigns, collectively, "**Administrative Agent**"), having an address of Two Alliance Center, 3560 Lenox Road, Suite #3050, Atlanta, Georgia 30326, Attn: Mike Mitchell, SAILORMEN, INC., a Florida corporation ("**Borrower**"), having an address of 9400 S. Dadeland, Suite 720, Miami, Florida 33156, Attn: Kara Nordstrom, INTERFOODS OF AMERICA, INC., a Nevada corporation ("**Parent**"), having an address of 9400 S. Dadeland, Suite 720, Miami, Florida 33156, Attn: Robert S. Berg, and POPEYES LOUISIANA KITCHEN, INC., a Minnesota corporation ("**Franchisor**"), having an address of 400 Perimeter Center Terrace, Suite 1000, Atlanta, Georgia 30346, Attn: Harold M. Cohen, General Counsel.

## RECITALS

A.    Borrower, as tenant, has entered into, or may hereafter enter into, certain leases (as amended, restated, modified or otherwise supplemented from time to time, each, a "**Lease**" and collectively, the "**Leases**") with certain landlords (each, a "**Landlord**" and collectively, the "**Landlords**"), pertaining to certain premises situated on certain real property described in such Leases (each individually, a "**Leasehold Property**" and collectively, the "**Leasehold Properties**"), including, without limitation those Leasehold Properties listed on **Exhibit A** attached hereto and incorporated herein by this reference (each such Leasehold Property listed on **Exhibit A** being identified by the word "Lease" in the column thereof entitled "Collateral Type").

B.    Borrower (or an affiliate of Borrower) is now, or may hereafter be, the owner of fee title to certain real properties (each individually, a "**Fee Property**" and collectively, the "**Fee Properties**"), including, without limitation those Fee Properties listed on **Exhibit A** attached hereto and incorporated herein by this reference (each such Fee Property listed on **Exhibit A** being identified by the word "Fee" in the column thereof entitled "Collateral Type") (the Fee Properties and the Leasehold Properties, together, each individually, a "**Property**" and collectively, the "**Properties**").

C.    Borrower and Franchisor have entered into, or may hereafter enter into, certain franchise agreements (each, as amended, renewed, extended or modified from time to time, a "**Franchise Agreement**" and collectively, the "**Franchise Agreements**") whereby Borrower is or will be the franchisee of Popeye's brand restaurants located at the Properties (each, a "**Restaurant**", and collectively the "**Restaurants**").

D.    Borrower, Steven M. Wemple ("**Wemple**") and Robert S. Berg ("**Berg**") have entered into that certain Operations and Management Agreement, dated March 4, 2011 (the "**Operations and Management Agreement**"), regarding the operations and management of Borrower and the Restaurants.

1

E.   Borrower, Parent and Franchisor have entered into that certain Reimage Agreement, dated August 5, 2016 (the "**Reimage Agreement**"), pursuant to which Borrower is required to complete certain reimaging and remodeling of the Properties in accordance with the schedule set forth therein.

F.   The Lenders may provide certain financing arrangements to Borrower (collectively, the "**Loan**") and enter into one or more swap transactions, cash management transactions or similar transactions arising out of the Loan relationship (collectively, "**Related Transactions**"), which will be evidenced and secured by, among other things, one or more promissory notes, deeds of trust or mortgages encumbering some or all of the Fee Properties and the improvements situated thereon (collectively, the "**Mortgages**"), and pledges of a first priority security interest in (i) all of Borrower's rights, title and interests in some or all of the Leases (the "**Pledged Leases**"), and (ii) any or all of Borrower's now owned or hereafter acquired general intangibles (including proceeds derived from the Franchise Agreements under Section 9-408 of the Uniform Commercial Code) and personal property, including, without limitation, machinery, equipment, inventory, fixtures or other property of any kind whatsoever which is or may be located on or about the Properties, but specifically excluding the Excluded Assets (as defined below) (collectively, the "**Pledged Assets**" and, together with the Pledged Leases and real property encumbered by the Mortgages, collectively, the "**Collateral**") (all of the foregoing instruments, together with all other instruments, documents and agreements entered into or delivered for the benefit of Administrative Agent in connection with the Loan, are collectively herein referred to as the "**Loan Documents**"). Notwithstanding the foregoing, the following intellectual property and other assets are specifically excluded from and shall not constitute any part of the Collateral: (i) the Franchise Agreements, and (ii) the names, trade name, service marks, logos, copyrights, trade secrets, formulae, recipes, franchise rights, copyrights, patents, permits and other intellectual property licenses, governmental authorizations and other marks, in each case under this clause (ii), owned or licensed by Franchisor under the Franchise Agreements or any other property constituting the proprietary system licensed by Franchisor under the Franchise Agreements, which includes, without limitation, the Marks and certain distinctive exterior and interior layouts, designs and color schemes, special recipes, menus and food and beverage items, and operating procedures of the Popeye's system and any and all features and components thereof and all similar rights and interests applied for, issued to or owned by Franchisor or used in the operation of the Popeye's restaurants and which are owned by Franchisor or licensed by Franchisor to Borrower under the Franchise Agreements (collectively, the "**Excluded Assets**").

G.   Parent has guaranteed the obligations of Borrower under the Loan Documents.

H.   Franchisor has, or may have, certain rights (together with any and all other statutory, common law, contractual, possessory and other rights, liens or encumbrances that Franchisor now has or may hereafter have against any or all of the Collateral, collectively, the "**Rights**"): (i) under the respective Leases or Franchise Agreements, by contract or otherwise, to assume such Leases or otherwise directly or indirectly acquire the right to occupy (or have one of its affiliates or another franchisee or other party assume such Leases or otherwise directly or indirectly acquire the right to occupy),

2

whether by assignment, license, lease, sublease or otherwise, the respective Leasehold Properties in the event Borrower defaults under the applicable Franchise Agreement and/or the applicable Franchise Agreements expire or are otherwise terminated or for any other reason; and/or (ii) under the respective Franchise Agreements, by contract or otherwise (whether contingent or automatic, and whether by right of first refusal or first offer, or otherwise), to acquire, by purchase or otherwise, certain rights, title and interests in and to the Fee Properties and/or the Pledged Assets.

I.    As a condition precedent to providing the Loan, Administrative Agent is requiring that Borrower obtain Franchisor's acknowledgement and agreement with respect to certain matters pertaining to the Franchise Agreements, the Rights, the Leases, the Properties and the Collateral, all as more particularly set forth in this Agreement. As a condition to Franchisor's delivery of this Agreement, Franchisor is requiring that Administrative Agent provide Franchisor certain rights to protect its interest in retaining franchised restaurants under its system in the markets where the Properties are located.

J.    It is the desire of the parties hereto to set forth their understandings and agreements regarding certain of their respective rights and obligations in connection with the Franchise Agreements, the Rights, the Leases, the Properties and the Collateral, all as more particularly set forth in this Agreement.

K.    Franchisor, Borrower, Parent and Administrative Agent (the "**Parties**") entered into that certain Tri-Party Agreement dated March 27, 2014 (the "**Existing Tri-Party Agreement**").  In connection with the refinancing of the Loan, the Parties desire to amend and restate the Existing Tri-Party Agreement on the terms and conditions set forth in this Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned parties, intending to be legally bound hereby, represent, acknowledge, confirm to one another and agree as follows, notwithstanding anything to the contrary that may be set forth in any of the Franchise Agreements, the Reimage Agreement or the Loan Documents:

1.    Recitals Incorporated. The foregoing Recitals are incorporated into this Agreement with the same force and effect as if set forth at length herein below, provided, however, Franchisor is not deemed hereby to make any representation or warranty with respect to the accuracy of any of the Recitals.

2.    Franchisor's Consent. Franchisor hereby consents to Administrative Agent: (i) obtaining a security interest in each component comprising the Collateral as aforesaid, provided that no such interest shall thereby attach to any of the Excluded Assets; (ii) recording such documents and instruments as Administrative Agent may deem necessary or desirable to create and perfect its liens and such security interests in the Collateral (collectively, the "**Liens**") provided that Franchisor is not required to be a party thereto; and (iii) subject to the rights of Franchisor as set forth in this Agreement, enforcing and foreclosing upon such Liens without any further consent of Franchisor, provided that

3

Franchisor shall not be made a party to any such enforcement or foreclosure without Franchisor's prior written consent in each instance, except to the extent required under applicable law in order for such foreclosure to extinguish Franchisor's Rights with respect to the applicable portion of the Collateral being foreclosed upon.

3. <u>Subordination</u>. Notwithstanding anything to the contrary set forth in any Franchise Agreement, or any Lease, Franchisor hereby agrees that all of the Rights (with respect to the Collateral only) are subject and subordinate (the "**Subordination**") to the Liens in favor of Administrative Agent on the Collateral and to Administrative Agent's rights and remedies under the Loan Documents with respect thereto, subject to the terms and conditions of this Agreement, so that as between Administrative Agent and Franchisor (and their permitted successors and assigns), the Liens of Administrative Agent in the Collateral shall be prior and superior to the liens and Rights of Franchisor in the Collateral. Franchisor further agrees that, upon the exercise by Administrative Agent of any or all of its rights and remedies under the Loan Documents with respect to the Collateral, the Rights with respect to any of the Collateral that is properly foreclosed upon such that Borrower has no further rights thereto shall terminate and be of no further force or effect and Administrative Agent or any other party taking possession of any portion of the Collateral by foreclosure, deed or assignment in lieu thereof shall take free and clear of the Rights (provided such party is not an affiliate of Borrower). The foregoing Subordination shall apply notwithstanding any contrary provision of the Uniform Commercial Code as enacted in the respective states where the Collateral is located, with respect to the attachment and relative priority of the Liens in the Collateral only. Except as otherwise expressly set forth herein, the Subordination is in favor of Administrative Agent and the Lenders only, and not in favor of any third parties or third party intervening liens. Notwithstanding anything to the contrary contained herein, the Subordination is expressly limited to the Liens in favor of Administrative Agent in the Collateral and the Subordination shall not operate to subordinate the Rights to any other liens or interests of any other party in or to any portion of the Collateral, whether or not such other liens or interests are senior or subordinate to the Liens of Administrative Agent in the Collateral. Upon repayment of the Loan in full and satisfaction of all other obligations of Borrower under the Loan Documents, including, without limitation, the obligations of Borrower under any Related Transactions, or if Borrower is otherwise released from its obligations of the Loan, the Subordination shall terminate and be of no further force or effect.

4. <u>Franchisor's Ability to Exercise the Rights</u>.  If any event shall occur giving rise to Franchisor's right to exercise any of its Rights, and if Franchisor shall desire to exercise the same, prior to Franchisor exercising such Rights, Franchisor shall notify Administrative Agent of its intention to do so and, in such event, Franchisor may exercise such Rights in accordance with their terms but only if Franchisor shall have first repaid the Loan in full and satisfied all other monetary obligations of Borrower under the Loan Documents, including, without limitation, the obligations of Borrower under any Related Transactions. Upon repayment of the Loan in full and satisfaction of all other monetary obligations of Borrower under the Loan Documents, including, without limitation, the obligations of Borrower under any Related Transactions, Administrative Agent shall release all Liens in favor of Administrative Agent encumbering the Collateral and

Franchisor may then exercise its Rights (in accordance with their terms) with respect to the Collateral.

5.    <u>Franchisor's Right to Cure Loan Defaults or Purchase the Loan</u>.    If Borrower defaults in its obligations under the Loan Documents, Administrative Agent shall notify Franchisor of such default and the then outstanding balance of the Loan (the "**Loan Default Notice**") and Franchisor shall have the following rights (but not the obligation) to:

(a)    prior to Administrative Agent accelerating the Loan, cure such default within the cure period set forth in the Loan Documents, provided that no failure of Administrative Agent to notify Franchisor shall constitute a waiver of such default, and no such failure shall invalidate any notice given to Borrower. In such event, all payments made by Franchisor to cure such default shall constitute additional indebtedness owed by Borrower under the Franchise Agreements; or

(b)    prior to Administrative Agent exercising any remedies under the Loan Documents, purchase each of the Lender's interests in the Loan by giving notice to Administrative Agent within fifteen (15) days after receipt of the Loan Default Notice that it desires to exercise such purchase option. If Franchisor delivers such notice within such period, Franchisor shall have until the date that is thirty (30) days after receipt of the Loan Default Notice (such period, the "**Standstill Period**") within which to complete the purchase of the Loan in accordance herewith. The purchase price of the Loan (the "**Purchase Price**") shall be an amount equal to the sum of (X) the aggregate outstanding principal amount of the Loan as of the date of the closing of the sale and assignment of the Loan, plus (Y) all accrued interest and other amounts due and owing under the Loan Documents (including, without limitation, any LIBOR breakage costs incurred by Administrative Agent or the Lenders in connection with such payment and any protective advances made by Administrative Agent under Loan Documents with respect to the Collateral, but excluding any default rate of interest or other penalties, attorney's fees or any prepayment premium). The closing of the sale and assignment of the Loan, Loan Documents and assignment of the Collateral shall occur by Franchisor's (or its assignee's) tender of the Purchase Price to Administrative Agent within the Standstill Period. Upon receipt of the Purchase Price, (i) each Lender shall immediately endorse (without recourse) and deliver the promissory note(s) in favor of such Lender evidencing the Loan made by such Lender to Franchisor or its assignee, and (ii) Administrative Agent shall assign and deliver all other Loan Documents and the Collateral in its possession to Franchisor or its assignee, and (iii) Administrative Agent and the Lenders, as applicable, shall execute and deliver such other instruments (e.g., UCC and mortgage assignments) as may be reasonably required to effect the transfer of the Loan, Loan Documents and the Collateral to Franchisor or its assignee so that Franchisor or its assignee succeeds to Administrative Agent's and the Lender's interests in the Loan, Loan Documents and the Collateral, all in form reasonably acceptable to Administrative Agent, the Lenders and Franchisor without representation or warranty (other than to represent and warrant that (A) the assignee is the legal and beneficial owner of the interest being assigned, (B) the outstanding amount of the Loan, and (C) that the assignee has not previously assigned or pledged the interests

being sold).

6.  <u>Administrative Agent's Right to Cure Franchise Agreement Defaults</u>. If Borrower defaults in its obligations to Franchisor under any of the Franchise Agreements or the Reimage Agreement, prior to taking any action to terminate any Franchise Agreement, Franchisor shall notify Administrative Agent of such default, and Administrative Agent shall have the right (but not the obligation) to cure such default within the cure period set forth in the applicable Franchise Agreement or Reimage Agreement, provided that no failure of Franchisor to notify Administrative Agent shall constitute a waiver of such default, and no such failure shall invalidate any notice given to Borrower. In such event, all payments made by Administrative Agent to cure such default shall constitute additional indebtedness owed by Borrower under the Loan.

7.  <u>No Right to Act as Popeye's Franchisee</u>. Notwithstanding anything to the contrary contained herein, Administrative Agent shall not have any right to act as a franchisee of Franchisor or to operate a Popeye's brand restaurant on any Property without Franchisor's prior written consent, which consent may be granted or withheld by Franchisor in its sole good faith discretion applying the credit, financial, operational, historical experience and other standards Franchisor normally applies when evaluating potential franchisees or considers granting additional Franchise Agreements or Restaurants to existing franchisees. Notwithstanding the foregoing, upon taking possession of one or more of the Restaurants by foreclosure, deed or assignment in lieu thereof, appointment of a receiver or otherwise, Administrative Agent may either (i) request that Franchisor manage such Restaurant(s) pursuant to the terms of a management agreement reasonably acceptable to both Franchisor and Administrative Agent (provided that Franchisor shall be under no obligation to agree to manage such Restaurant(s)), or (ii) cause the Restaurant(s) to be managed by a management company approved by Franchisor, such approval not to be unreasonably withheld, conditioned or delayed.

8.  <u>Cooperation</u>. Franchisor and Administrative Agent further covenant and agree that in the event that an event of default shall occur under the Loan Documents, Franchisor and Administrative Agent shall cooperate with each other in a commercially reasonable manner.

9.  <u>De-Identification of Restaurants</u>. If Franchisor terminates any Franchise Agreement, Franchisor shall have the right to enter the applicable Restaurant and de-identify the improvements located thereon in accordance with the applicable Lease and Franchise Agreement and otherwise remove or dispose of any Excluded Assets, such right to be exercised, if at all, on or before the date that is the later of (1) ninety (90) days after the date of termination of the applicable Franchise Agreement, and (2) such later date to which Administrative Agent may agree in writing to extend such period. Franchisor shall use commercially reasonable efforts to minimize any damage to any Property caused by such entry and shall repair any damage caused by Franchisor's or its agents negligence or willful misconduct.

10. <u>Notices</u>. All notices, requests or demands and other communications hereunder shall be in writing; delivered by overnight delivery service or mailed to the intended recipient at

the party's address specified above. Such notices, requests, demands and other communications shall be deemed to have been fully given when delivered by a nationally reputable overnight delivery service or, in the case of mailed notices, three (3) business days after such notice is enclosed in a properly sealed and addressed envelope and deposited in a post office or collection facility regularly maintained by the United States Postal Service (registered or certified mail, return receipt requested, postage and certification or registration prepaid). Any party may change its address for the purpose of notice to any other address by giving notice in accordance with the foregoing provisions.

11. <u>Representations and Warranties</u>.

(a)      To the best of Franchisor's actual knowledge, without any duty of investigation or inquiry, Franchisor represents as of the date hereof, that: (i) Franchisor is not in breach or default under any of the material terms and conditions of any of the Franchise Agreements that would likely give rise to termination of any Franchise Agreement; (ii) Borrower is not in breach or default of (1) any of Borrower's obligations under any of the Franchise Agreements to make royalty or advertising fund payments, (2) any of Borrower's other monetary or non-monetary obligations under any of the Franchise Agreements, (3) any of Borrower's obligations under the Reimage Agreement, that would likely give rise to termination of any Franchise Agreement, or (4) the Operations and Management Agreement; and (iii) for each of the Restaurants listed on **Exhibit B** hereto (the "**Reimaged Restaurants**"), the improvements required under the Reimage Agreement have not been completed as of the date hereof and must be completed by Borrower and approved by Franchisor no later than the date set forth on **Exhibit B** for such Reimaged Restaurant; provided, that, the Reimaged Restaurants set forth on **Exhibit B** can be adjusted by Borrower from time to time, without amendment to **Exhibit B**, provided the total number of Reimaged Restaurants to be completed by a given date remains the same. For purposes of clarification, although **Exhibit B** identifies particular locations to be completed by particular dates, Borrower need not complete any particular location by the date specified, so long as the total number of Reimaged Restaurants completed by a given date is the same as the number of Reimaged Restaurants contemplated to be completed by such date on **Exhibit B**. As of the date hereof, to the knowledge of Franchisor, Borrower is behind schedule of its obligations under the Reimage Agreement, but Borrower has informed Franchisor that it intends to satisfy its obligations thereunder on or before December 25, 2016. Franchisor further represents that Franchisor is the current holder of the Franchisor's interest under all of the Franchise Agreements subject to any pledge of rights to Franchisor's lenders under its credit facility. As used herein, Franchisor's actual knowledge shall mean the present and actual knowledge of Harold M. Cohen, General Counsel of Franchisor.

(b)      To the best of Borrower's knowledge, Borrower represents and warrants that: (i) neither Franchisor nor Borrower is in breach or default in any material respect under any of the terms and conditions of any of the Franchise Agreements; (ii) except as set forth in the Reimage Agreement, no event or circumstance has occurred or exists which, with the passage of time and/or the giving of notice or both, would constitute a material breach or default under any of the Franchise Agreements; (iii) neither Franchisor nor Borrower has given or received any notice of any breach or default under any of the Franchise

Agreements which has not heretofore been satisfactorily cured; (iv) neither Borrower nor Wemple nor Berg is in default under the terms of the Operations and Management Agreement; and (v) the Franchise Agreements and the documents referenced therein and any amendments thereto or extensions thereof, constitute the entire agreement and understanding between Franchisor and Borrower with respect to the Properties. Borrower further represents and warrants that Borrower has delivered true and correct copies of each Lease and each Franchise Agreement to Administrative Agent to the extent the same are in Borrower's possession.

12.   <u>Material Inducement; Reliance; Successors and Assigns</u>.   This Agreement, and the representations and agreements made herein, are given with the understanding that: (i) this Agreement constitutes a material inducement for Administrative Agent to provide the Loan to Borrower and for Franchisor to grant the Subordination; (ii) Administrative Agent shall rely on this Agreement in providing the Loan to Borrower; and (iii) this Agreement shall be binding upon and inure to the benefit of each of the undersigned parties' respective successors and assigns.

13.   <u>Estoppels</u>.   Within ten (10) business days after Franchisor's receipt of a request by written notice from Administrative Agent, Franchisor shall deliver an estoppel letter to Administrative Agent (i) stating whether to the best of Franchisor's knowledge, Borrower is in breach or default under any of the material terms and conditions of any of the Franchise Agreements, the Reimage Agreement, the Operations and Management Agreement or any other agreement that would likely give rise to termination of any Franchise Agreement (and, if in default, specifying any default thereunder), and (ii) certifying the status, as of the date of such estoppel, of the completion of improvements at, and issuance of renewal Franchise Agreements for, the Reimaged Restaurants. Within ten (10) business days after Administrative Agent's receipt of a request by written notice from Franchisor, Administrative Agent shall deliver an estoppel letter to Franchisor stating (i) whether to the best of Administrative Agent's knowledge, Borrower is in compliance in all material respects with the Loan Documents (and, if not, specifying any default thereunder), (ii) the amount of the Loan outstanding as of the date of such letter, and (iii) a list of any Related Transactions entered into and outstanding as of the date of such letter. The foregoing estoppel letters shall run only to the benefit of and may be relied upon only by, the party to whom it is addressed and shall not alter, evidence or modify the obligations of Borrower. Neither Administrative Agent nor Franchisor shall request such estoppels more than two times per calendar year.

14.   <u>Consent and Indemnification</u>.   Prior to the date that (i) Borrower has completed all improvements to the Reimaged Restaurants required under the Reimage Agreement, and (ii) such improvements have been approved by the Franchisor (the "**Reimage Period**"), Borrower and Parent hereby irrevocably consent to the sharing of information by and between Franchisor and Administrative Agent regarding the Franchise Agreements, the Reimage Agreement, the Operations and Management Agreement and the Properties, including, without limitation, notices of default and other notices to Borrower under the Franchise Agreements, the Reimage Agreement or the Operations and Management Agreement, and copies of marketing status and/or improvement status reports for the Restaurants delivered by Borrower to Franchisor or Administrative Agent (collectively

8

the "**Shared Information**"). Borrower and Parent, for themselves and on behalf of their respective officers, directors, shareholders, partners, members, employees and agents (collectively the "**Indemnitors**"), hereby release Franchisor and Administrative Agent, and their respective officers, directors, shareholders, partners, members, employees, agents, successors and assignees (collectively the "**Indemnified Parties**") from, and indemnify and agree to hold the Indemnified Parties harmless from and against, any and all actions, causes of action, suits, claims, costs, liabilities, damages, expenses and demands whatsoever, whether known or unknown, developed or undeveloped, in law or in equity, in tort or contract, which any of the Indemnitors now has, ever had, or shall have against any of the Indemnified Parties arising out of the Shared Information or any communications between the Indemnified Parties with respect thereto during the Reimage Period (the "**Claims**"). Each of the Indemnitors hereby covenants and agrees not to sue any of the Indemnified Parties with respect to any of the Claims. The agreements by the Indemnitors in this Section shall survive the expiration or termination of the Reimage Period.

15.    <u>Confidentiality</u>. Administrative Agent and Borrower agree this Agreement is delivered by Franchisor on the understanding that neither this Agreement, nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person except (a) to Administrative Agent's and Borrower's officers and professional advisors who are directly involved in the consideration of this matter, (b) as may be compelled in a judicial or administrative proceeding or as otherwise required by law, (c) with respect to Administrative Agent, to prospective participants and other prospective lenders (and their officers and professional advisors) in connection with the sale or potential sale of any interest or participation in the Loan, (d) to the various lenders and advisors who will have access to all of the Loan Documents, (e) to regulatory officials, and (f) to rating agencies if requested or required by such agencies in connection with a rating relating to the Loan.

16.    <u>GOVERNING LAW; JURISDICTION</u>.

(A)    THE PARTIES HEREBY AGREE THAT, IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF ANY LIEN AND SECURITY INTEREST SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE APPLICABLE COLLATERAL IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE

CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF THIS AGREEMENT AND ALL OF THE OBLIGATIONS ARISING HEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, AND THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(B)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY PARTY HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT ADMINISTRATIVE AGENT'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN FULTON COUNTY, GEORGIA, AND EACH PARTY HERETO HEREBY WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

17.    <u>Modification</u>. This Agreement may not be modified or otherwise changed without an express written agreement executed by each of the parties hereto.

18.    <u>Counterparts</u>. This Agreement may be executed in counterparts, all of which shall be deemed originals and shall collectively constitute one instrument.

19.    <u>Amendment and Restatement</u>.  This Agreement is an amendment and restatement of the Existing Tri-Party Agreement in its entirety.  Accordingly, the parties acknowledge and agree that the Existing Tri-Party Agreement is hereby superseded and replaced by this Agreement from and after the date of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have signed this Agreement on the day and date above written.

**FRANCHISOR:**
POPEYES LOUISIANA KITCHEN, INC.,
a Minnesota corporation

By: _____
Name:  Steven J. Fricker
Title:    Senior Vice President, Development

**ADMINISTRATIVE AGENT:**
COMPASS BANK,
an Alabama banking corporation

By: _____
Name:  Michael Mitchell
Title:    Sr. Vice President

**BORROWER:**
SAILORMEN, INC.,
a Florida corporation

By: _____
Name: _____
Title: _____

**PARENT:**
INTERFOODS OF AMERICA, INC.,
a Nevada corporation

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have signed this Agreement on the day and date above written.

**FRANCHISOR:**
POPEYES LOUISIANA KITCHEN, INC.,
a Minnesota corporation


By: _____
Name: _____
Title: _____

**ADMINISTRATIVE AGENT:**
COMPASS BANK,
an Alabama banking corporation


By: _____
Name:  Michael Mitchell
Title:   Sr. Vice President

**BORROWER:**
SAILORMEN, INC.,
a Florida corporation


By: _____
Name: _____
Title: _____

**PARENT:**
INTERFOODS OF AMERICA, INC.,
a Nevada corporation


By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have signed this Agreement on the day and date above written.

**FRANCHISOR:**
POPEYES LOUISIANA KITCHEN, INC.,
a Minnesota corporation

By: _____
Name: _____
Title: _____

**ADMINISTRATIVE AGENT:**
COMPASS BANK,
an Alabama banking corporation

By: _____
Name: Michael Mitchell
Title:  Sr. Vice President

**BORROWER:**
SAILORMEN, INC.,
a Florida corporation

By: _____
Name: Kara Nordstrom
Title: CEO

**PARENT:**
INTERFOODS OF AMERICA, INC.,
a Nevada corporation

By: _____
Name: Steven Wemple
Title: Director

IN WITNESS WHEREOF, the parties have signed this Agreement on the day and date above written.

**FRANCHISOR:**
POPEYES LOUISIANA KITCHEN, INC.,
a Minnesota corporation

By: _____
Name: _____
Title: _____

**ADMINISTRATIVE AGENT:**
COMPASS BANK,
an Alabama banking corporation

By: _____
Name: Michael Mitchell
Title:  Sr. Vice President

**BORROWER:**
SAILORMEN, INC.,
a Florida corporation

By: _____
Name: _Kara Nordstrom_
Title: _CEO_

**PARENT:**
INTERFOODS OF AMERICA, INC.,
a Nevada corporation

By: _____
Name: _Steven Wemple_
Title: _Director_

EXHIBIT A

LIST OF FEE AND LEASEHOLD PROPERTIES

| Sailormen No. | Franchisor Store No. | Address | City | State | Collateral Type |
|---|---|---|---|---|---|
| 55 | 5536 | 27101 S. Dixie Hwy. | Naranja | FL | Fee |
| 56 | 2045 | 5351 I-55, North Frontage Road | Jackson | MS | Fee |
| 58 | 4034 | 2505 Hwy 80 West | Jackson | MS | Fee |
| 59 | 2409 | 4337 Robinson Road | Jackson | MS | Fee |
| 61 | 2661 | 986 High Street | Jackson | MS | Fee |
| 62 | 2846 | 3085 Terry Road | Jackson | MS | Fee |
| 63 | 2955 | 4725 Clinton Boulevard | Jackson | MS | Fee |
| 66 | 2173 | 405 Riverwind Drive | Pearl | MS | Lease |
| 67 | 2904 | 1176 US Highway 49 South | Richland | MS | Fee |
| 69 | 4535 | 1000 Topps Street | Flowood | MS | Fee |
| 70 | 2451 | 1074 East County Line Road | Ridgeland | MS | Lease |
| 77 | 3790 | 671 Highway 6 East | Batesville | MS | Lease |
| 81 | 3852 | 524 U.S. Highway 82 West | Indianola | MS | Fee |
| 87 | 2781 | 501 West California Avenue | Ruston | LA | Lease |
| 92 | 3179 | 1713 Highway 165 South | Monroe | LA | Lease |
| 99 | 4901 | 5950 Park Blvd. | Pinellas Park | FL | Fee |
| 149 | 1194 | 649 S. McDuff Ave | Jacksonville | FL | Fee |
| 153 | 2213 | 1833 Kings Rd | Jacksonville | FL | Fee |
| 157 | 438 | 1902 N. Main St. | Jacksonville | FL | Fee |
| 159 | 426 | 656 Edgewood Ave. N | Jacksonville | FL | Fee |
| 160 | 2459 | 2143 Edgewood Ave | Jacksonville | FL | Fee |
| 168 | 5730 | 26174 Hwy 27 | Crystal Springs | MS | Lease |
| 1 | 2110 | 5534 NW 7th Avenue | Miami | FL | Lease |
| 2 | 2137 | 2490 NW 79th Street | Miami | FL | Lease |
| 3 | 2198 | 3285 NW 183rd Street | Carol City | FL | Lease |
| 4 | 2130 | 11205 SW 152nd Street | MIami | FL | Lease |
| 5 | 4240 | 130 NE 8th Street | Homestead | FL | Lease |
| 6 | 2323 | 1695 NW 103rd Street | Miami | FL | Lease |
| 7 | 2339 | 1355 W. Sunrise Blvd. | Ft. Lauderdale | FL | Lease |
| 8 | 2450 | 12100 NW 7th Avenue | North Miami | FL | Lease |
| 9 | 2563 | 20690 NW 2nd Avenue | Miami | FL | Lease |
| 10 | 2648 | 233 W. Hillsboro Blvd. | Deerfield Beach | FL | Lease |
| 11 | 2647 | 1501 NW 20th Street | Miami | FL | Lease |
| 12 | 2176 | 3291 W. Broward Blvd. | Ft. Lauderdale | FL | Lease |
| 13 | 2131 | 4020 Airport Highway | Birmingham | AL | Lease |
| 14 | 2273 | 932 9th Avenue North | Bessemer | AL | Lease |

| 15 | 2456 | 725 11th Court West | Birmingham | AL | Lease |
|---|---|---|---|---|---|
| 16 | 2502 | 2233 Bessemer Road | Birmingham | AL | Lease |
| 17 | 4754 | 3499 W. Oakland Park Blvd. | Lauderdale Lakes | FL | Lease |
| 18 | 4696 | 1000 NE 163rd Street | N. Miami Beach | FL | Lease |
| 19 | 2224 | 1601 South US Highway 1 | Ft. Pierce | FL | Lease |
| 28 | 2049 | 3411 N. Pace Blvd. | Pensacola | FL | Lease |
| 29 | 2086 | 814 E. Cervantes Street | Pensacola | FL | Lease |
| 30 | 2175 | 711 N. Navy Blvd. | Pensacola | FL | Lease |
| 31 | 2762 | 312 E. Nine Mile Road | Pensacola | FL | Lease |
| 52 | 4815 | 1717 Finley Blvd. | Birmingham | AL | Lease |
| 53 | 4865 | 361 Palisades Blvd. | Birmingham | AL | Lease |
| 54 | 4822 | 107 S 25th Street | Ft. Pierce | FL | Lease |
| 60 | 2560 | 324 West Northside Drive | Jackson | MS | Lease |
| 64 | 3283 | 5583 I-55, South Frontage Road | Byram | MS | Lease |
| 65 | 3559 | 485 Springridge Road | Clinton | MS | Lease |
| 68 | 4152 | 1410 West Government Street | Brandon | MS | Lease |
| 71 | 3124 | 1418 West Peace Street | Canton | MS | Lease |
| 72 | 3431 | 1061 Highway 51 North | Madison | MS | Lease |
| 73 | 2862 | 3309 Pemberton Square Blvd. | Vicksburg | MS | Lease |
| 74 | 2185 | 991 Brookway Boulevard | Brookhaven | MS | Lease |
| 75 | 2138 | 1320 Delaware Avenue | McComb | MS | Lease |
| 76 | 2141 | 848 Highway 98 Bypass | Columbia | MS | Lease |
| 78 | 3155 | 53 Davis Avenue | Cleveland | MS | Lease |
| 79 | 2190 | 717 S. State Street | Clarksdale | MS | Lease |
| 82 | 2480 | 1983 Hwy 32 East | Greenville | MS | Lease |
| 83 | 3087 | 1701 South Gloster | Tupelo | MS | Lease |
| 84 | 4497 | 222 Highway 45 North Alt. | West Point | MS | Lease |
| 85 | 2786 | 1535 Highway 45 North | Columbus | MS | Lease |
| 86 | 4706 | 814 Alternate Hwy 12 West | Starkville | MS | Lease |
| 88 | 2055 | 1950 Louisville Avenue | Monroe | LA | Lease |
| 89 | 2074 | 700 Highway 165 North | Monroe | LA | Lease |
| 90 | 2156 | 210 Thomas Road | West Monroe | LA | Lease |
| 93 | 4723 | 2201 E. Hillsborough | Tampa | FL | Lease |
| 94 | 4962 | 5156 S. Dale Mabry | Tampa | FL | Lease |
| 95 | 5321 | 2216 E.Fletcher Avenue | Tampa | FL | Lease |
| 96 | 2255 | 2619 W.Waters Ave | Tampa | FL | Lease |
| 97 | 2265 | 2337 Green St. | Tampa | FL | Lease |
| 100 | 2153 | 108 S. Kings Ave. | Brandon | FL | Lease |
| 101 | 2939 | 2005 S. Frontage Rd. | Plant City | FL | Lease |
| 102 | 4261 | 12131 South Orange Blossom Trail | Orlando | FL | Lease |
| 103 | 2348 | 324 W. Vine St. | Kissimmee | FL | Lease |

| 104 | 4904 | 2550 N. US Hwy. 98 | Lakeland | FL | Lease |
| 105 | 2600 | 1148 Hwy 27 | Haines City | FL | Lease |
| 106 | 4806 | 25 6th St. SW | Winter Haven | FL | Lease |
| 107 | 2606 | 1035 Lee Rd | Orlando | FL | Lease |
| 109 | 8981 | 5760 South Orange Blossom Trail | Orlando | FL | Lease |
| 110 | 2088 | 600 S. Orlando Ave. | Winter Park | FL | Lease |
| 112 | 2689 | 613 N. 14th St. | Leesburg | FL | Lease |
| 113 | 2252 | 1713 S. Pine St. | Ocala | FL | Lease |
| 114 | 2896 | 402 E. Main St. | Apopka | FL | Lease |
| 115 | 166 | 3981 Columbia St. | Orlando | FL | Lease |
| 116 | 2299 | 5700 Lake Underhill | Orlando | FL | Lease |
| 117 | 2347 | 460 W. SR 436 | Altamonte Springs | FL | Lease |
| 118 | 2885 | 2225 W. New Haven Ave. | Melbourne | FL | Lease |
| 119 | 2500 | 116 W. Merritt Island Cswy. | Merritt Island | FL | Lease |
| 120 | 2186 | 5245 W. Colonial Dr | Orlando | FL | Lease |
| 121 | 2250 | 45 North Orange Blossom Trail | Orlando | FL | Lease |
| 122 | 2187 | 6725 Sand Lake Rd | Orlando | FL | Lease |
| 123 | 2894 | 81 Geneva Dr. | Oviedo | FL | Lease |
| 124 | 2804 | 2660 Hwy. 17-92 | Sanford | FL | Lease |
| 125 | 2300 | 101 N. Ridgewood Ave. | Daytona Beach | FL | Lease |
| 126 | 2503 | 928 N. Wooland Blvd. | Deland | FL | Lease |
| 127 | 3799 | 2561 Enterprise Rd. | Orange City | FL | Lease |
| 128 | 2646 | 1412 N. Main St | Gainesville | FL | Lease |
| 129 | 4214 | 1050 S. Walnut St. | Starke | FL | Lease |
| 130 | 2594 | 430 Blanding Blvd | Orange Park | FL | Lease |
| 131 | 716 | 205 W. Duval St. | Lake City | FL | Lease |
| 132 | 4262 | 710 Hwy 19 S. | Palatka | FL | Lease |
| 136 | 4710 | 3246 Mercer Univ. Dr. | Macon | GA | Lease |
| 137 | 4573 | 742 Shurling Dr | Macon | GA | Lease |
| 138 | 4000 | 744 Russell Pkwy | Warner Robins | GA | Lease |
| 139 | 918 | 813 Lake Bradford Rd | Tallahassee | FL | Lease |
| 140 | 2272 | 491 W. Tennessee St. | Tallahassee | FL | Lease |
| 141 | 2895 | 3511 Thomasville Rd | Tallahassee | FL | Lease |
| 142 | 4574 | 2119 Bemiss Rd. | Valdosta | GA | Lease |
| 143 | 4624 | 2525 E. Pinetree Blvd. | Thomasville | GA | Lease |
| 144 | 927 | 3319 Altama Ave | Brunswick | GA | Lease |
| 145 | 2537 | 1817 Glynn Ave | Brunswick | GA | Lease |
| 146 | 1097 | 7507 Atlantic Blvd. | Jacksonville | FL | Lease |
| 148 | 2259 | 5715 Normandy Blvd. | Jacksonville | FL | Lease |
| 150 | 1369 | 6310 103rd St | Jacksonville | FL | Lease |
| 151 | 2519 | 1324 Dunn Ave | Jacksonville | FL | Lease |

| 152 | 405 | 8007 Normandy Blvd. | Jacksonville | FL | Lease |
| 154 | 2078 | 1509 University Blvd | Jacksonville | FL | Lease |
| 155 | 2808 | 10132 San Jose Blvd. | Jacksonville | FL | Lease |
| 156 | 2465 | 524 Atlantic Blvd. | Jacksonville | FL | Lease |
| 161 | 285 | 7606 Lem Turner Rd. | Jacksonville | FL | Lease |
| 162 | 2350 | 4108 University Blvd. S | Jacksonville | FL | Lease |
| 163 | 140 | 5581 Soutel Dr | Jacksonville | FL | Lease |
| 167 | 6089 | 18403 S. Dixie Hwy. | Miami | FL | Lease |
| 170 | 3593 | 615 East Oglethorpe Ave. | Hinesville | GA | Lease |
| 171 | 8782 | 2701 East Busch Blvd. | Tampa | FL | Lease |
| 173 | 10709 | 747 Sunset Drive. | Grenada | MS | Lease |
| 177 | 11707 | 12001 East Colonial Drive | Orlando | FL | Lease |
| 178 | 11853 | 1678 Taylor Road | Port Orange | FL | Lease |

*New franchised location currently being constructed at 10945 West Colonial Highway, Ocoee, FL.

EXHIBIT B

LIST OF RESTAURANTS

| Unit | Mailing Address | City | State | Reimage Commitment Date |
|---|---|---|---|---|
| 2088 | 600 S Orlando Ave | Winter Park | FL | 9/30/2016 |
| 2110 | 5534 NW 7th Ave | Miami | FL | 8/15/2016 |
| 2137 | 2490 NW 79th Street | Miami | FL | 9/20/2016 |
| 2176 | 3291 W Broward Blvd | Ft Lauderdale | FL | 11/1/2016 |
| 2323 | 1695 NW 103rd St | Miami | FL | 12/13/2016 |
| 2648 | 233 W Hillsboro Blvd | Deerfield Beach | FL | 11/11/2016 |
| 4000 | 744 Russell Pkwy | Warner Robins | GA | 10/20/2016 |
| 4710 | 3246 Mercer University Dr | Macon | GA | 11/18/2016 |
| 10709 | 747 Sunset Dr (8/27/2007) | Grenada | MS | 12/8/2016 |
| 2187 | 6725 W Sand Lake Rd (5/17/1990) | Orlando | FL | 12/25/2016 |
| 2661 | 986 High St (9/7/1985) | Jackson | MS | 12/25/2016 |
| 4240 | 130 NE 8th Street (9/7/1997) | Homestead | FL | 12/25/2016 |
| 4497 | 222 Highway 45 N (2/27/1998) | West Point | MS | 12/25/2016 |