UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                                      Chapter 11

SAILORMEN, INC.,                                   Case No. 26-10451-RAM

   Debtor.[1]
_____ /

**MOTION OF THE DEBTOR AND DEBTOR-IN-POSSESSION FOR ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) APPROVING THE FORM OF ASSET PURCHASE AGREEMENT; (III) AUTHORIZING THE DEBTOR TO ENTER INTO STALKING HORSE AGREEMENTS AND APPROVING BID PROTECTIONS FOR ANY STALKING HORSE BIDDERS; (IV) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (V) SCHEDULING AN AUCTION FOR, AND HEARING TO APPROVE, THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (VI) APPROVING THE FORM AND MANNER OF SALE NOTICE; AND (VII) GRANTING RELATED RELIEF**

---

**Contemporaneously with the filing of this Bidding Procedures Motion, the Debtor is submitting an *ex parte* motion to shorten the notice period for this Bidding Procedures Motion to seven (7) days. All of the major parties-in-interest consent to this shortened notice period, including PLKI, the Creditors' Committee, and the Prepetition Agent, in order for this Bidding Procedures Motion to be set for hearing at 10:00 a.m. on March 20, 2026.**

**The Debtor has requested in the *Ex Parte Motion by the Debtor and Debtor-in-Possession to Shorten Notice Period for Debtor's Bidding Procedures Motion* that the Court extend the response deadline set by Local Rule 5005-1, such that any objection to this Bidding Procedures Motion must be filed by 12:00 p.m. on March 19, 2026.**

---

Sailormen, Inc., the debtor and debtor-in-possession in the above-captioned chapter 11 case

(the "**Debtor**"), by its undersigned counsel, pursuant to Sections 105(a), 363, and 365 of Title 11

---

[1] The Debtor in this Chapter 11 case and the last four digits of its federal tax identification number are Sailormen, Inc. (5214). The location of the Debtor's corporate headquarters and the Debtor's service address in this chapter 11 case is Miami, Florida.

of the United States Code (11 U.S.C. §§ 101, *et seq.*) (the "**Bankruptcy Code**") and Rules 2002,

6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), hereby

moves the Court (the "**Bidding Procedures Motion**" or the "**Motion**") for entry of an order,

substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"):

(i)     authorizing and approving certain proposed bidding and sale procedures, substantially in the form of those attached as **Exhibit 1** to the Bidding Procedures Order (the "**Bidding Procedures**"), for the sale of all or substantially all of the Debtor's assets (the "**Purchased Assets**") free and clear of all liens, claims, encumbrances, and interests (the "**Sale**");

(ii)    approving the form asset purchase agreement (the "**Form APA**"), attached hereto as **Exhibit B**, to be used in connection with the solicitation of bids;

(iii)   authorizing the Debtor to enter into one or more Stalking Horse Agreements (defined below) and approving certain proposed bid protections (the "**Bid Protections**") for any Stalking Horse Bidder(s) (defined below);

(iv)    authorizing and approving procedures for assumption and assignment of unexpired leases proposed to be assumed and assigned ("**Proposed Assumed Leases**") and the determination of amounts necessary to cure any arrearages thereunder (the "**Cure Costs**"), and approving the form and manner of notice of assumption and/or assignment (the "**Cure Notice**");

(v)     scheduling (a) an auction for the sale of the Purchased Assets (as further described below, the "**Auction**"), and (b) a hearing to consider the approval of the sale of the Purchased Assets to the Stalking Horse Bidder(s) or, in the event of an Auction, to the Successful Bidder(s) (defined below), as well as to resolve any objections to the assumption and assignment of the Proposed Assumed Leases (the "**Sale Hearing**");

(vi)    approving the form and manner of the notice of Sale (the "**Sale Notice**"); and

(vii)   granting related relief.

In support of the Motion, the Debtor relies upon and hereby incorporates by reference the

*Declaration of David Baker in Support of First-Day Motions* [ECF No. 9] (the "**Baker**

**Declaration**").[2]  In further support of this Motion, the Debtor respectfully states as follows:

---

[2]   All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Baker Declaration.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this Bidding Procedures Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested in this Bidding Procedures Motion are Sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 6006.

**BACKGROUND**

4. On January 15, 2026 (the "**Petition Date**"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

5. The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. On February 12, 2026, the United States Trustee appointed an official committee of unsecured creditors (the "**Creditors' Committee**").

7. No request for a trustee or examiner has been made in this chapter 11 case.

8. Further information regarding the Debtor's business, capital structure, and the circumstances leading to the commencement of this chapter 11 case is set forth in the Baker Declaration.

**I.    Overview of the Debtor's Business.**

9. Founded in 1984 for the purpose of owning and operating Popeyes restaurants (collectively, the "**Restaurants**" or "**Stores**" and each, a "**Restaurant**" or "**Store**") as a franchisee pursuant to a franchise agreement with Popeyes Louisiana Kitchen, Inc. ("**PLKI**"), the Debtor was acquired by Bob Berg and Steve Wemple in July 1987. At the time, Sailormen operated 11 Popeyes

stores in the Miami, Florida area. Through relocations and organic growth, Sailormen grew its portfolio to 15 stores by the end of 1995.  In late 1995, Sailormen acquired 5 underperforming stores in Birmingham, Alabama. From 1996 until the end of 2000,  Sailormen successfully completed eight additional acquisitions, ranging in size from a single unit to 72 units, and established itself in several new markets, operating in seven states: (i) Florida, (ii) Alabama, (iii) Georgia, (iv) Illinois, (v) Louisiana, (vi) Missouri, and (vii) Mississippi.  Between 2012 and 2018, Sailormen exited the markets in Alabama, Illinois, Louisiana, Missouri, and Mississippi to concentrate on development in Florida and Georgia. At the time of the filing of this Motion, Sailormen operates 119 Popeyes Restaurants in Florida and Georgia.

10.     Interfoods of America, Inc, a Nevada Corp., owns 100% of the outstanding capital stock of Sailormen.

## II.     **Events Leading to Chapter 11 Filing.**

11.     Like many other businesses, and particularly restaurants, the Debtor has faced significant challenges over the past 12 months. Various macroeconomic factors have caused tremendous uncertainty and disruption within the business.  Those factors include, among others, the trailing national impact of the COVID-19 pandemic on restaurant operations, consumer choice, high inflation, increased borrowing rates, and an increasingly limited qualified labor force.

12.     Due to low performance and increasing losses, the Debtor made the difficult decision to sell 16 restaurants in an attempt to improve its financial performance and to stabilize the business, but the purchaser subsequently closed, and the Debtor remained liable on the lease guarantees.  Unfortunately, these cost-cutting measures have not been sufficient to stabilize the Debtor's financial situation. As of the Petition Date, the Debtor had fallen behind on rent payments to several landlords as well.

4

13.     Facing increased pressure from landlords, vendors, and BMO, as further described in the Baker Declaration, the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code in this Court to preserve the value of the Debtor's business and assets as a going concern, and to maximize value for the benefit of creditors and other parties in interest.  In consultation with its professionals, the Debtor has determined that the best possible path to maximizing estate value and providing a return to parties in interest is a well-marketed sale of substantially all of the Debtor's assets pursuant to Section 363(b) of the Bankruptcy Code.

### III.     Post-Petition Marketing Efforts.

14.     On March 3, 2026, the Debtor filed its *Expedited Application to Employ Peak Franchise Capital LLC as Investment Banker to the Debtor* [ECF No. 288] (the "**Peak Employment Application**"), seeking to retain Peak Franchise Capital LLC ("**Peak**") to commence a postpetition marketing process and to solicit interest for the purchase of the Debtor's assets (along with the Bidding Procedures, the "**Sale Process**").  The Court has scheduled a hearing to consider the Peak Employment Application for March 20, 2026.  In the meantime, Peak is in the process of familiarizing itself with the Debtor's business and, along with Aurora, assisting in developing a financial model and furnishing a virtual data room (the "**Data Room**") for the review of potentially interested bidders (the "**Potential Bidders**").  Provided that the Peak Employment Application is granted, Peak will engage in a robust and sophisticated marketing campaign designed to maximize the value of the Debtor's estate and the return to creditors.

15.     To that end, Peak will begin soliciting interest by preparing and distributing a one-page "teaser" document, describing the history of the Debtor's businesses and key financial metrics to Potential Bidders, including "strategic" Potential Bidders, *i.e.*, competitors and those already engaged in a business similar or adjacent to the Debtor's business and "financial" Potential

Bidders, *i.e.*, private equity and other firms engaged in the business of buying companies in and out of distressed situations.  Peak will further prepare a confidential information memorandum providing a detailed overview of the Debtor's financial records and certain projections designed to permit Potential Bidders to analyze the *bona fides* of a sale (the "**CIM**").  Potential Bidders will be required to sign a nondisclosure agreement in order to receive a copy of the CIM and access to the Data Room. The Data Room shall include the Form APA, and Potential Bidders may submit a marked copy of the Form APA, reflecting any changes made thereto, to indicate their intent to purchase some portion of the Restaurants, either to potentially serve as a Stalking Horse Bidder or to submit a Qualified Bid by the Bid Deadline, as the case may be, pursuant to the Bidding Procedures discussed below.

16.     In consultation with its professionals, the Debtor has directed Peak to market the Purchased Assets as a complete portfolio, or as any portion of 6 regions, consisting of Southeast Florida, Central Florida, Northeast Florida, Florida Panhandle, South Alabama, South Georgia (each, and "**Region**" and, together, the "**Regions**").

## IV.     The Stalking Horse Agreements and Bid Protections.

17.     The Debtor consulted with its professionals and determined in its business judgment that the net proceeds of the Sale may be maximized by (1) securing a Stalking Horse Bidder and (2) offering certain bid protections for the entities willing to serve as a Stalking Horse Bidder.

18.     To that end, the Debtor's professionals hope to secure the Stalking Horse Agreement(s) by offering a uniform set of bid protections for each Stalking Horse Bidder, in the form of a break-up fee of 2.5% of the Purchase Price proposed in each Stalking Horse Agreement (the "**Break-Up Fee(s)**"), plus a maximum reimbursement of $1,000 per Store for reasonable and

substantiated expenses incurred in connection with each Stalking Horse Bidder's submission (the "**Expense Reimbursement(s)**" and, together with the Break-Up Fee, the "**Bid Protections**").

19.    The proposed Form APA is attached hereto as **Exhibit B** and will serve as the basis for potential Stalking Horse Agreements. The Debtor will file any executed Stalking Horse Agreement(s) under notice with the Court, which notices shall include a marked copy of the Stalking Horse Agreement reflecting any changes from the Form APA (the "**Stalking Horse Notice(s)**"). The deadline for the Debtor to select a Stalking Horse Bidder and submit any Stalking Horse Notices shall be June 1, 2026 (the "**Stalking Horse Notice Deadline**"), subject to the Debtor's right to modify such deadline, after consultation with the Creditors' Committee, in its reasonable discretion.

20.    Each of the Stalking Horse Agreements shall be subject to higher and better Bids that may be submitted prior to the Bid Deadline, as discussed below.

**V.    Proposed Bidding Procedures, Auction, and Sale Hearing.[3]**

21.    The Bidding Procedures, attached to the Bidding Procedures Order as **Exhibit 1**, are designed to promote participation and active bidding at an Auction and to ensure an orderly Sale Process. The Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the process for submitting written, irrevocable offers ("**Bids**"), the manner in which Potential Bidders and Bids become "qualified," the negotiations of Bids received, the conduct of any Auction, the selection and approval of any Successful Bidder(s) and Back-up Bidder(s) (both defined below), and the deadlines with respect to the foregoing.  The Bidding

---

[3]  Capitalized terms used but not defined in this Section have the meanings ascribed to them in the Bidding Procedures.

Procedures will allow the Debtor to conduct the Sale Process in a fair, orderly, and transparent manner that will maximize value for all stakeholders.

22.    As described in more detail in the Bidding Procedures, Potential Bidders may submit Qualified Bids for all or some portion of the Purchased Assets through June 11, 2026 at 5:00 pm (Eastern), or such other date as is determined by the Debtor in accordance with the Bidding Procedures Order (the "**Bid Deadline**").  To the extent that the Debtor enters into one or more Stalking Horse Agreements, Potential Bidders may submit Bids by the Bid Deadline for a subset of the Purchased Assets included in one of the Stalking Horse Agreements, or a different subset of the Purchased Assets, as the case may be.  Whether such Bids constitute Qualified Bids shall be determined by the Debtor in its sole discretion and business judgment in consultation with the Creditors' Committee.  If at least one Qualified Bid is received before the Bid Deadline for Purchased Assets subject to a Stalking Horse Agreement, the Debtor will conduct an Auction for the Sale of the Purchased Assets, as set forth below.  In the event that there are no Stalking Horse Bidders, the Debtor will conduct an Auction if at least two Qualified Bids are received before the Bid Deadline.  If an Auction is conducted, the Debtor, in its sole discretion and business judgment, in consultation with BMO, as administrative agent (the "**Prepetition Agent**"), the Creditors' Committee, and PLKI (collectively, the "**Consultation Parties**"), (i) may designate the highest or otherwise best Bid(s) and the Successful Bidder(s), and (ii) may further designate the second highest or otherwise best Bid(s) and the Back-Up Bidder(s) to consummate the Sale in the event that a Sale to the Successful Bidder(s) does not close.  In the event that an asset purchase agreement is executed with one or more Successful Bidder(s) or Back-Up Bidder(s) (each a "**Bidder Purchase Agreement**"), the Debtor will file notice thereof in accordance with the Bidding

8

Procedures Order and will submit any such Bidder Purchase Agreement(s) to the Court in advance of the Sale Hearing.

23.    To effectuate the Sale Process, the Debtor hereby requests that the Court authorize the scheduling of the Auction, as set forth in the Bidding Procedures Order, for **June 15, 2026, at 10:00 am (Eastern)**, at the **JW Marriott Miami, 1109 Brickell Avenue, Miami, Florida 33131**. In the event that fewer than two Qualified Bids and/or Stalking Horse Bids are submitted for the Purchased Assets, the Debtor will cancel the Auction and seek to consummate the proposed Sale with any Stalking Horse Bidders and/or any other Potential Bidders who submitted Qualified Bids.

24.    The Debtor further asks the Court to schedule a hearing for June 18, 2026 to consider and approve the Sale and to resolve any objections to the assumption and assignment of the Proposed Assumed Leases (the "**Sale Hearing**").

25.    Below is a summary of the material terms of the Bidding Procedures:[4]

| SUMMARY OF BIDDING PROCEDURES |
|---|
| **A. Due Diligence.**  Upon execution of a valid nondisclosure agreement in form and substance reasonably acceptable to the Debtor, the Debtor will afford interested parties such due diligence access or additional information as the Debtor, in consultation with its advisors, deems appropriate.  The Debtor will limit access to due diligence to those parties it believes, in the exercise of the Debtor's business judgment, are pursuing the transaction in good faith and are capable of submitting a Qualified Bid (as defined below) ("**Potential Bidders**"), as well as the Consultation Parties, and each of their respective professionals.<br><br>**B. Bid Deadline** – **June 11, 2026, 5:00 pm (Eastern).**  Other than as set forth herein, in order to participate in the Auction, a Potential Bidder must submit a Qualified Bid (defined below), in writing or by email, so as to be actually received by the Bid Deadline, to: |

---

[4]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms have the meaning ascribed to them in the Bidding Procedures.

i.  the Debtor, c/o Aurora Management Partners, 112 South Tryon Street, Suite 1770, Charlotte, NC 28284, Attention David Baker, CRO, dbaker@auroramp.com;

ii.  counsel for the Debtor, Gary H. Leibowitz, Esq., Cole Schotz P.C., 1201 Wills Street, Baltimore, MD 21231, gleibowitz@coleschotz.com; Luis Salazar, Esq., Cole Schotz, P.C., 2121 SW 3rd Avenue, Suite 200, Miami, FL 33129, lsalazar@coleschotz.com; and Bradley Shraiberg, Esq., Shraiberg Page P.A., 2385 NW Executive Center Drive, Suite 300, Boca Raton, FL 33421, bss@slp.law.com;

iii.  Peak Franchise Capital LLC, 4100 Spring Valley Road, Suite 535, Dallas, TX 75244, Attention: Michael Elliott, Managing Partner, mike.elliot@peakfranchisecapital.com;

iv.  the Prepetition Agent, c/o counsel for the Prepetition Agent, Paul Singerman, Esq., Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, singerman@bergersingerman.com; Peter P. Knight, Esq. and Terence G. Banich, Esq., Katten Muchin Roseman LLP, 525 W. Monroe Street, Chicago, IL 60661, peter.knight@katten.com and terence.banich@katten.com; and

v.  proposed counsel for the Creditors' Committee, Eric. J Silver, Esq., Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Museum Tower, Suite 2200, 150 West Flagler Street, Miami, FL 33130, esilver@stearnsweaver.com; David Besikof, Esq. and Gianfranco Finizio, Esq., Lowenstein Sandler LLP, 1251 Avenue of the Americas, 17th Floor, New York, New York 10020, dbesikof@lowenstein.com, and gfinizio@lowenstein.com;

vi.  counsel to PLKI, Paul J. Battista, Esq. and Glenn D. Moses, Esq., Venable LLP, 801 Brickell Avenue, Suite 1500, Miami, FL 33131, pjbattista@venable.com and gmoses@venable.com (together, the "**Notice Parties**").

If the Prepetition Agent intends to credit bid at the Auction, they shall provide the Debtor with a "Notice of Intention to Credit Bid" by 5:00 pm (Eastern) on the Business Day prior to commencement of the Auction, which notice shall include a marked copy of the asset purchase agreement corresponding to the Starting Auction Bid (defined below), provided that Prepetition Agent will have the same rights as any other Qualified Bidder (defined below) hereunder to amend such terms during the Auction. If the Prepetition Agent submits a Notice of Intention to Credit Bid, the Prepetition Agent shall thereafter cease to be a consultation party hereunder.

## C.  Qualified Bid Requirements.

To constitute a Qualified Bid, a Bid must:

i.  fully disclose the identity of the Potential Bidder and include contact information for the specific person(s) the Debtor should contact if they have any questions about the Potential Bidder's Bid;

ii.    if the Debtor has entered into one or more Stalking Horse Agreements, identify the Stalking Horse Agreement(s) that the Potential Bidder seeks to overbid, including the specific Store numbers and locations the Potential Bidder proposes to purchase, along with any Stores included in the Stalking Horse Agreement(s) that are excluded from the Bid, and any other Stores not included in the Stalking Horse Agreement(s) that are included in the Bid, as well as any liabilities proposed to be assumed as part of the Bid's Purchase Price;

iii.    if the Debtor has not entered into one or more Stalking Horse Agreements, identify the specific Store numbers and locations the Potential Bidder proposes to purchase;

iv.    include a signed writing that the Potential Bidder's offer is formal, binding, unconditional, and irrevocable until (i) the closing of the transaction with the Successful Bidder (as defined below) and (ii) for two (2) business days after the earlier of the closing of the sale transaction with the Successful Bidder or the termination of the Successful Bid, if such bidder is designated the Back-Up Bidder (as defined below) at the conclusion of the Auction;

v.    confirm that there are no conditions precedent to the Potential Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the Bid;

vi.    include a duly authorized and executed copy of an asset purchase agreement, including the purchase price (the "**Purchase Price**") for the Stores and other Purchased Assets for which the bid is submitted (a "**Bidder Purchase Agreement**"), together with all exhibits and schedules thereto and copies marked to show any amendments and modifications to the applicable Stalking Horse Agreement(s) the Bid seeks to overbid or to the Form APA, as the case may be; provided, however, that such Bidder Purchase Agreement shall not include any financing or diligence conditions and that such exhibits and schedules may be provided after submission of the Bid;

vii.    include written evidence (which may include bank deposit statements and capital commitment letters) of sufficient cash on hand to fund the Purchase Price or sources of immediately available funds that are not conditioned on further third party approvals or commitments, that will allow the Debtor to make a reasonable determination, in consultation with the Creditors' Committee, as to the Potential Bidder's financial and other capabilities to consummate the transaction contemplated by the Bidder Purchase Agreement, and such other financial information of the Potential Bidder as may be acceptable to the Debtor in its reasonable discretion in consultation with the Creditors' Committee (collectively, the "**Financials**"), or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, the Financials of the Potential Bidder's equity holder(s) or other financial backer(s);

viii.  if the Debtor has entered into one or more Stalking Horse Agreements:

    (a)  where a Potential Bidder seeks to submit a Bid for the purchase of the same Stores contemplated in a particular Stalking Horse Agreement or multiple Stalking Horse Agreements, provide for a cash Purchase Price of at least 2.5% more than the value of the total combined Purchase Price offered in the respective Stalking Horse Agreement or Stalking Horse Agreements, as the case may be, *plus* an additional $1,000 per Store included in the Potential Bidder's Bid, along with an additional $100,000 overbid, and/or otherwise have a Purchase Price and value to the Debtor that, in the Debtor's business judgment, is greater or otherwise better than the Purchase Price and value offered under the Stalking Horse Agreement(s); and

    (b)  where a Potential Bidder seeks to submit a Bid for a portion of the Purchased Assets that is not the same as that contemplated in one or more Stalking Horse Agreements, and includes a different combination of Stores than those designated in any or all of the Stalking Horse Agreements, provide greater or otherwise better value than the value offered under the Stalking Horse Agreement(s), in the Debtor's business judgment, in consultation with the Consultation Parties, including consideration of the total combined sale price of the Purchased Assets, the specific Restaurants' marketability, practical matters concerning Restaurant-level issues, and such other considerations as the Debtor may deem appropriate in its business judgment in consultation with the Consultation Parties (together or separately, as the case may be, a "**Minimum Overbid**");

  ix.  provide a commitment to close the transactions contemplated by the Bidder Purchase Agreement within 5 business dates ,but in no event later than June 30, 2026;

  x.  identify with particularity the unexpired leases the Potential Bidder wishes to assume;

  xi.  contain sufficient information concerning the Potential Bidder's ability to provide adequate assurance of future performance with respect to unexpired leases to be assumed and assigned;

  xii.  include sufficient information, including copies of all information submitted to PLKI for obtaining PLKI's approval, to satisfy the Debtor that the Potential Bidder has obtained the PLKI's approval to become a franchisee for the Stores included in the Bid or, as determined by the Debtor in its sole discretion, after consultation with the Prepetition Agent and the Creditors' Committee, that the Potential Bidder is reasonably likely to be able to obtain such approval prior to Closing or otherwise is willing and able to complete Closing without such prior approval;

xiii. include an acknowledgement and representation by the Potential Bidder that it: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its Bid; (C) did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Bidder Purchase Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its Bid;

xiv. be accompanied by a good faith deposit in the form of a wire transfer, certified check, or such other form that is acceptable to the Debtor, payable to the order of the escrow agent designated by the Debtor in an amount no less than ten percent (10%) of the Purchase Price;

xv. state that the Potential Bidder agrees to serve as a Back-Up Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or otherwise next best bid after the Successful Bidder (as defined below) with respect to the Purchased Assets;

xvi. state that the Potential Bidder consents to the jurisdiction of the Bankruptcy Court; and

xvii. contain such other information reasonably requested by the Debtor.

D. **Credit Bids.** On or before the Bid Deadline, parties holding a valid lien on some or all of the Debtor's assets that secures a bona fide claim may submit a credit bid for some or all of such assets to the fullest extent permitted under section 363(k) of the Bankruptcy Code. The Prepetition Agent shall be entitled to credit bid any portion of its outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code with respect to any assets on which they hold liens (a "**Prepetition Credit Bid**").

E. **Auction.** If one or more Qualified Bids (including a Prepetition Credit Bid) are received on or before the Bid Deadline, the Debtor shall conduct the Auction commencing on **June 15, 2026 at 10:00 a.m. (Eastern)**, at the **JW Marriott Miami, 1109 Brickell Avenue, Miami, Florida 33131**. The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction, or before the Auction by notice provided in the best efforts of the Debtor to all interested parties and to the Court; provided, however, that any changes to the dates and deadlines set forth herein shall (i) comply with any milestones contained in any order for the use of cash collateral entered by the Court in this case or (ii) be made in consultation with the Prepetition Agent and the Creditors' Committee. The Debtor reserves the right to cancel the Auction (in consultation with the Prepetition Agent and the Creditors' Committee) if the requisite Bids described above are not received as of the Bid Deadline.

F.  **Auction Procedures.**  Only any Stalking Horse Bidders and a person or entity that has submitted a Qualified Bid (including a Prepetition Credit Bid) (a "**Qualified Bidder**") to the Notice Parties and such person's or entity's respective advisors are eligible to participate in the Auction.  For the avoidance of doubt, the Prepetition Agent, the Creditors' Committee, and their advisors are entitled to attend the Auction in person or via video conferencing.  All participants shall appear in person, by telephone (with prior written authorization by the Debtor, in the Debtor's sole discretion after consultation with the Creditors' Committee), or through a duly authorized representative.  Prior to the Auction, the Debtor, after consultation with the Prepetition Agent and the Creditors' Committee, shall select the Qualified Bids that, in the Debtor's business judgment, reflect the highest or otherwise best value for the Debtor's estate and the portion of the Purchased Assets contemplated by each Qualified Bid as the starting Bid or Bids (as the case may be, the "**Starting Auction Bid(s)**"), and advise all participants in the Auction of the terms of the Starting Auction Bid(s).

Where Qualified Bidders seek to submit Bids at the Auction for the purchase of the same portion of the Purchased Assets contemplated in a particular Starting Auction Bid or multiple Starting Auction Bids—including the same Restaurant locations—Qualified Bidders may submit Bids that are higher and better than the total combined Purchase Price of the Starting Auction Bid(s) in an initial increment equal to the aggregate amount of the Starting Auction Bid(s) plus $100,000, and in subsequent increments of at least $100,000, unless and until the Debtor, in its sole discretion and in consultation with the Prepetition Agent and the Creditors' Committee, lifts or modifies this requirement.

Where Qualified Bidders wish to submit Bids for a portion of the Purchased Assets that is not the same as that contemplated in one or more of the Starting Auction Bids, and includes a different combination of Restaurant locations than those designated in any or all of the Starting Auction Bids, Qualified Bidders may submit Bids that provide greater or otherwise better value than the Starting Auction Bid(s), in the Debtor's business judgment, in consultation with the Prepetition Agent and the Creditors' Committee, including consideration of the total combined sale price of the Purchased Assets, the specific Restaurants' marketability, practical matters concerning Restaurant-level issues, and such other considerations as the Debtor may deem appropriate, and in subsequent increments as are set by the Debtor for each applicable combination of Purchased Assets and/or Restaurant locations (collectively, the "**Overbid Increments**").  The Debtor, in consultation with the Prepetition Agent and the Creditors' Committee, may adjourn, continue, re-open, or terminate the Auction, and reserves the right to adopt other and further rules and procedures for the Auction that, in its business judgment, will better promote the goals of the Auction.

Each Qualified Bidder participating in the Auction will be required to confirm on the record at the Auction that it has not engaged in any collusion with respect to the bidding and sale process and that it has reviewed, understands, and accepts the Bidding Procedures.

G.  **Selection of Successful Bidder and Back-Up Bidder.**  The Debtor may designate, in its sole discretion and in consultation with the Prepetition Agent and the Creditors'

14

Committee, in the Debtor's business judgment, pursuant to these Bidding Procedures, the highest or otherwise best Bid(s) and the Successful Bidder or Bidders and the second highest or otherwise best Bid(s) as the Back-Up Bidder(s).

H. **Reservation of Rights.** The Debtor reserves the right to reject, without liability, any Bid that the Debtor, in its reasonable discretion and after consultation with the Prepetition Agent and the Creditors' Committee, determines to be (a) inadequate or insufficient, (b) not in conformity with the Bidding Procedures, the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, or (c) contrary to the best interests of the Debtor and its estate. The Debtor also reserves the right to modify these Bidding Procedures, in its sole discretion and after consultation with the Prepetition Agent and the Creditors' Committee, without the need for any further order of the Bankruptcy Court, including, without limitation, (i) extending the deadlines set forth in the Bidding Procedures, (ii) adjourning the Auction, and (iii) withdrawing any Purchased Assets from the Sale Process at any time prior to or during the Auction; provided, however, that any changes to the dates and deadlines set forth herein shall (i) comply with any milestones contained in any order for the use of cash collateral entered by the Court in these cases or (ii) be made in consultation with the Prepetition Agent and the Creditors' Committee.

26.     A summary of the timeline for the Bidding Procedures and Auction is as follows:

| Event | Date |
|---|---|
| Stalking Horse Notice Deadline | June 1, 2026 |
| Deadline for Qualified Bids | June 11, 2026 |
| Auction | June 15, 2026 |
| Cure Amount Objection/Assumption Objection Deadline | June 16, 2026 at 12:00 p.m. (ET) |
| Sale Objection Deadline | June 16, 2026 at 12:00 p.m. (ET) |
| Adequate Assurance Deadline | June 16, 2026 |
| Adequate Assurance Objection Deadline | June 16, 2026 |
| Proposed Sale Hearing (subject to Court availability) | June 18, 2026 |
| Closing | On or before June 30, 2026 |

15

VI.    **The Assumption and Assignment Procedures.**

27.    As part of the Sale Process, the Debtor will serve by first-class mail, postage prepaid, a cure notice concerning each executory contract or unexpired lease that is proposed to be assumed and assigned – including, without limitation, each Proposed Assumed Lease (as defined and designated in the Stalking Horse Agreement or Bidder Purchase Agreement, as applicable) – on each counterparty thereto, substantially in the form attached hereto as **Exhibit C** (the "**Cure Notice**"). The Cure Notice shall, for each such executory contract, (i) state the cure amount that the Debtor believes is necessary to assume such executory contract or unexpired lease (the "**Cure Amount**"); (ii) notify the non-Debtor counterparty that such party's contract or lease, including any amendments and subordination, non-disturbance, and attornment agreements related to the leases, may be assumed and assigned to a purchaser of the Purchased Assets (as defined in the Stalking Horse Agreement or Bidder Purchase Agreement, as applicable) at the conclusion of the Auction; (iii) state the applicable deadline, which will be **June 16, 2026 at 12:00 pm (Eastern Time)** (the "**Cure Objection Deadline**"), by which the non-Debtor counterparty must file an objection to the Cure Amount (a "**Cure Amount Objection**") or to the assumption and assignment of a Proposed Assumed Lease (an "**Assumption Objection**"), and that the deadline to file a an objection to the Sale (a "**Sale Objection**") is **June 16, 2026 at 12:00 pm (Eastern Time)** (the "**Sale Objection Deadline**"); and (iv) state the date of the Sale Hearing and that Cure Amount Objections, Assumption Objections, and Sale Objections will be heard at the Sale Hearing; provided, however, that the inclusion of a contract, lease, or agreement on the Cure Notice shall not constitute an admission that such contract, lease, or agreement is an executory contract or unexpired lease (as more fully described herein and including the process set forth in the Cure Notice, the "**Assumption and Assignment Procedures**"). The Cure Notice will further state that

16

the Debtor reserves all rights, claims, and causes of action with respect to the contracts, leases, and agreements listed on or appended to the Cure Notice or pertaining to the Proposed Assumed Leases.

28. Any Cure Amount Objections must be filed in accordance with the Cure Notice, so as to actually be received by the parties listed on the Cure Notice, at or before **12:00 pm (Eastern Time) on June 16, 2026**.

29. Unless a non-Debtor counterparty to any executory contract or unexpired lease files a Cure Amount Objection by the Cure Amount Objection Deadline, then the Cure Amount set forth in the Cure Notice shall be binding upon the non-Debtor counterparty to such agreement for all purposes and will constitute a final determination of the Cure Amount required to be paid in connection with the assumption and assignment of such agreement. In addition, all counterparties to the Proposed Assumed Leases who fail to file an objection will be (a) forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Proposed Assumed Leases, and the Debtor, a Stalking Horse Bidder, or a Successful Bidder or Back-Up Bidder (as applicable) shall be entitled to rely solely upon the Cure Amount set forth in the Cure Notice, and (b) be forever barred and estopped from asserting or claiming against the Debtor, a Stalking Horse Bidder, or a Successful Bidder or Back-Up Bidder (as applicable), or any other assignee of the Proposed Assumed Leases, that any additional amounts are due or that defaults exist, or conditions to assumption and assignment must be satisfied with respect to such Proposed Assumed Leases.

30. In the event that the Debtor and the non-Debtor party cannot resolve the Cure Amount Objections, the Debtor shall segregate any disputed Cure Amounts ("**Disputed Cure**

**Amounts**") pending the resolution of any such disputes by the Court or mutual agreement of the parties.

31.     The Debtor shall, by no later than June 16, 2026 (the "**Adequate Assurance Deadline**"), provide the necessary financial information to demonstrate that the Successful Bidder and/or Back-Up Bidder (as defined in the Bidding Procedures), as applicable, can provide adequate assurance of future performance under Section 365 of the Bankruptcy Code (the "**Adequate Assurance Information**") to those counterparties to the Proposed Assumed Leases (or their counsel) who have (x) submitted a written request (by e-mail to Debtor's counsel is acceptable) for Adequate Assurance Information and (y) confirmed in writing to the Debtor's counsel (by e-mail is acceptable) their agreement to keep such Adequate Assurance Information strictly confidential and use it solely for the purpose of evaluating whether a Qualified Bidder or the Stalking Horse Bidder has provided adequate assurance of future performance under the applicable Proposed Assumed Leases; provided, however, that the Stalking Horse Bidder or Qualified Bidder, as applicable, may require the counterparties to the applicable Proposed Assumed Leases to execute nondisclosure agreements prior to the remittance of any confidential, non-public information to such counterparty.

32.     Any objection to the provision of adequate assurance of future performance (an "**Adequate Assurance Objection**") must be filed and served in accordance with the Cure Notice, so as to actually be received by the parties listed on the Cure Notice, at or before **12:00 p.m. (Eastern Time) on June 16, 2026** (the "**Assumption Objection Deadline**").

33.     Any such objection must also state the basis therefor. If a non-Debtor party to any executory contract or unexpired lease fails to object to the assumption or assignment and provision of adequate assurance of future performance by the Assumption Objection Deadline or at the Sale

18

Hearing, as the case may be, such counterparty shall be forever barred from raising any such objection. Assumption Objections may be resolved by the Court at the Sale Hearing, or at a separate hearing either before the Sale Hearing or after the Sale Hearing. Any counterparty to an executory contract or unexpired lease, including, without limitation, a Proposed Assumed Leases, that fails to timely file and serve an Assumption Objection shall be forever barred from disputing the assumption and assignment of such Assumed Lease to a Stalking Horse Bidder or to a Successful Bidder or seeking adequate assurance of future performance. If the Debtor elects to exclude a Proposed Assumed Lease pursuant to the Stalking Horse Agreements, the Debtor shall provide the Stalking Horse Bidder and Qualified Bidders with notice of the excluded Proposed Assumed Lease three (3) business days before the Auction.

34.     Notwithstanding anything to the contrary herein, at any time before the Auction, the Stalking Horse Bidders or any Qualified Bidders who become a Successful Bidder, as the case may be, shall have the right to exclude any of the Proposed Assumed Leases from the Purchased Assets (an "**Excluded Contract**") to the extent permitted in the applicable Stalking Horse Agreement or Bidder Purchase Agreement, and any such Excluded Contract shall constitute an Excluded Asset (as defined in the applicable Stalking Horse Agreement or Bidder Purchase Agreement) and shall not constitute, for any purpose whatsoever, a Purchased Asset and the Purchase Price shall be reduced to the extent permitted in the Stalking Horse Agreement or Bidder Purchase Agreement; provided, however, that any Excluded Contract nevertheless may be assumed and assigned, at a Successful Bidder's written request to Debtor's counsel made no later than the Closing (as defined in the Stalking Horse Agreement or Bidder Purchase Agreement) (the "**Subsequently Added Contract**") unless alternative mutual arrangements are made between the Debtor and the Stalking Horse Bidder or Successful Bidder; and provided that any Excluded

Contract that does not become a Subsequently Added Contract shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code effective as of the date of the Auction. Neither the Stalking Horse Bidders nor the Successful Bidders, as applicable, shall incur any liability, obligation, or debt in connection with or related to any such Excluded Contract that constitutes an Excluded Asset.

## VII.    The Sale Notice.

35.    On a date that is at least twenty-one (21) calendar days prior to the Sale Hearing, the Debtor will serve a notice of the Sale and Sale Hearing, substantially in the form attached hereto as **Exhibit D** (the "**Sale Notice**"), by first-class mail, postage prepaid, or by email where available, upon (a) all known creditors of the Debtor, (b) all equity holders of the Debtor, (c) entities known to have expressed an interest in a transaction with respect to some or all of the Purchased Assets; (d) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Purchased Assets; (e) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtor has or may have any tax liability; (f) the Securities and Exchange Commission; (g) counsel to the Prepetition Agent; (h) counsel to PLKI; (i) counsel to the Creditors' Committee; (j) the Office of the Attorney General for the State of Florida; (k) the Office of the United States Trustee for Region 21; and (l) those parties who have filed the appropriate notice requesting notice of all pleadings filed in this chapter 11 case.

36.    Additionally, pursuant to the Bidding Procedures Order, the Debtor will file and serve a notice identifying any Successful Bidder(s) or Back-up Bidder(s) in accordance with the Bidding Procedures Order.

**BASIS FOR RELIEF REQUESTED**

37.    The instant Bidding Procedures Motion is the first step in a two-step process, whereby the Debtor intends ultimately to sell all or substantially all of its assets with Court approval.  The Debtor intends to engage in robust marketing efforts to obtain Stalking Horse Bidder(s) and conduct the Auction with active participation from as many interested parties as possible.  The Debtor, with the advice of its professionals, believes that this course of action will maximize the value of the Debtor's business as a going concern and result in the best possible recovery to the Debtor's creditors.  While the instant Bidding Procedures Motion does not seek authorization to consummate a sale, the legal standard is nevertheless set forth in brief below as a complement to the forthcoming Sale Motion.

**I.    Section 363(b) of the Bankruptcy Code authorizes the sale of assets under these circumstances.**

38.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper,* 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.,* 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung,* 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983).

39.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether

21

adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.,* 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.,* 147 B.R. at 656 (quoting *Van Gorkum,* 488 A.2d 858, 872 (Del. 1985)).  A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.,* 722 F.2d at 1063; *In re Food Barn Stores, Inc.,* 107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

40.    The Debtor's forthcoming Sale Motion will address the legal standard set forth here, and the factual elements satisfying the standard, in detail.

## II.    The Bidding Procedures are fair and are designed to elicit the highest or otherwise best possible value for the sale of the Debtor's assets.

41.    There is ample authority for approving the Bidding Procedures described above. Courts have consistently held that a Debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re 160 Royal Palm, LLC*, 600 B.R. 119, 126-28 (S.D. Fla.), aff'd, 785 F. App'x 829 (11th Cir. 2019) (holding that Debtor had "broad discretion to determine the appropriate procedures for marketing and selling" assets of the estate); *In re Diplomat Const., Inc.*, 481 B.R. 215, 219 (Bankr. N.D. Ga. 2012) ("the [debtor] is responsible for the administration of the estate and its judgment on the sale

22

and the procedure for the sale is entitled to respect and deference from the Court, so long as the burden of giving sound business reasons is met"); *In re Phillips*, No. 2:12-CV-585-FTM-29, 2013 WL 1899611 at \*10 (M.D. Fla. May 7, 2013), *aff'd in part, dismissed in part*, 574 F. App'x 926 (11th Cir. 2014) (same); *In re Schipper,* 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the Debtors in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *see also In re Farmland Indus., Inc.,* 294 B.R 855, 881 (Bankr. W.D. Mo. 2003) (holding that courts in this district are reluctant to interfere with corporate decisions unless "it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code"); *In re Integrated Res., Inc.,* 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

42.    The purpose of sale and bidding procedures is to promote competition in order to maximize the value of the Debtor's assets. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. Of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992).

43.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., Integrated Resources,* 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to

23

maximize the value of the Debtors' assets"); *In re Fin. News Network, Inc.,* 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

44.     The Bidding Procedures proposed above are appropriate in this context. The Debtor designed the Bidding Procedures to ensure a fair and reasonable process that will yield the maximum value for the Debtor's assets, including the provision of the Form APA to establish a uniform baseline. The proposed Bidding Procedures will facilitate a competitive process in which all Potential Bidders are encouraged to participate and submit bids (while affording Potential Bidders flexibility in structuring their Bids). The Bidding Procedures also provide Potential Bidders with sufficient notice and opportunity to acquire information necessary to submit timely and informed bids at each stage of the Sale Process. Thus, the Debtor and all parties in interest can be assured that the Debtor will have the opportunity to consider all competing Bids in a fair process and that the consideration received will be the highest and best available.

**III.     Potential Stalking Horse Bidders and Bid Protections.**

45.     The Debtor has determined, in its reasonable business judgment, that a sale of the Purchased Assets according to the Bidding Procedures is warranted. The Debtor has also determined, in its reasonable business judgment, that the net proceeds of the sale of assets may be maximized by soliciting bids for Stalking Horse Bidders and then conducting the Auction to solicit higher or otherwise better bids. If one or more Stalking Horse Bidders are selected, the Debtor will file a notice with the Court prior to the Stalking Horse Notice Deadline and will provide notice to interested parties. In order to garner the interest of potential Stalking Horse Bidders and incentivize the submission of an offer, the Debtor asks the Court authorize the Debtor to enter into Stalking

24

Horse Agreement(s), using the Form APA as a baseline, that include the Break-Up Fees of 2.5% of the Purchase Price of each Stalking Horse Agreement, plus a maximum Expense Reimbursement of $1,000 per Store for substantiated expenses incurred in connection with each Stalking Horse Bidder's submission.

46.     Break-up and other termination fees are a normal, and in some cases necessary, component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code. *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that break-up fees may be legitimately necessary to convince a single "white knight" to enter the bidding by providing some form of compensation for the risk it is undertaking).

47.     The United States Court of Appeals for the Eleventh Circuit has yet to establish standards for determining the propriety of bidding incentives in the bankruptcy context. For this reason, courts in the Eleventh Circuit look to the standards adopted by other bankruptcy courts and/or circuits when considering whether to award a break-up fee in connection with a proposed sale. At least one bankruptcy court in the Eleventh Circuit has adopted the approach taken by the United States Bankruptcy Court for the District of Arizona, which seeks to determine whether the breakup fee will unduly burden the debtor's estate or impair the rights of parties in interest. *In re Sea Island Co.*, 2010 WL 4393269, *2 (S.D. Ga., Sept. 15, 2010). In *In re Sea Island Co.*, the United States Bankruptcy Court for the Southern District of Georgia considered the propriety of a proposed break-up fee contained in a bidding procedures motion filed by the debtor. The court recognized that bankruptcy courts generally examine "break-up fee arrangements under three standards." *Id.* "Some courts [] use[] a 'business judgment' standard requiring a reviewing court to defer to the business judgment of the debtor in possession and denying the use of such fees only when they are a product of bad faith or would chill bidding." *Id.* (citing *In re Integrated Resources,*

*Inc.*, 147 B.R. 650 (S.D.N.Y.1992)).  In contrast, "the Third Circuit Court of Appeals has held that the application for break-up fees and expenses under § 503(b) is no different from other applications for administrative expenses."  *Id.* (citing *In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010)).  Under this approach, the standard turns on "'the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.'"  *Id.* (quoting *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999)).  Other bankruptcy courts—such as the Bankruptcy Court for the District of Arizona—have held that the "standard is not whether a break-up fee is within the business judgment of the debtor, but whether the transaction will 'further the diverse interests of the debtor, creditors and equity holders, alike[.]'"  *Id.* (quoting *In re America West Airlines, Inc.,* 166 B.R. 908 (Bankr. Ariz. 1994)).

48.    To meet the standard used by the Bankruptcy Court for the Southern District of Georgia, "a breakup fee must not unduly burden a debtor's estate, and the relative rights of the parties in interest must be protected." *Id.* The court in *Sea Island Co.* ultimately found that the "standard set out in *America West* [was] the most appropriate of the three standards[,]" *id.* at *3, and looked to the following seven factors to determine whether that standard was met:

(1)    Whether the fee requested correlates with a maximization of value to the debtor's estate;

(2)    Whether the underlying negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;

(3)    Whether the principal secured creditors and the official creditors committee are supportive of the concession;

(4)    Whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;

(5)    Whether the dollar amount of the break-up fee is so substantial that it provides a "chilling effect" on other potential bidders;

(6)    The existence of available safeguards beneficial to the debtor's estate [in the event the transaction falls through]; and

(7)    Whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

*Id*. (citing *In re Hupp Industries, Inc*. 140 B.R. 191 (Bankr. N.D. Ohio 1992)).

49.    The standard set forth in *America West* and *Hupp* is met here.

(1)    The Bid Protections are beneficial to the Debtor's estate and its stakeholders because they are necessary to induce prospective Stalking Horse Bidders to enter into the Stalking Horse Agreements which, in turn, will set a higher floor for bidding at the Auction. *See e.g. In re Williamson*, 327 B.R. 578, 581 (Bankr. E.D. Va. 2005) ("It is reflected in some chapter 11 cases by the use of 'stalking horses', break-up fees and other devices, all of which encourage broad participation in a bankruptcy sale and recognize the risks inherent in participation from the peculiar requirements of bankruptcy sales.").

(2)    The Stalking Horse Bidders are being solicited through the Debtor's investment banker, Peak, and negotiated at arms' length.  Any changes made to the Form APA attached as Exhibit B by the Stalking Horse Bidders will be subject to the comment and approval of the Debtor, in consultation with the Creditors' Committee, resulting in an iterative process where both sides can seek to achieve the Purchase Price and terms most favorable to it.  It is the belief of the Debtor and its advisors that inclusion of the Bid Protections in the Form APA will be necessary to induce any potential Stalking Horse Bidders, and may forestall any such Stalking Horse Bidders from seeking to exert additional leverage over the sale process to extract a higher breakup fee and expense reimbursement.

(3)    The Break-Up Fee and Expense Reimbursement of 2.5% of the projected guaranteed value of each Stalking Horse Bidder's Bid, plus as much as $1,000 per Store of

substantiated expenses are of the same order of magnitude as break-up fees approved in other cases. *See, e.g., In re Sea Island Co.*, *Co*., 2010 WL 4393269 at n.1 (collecting cases where break-up fees between 2.25%-5.3% were authorized); *Consumer News & Business Channel Partnership v. Financial News Network, Inc.* (*In re Financial News Network, Inc.*), 980 F.2d 165, 167 (2d Cir. 1992) (noting without discussion $8.2 million Break-up fee on $149.3 million transaction (5.5% of consideration offered)); *Cottle v. Stores Communications*, 849 F.2d 570, 578-79 (11th Cir 1988) (approving $29 million fee on $2.5 billion transaction, 1.16%); *see also LTV Aerospace & Defense Co. v. Thomson-CSF, S.A.* (*In re Chateguay Corp.*), 1998 B.R. 848, 861 (S.D.N.Y. 1996) (enforcing $20 million "reverse Break-up fee" payable to debtor on $450 million offer (4.4% of consideration)).

(4)    The Bid Protections will not chill bidding. The projected Purchase Price of the various combinations of Purchased Assets are on the order of many tens of millions of dollars. As such, the Expense Reimbursements are nearly negligible and the Break-Up Fees, at only 2.5%, will be of a value that the Debtor and its professionals believe will not discourage a Potential Bidder from providing a Qualified Bid, which would require a Minimum Overbid in excess of the Purchase Price submitted by each Stalking Horse Bidder plus the Bid Protections. Rather than chill bidding, the Debtor believes the potential Stalking Horse Bids (which the Debtor believes it will only secure through offering the Bid Protections) will prompt active bidding before and during the Auction.

(5)    Here, in the event that the Bid Protections are triggered, it means that a Successful Bidder has been named following the Auction, and that a transaction with such Successful Bidder *has closed*. Moreover, to the extent that any transaction with a Successful Bidder is not consummated for any reason, the Debtor is seeking the Court's approval to designate

28

a Back-Up Bidder or Bidders at the Auction, and, through the forthcoming Sale Motion, to consummate the Sale with such Back-Up Bidder(s) to the extent that any transaction with a Successful Bidder does not close. Thus, if the Bid Protections are triggered, it means that a transaction has closed and the estate bears no risk of paying the Bid Protections where the transaction triggering those Bid Protections does not close.

(6)     There will be no adverse impact to the unsecured creditors because the value to be achieved through the Sale Process is only possible through offering the Bid Protections. As previously stated, prospective Stalking Horse Bidders generally refuse to enter into the Stalking Horse Agreements without Bid Protections, which would materially affect the opening bid amount and the outlook of any Auction or other Sale Process.

50.     It is also worth noting that the Bid Protections proposed here would satisfy the standards adopted in the Second and Third Circuits (and elsewhere), should the Court choose to apply them. To that end, the Debtor submits that (i) the Bid Protections were established in a reasonable exercise of the Debtor's business judgment, because the Debtor and its professionals consider them necessary to induce prospective Stalking Horse Bidders to enter into the Stalking Horse Agreements and the Bid Protections are of reasonable magnitude, and (ii) that the Bid Protections thereby will preserve and provide value to the Debtor's estate. Indeed, if any such Break-Up Fee is ultimately payable to a Stalking Horse Bidder—by definition, because the Debtor has received a higher or otherwise better offer and has closed on one or more superior transactions—the Stalking Horse Bidder's Bid will have benefited the estate, particularly in the context of the total consideration received. The Bidding Procedures require a Minimum Overbid of at least the combined Purchase Prices of any Stalking Horse Bidders' Bids *plus* 2.5% of that

total, and $100,000 to exceed the maximum possible Expense Reimbursement, which will more than offset any Break-up Fee that is triggered.

51.    It is also possible that Bids will be submitted before or during the Auction that contemplate a different portion of the Purchased Assets (*i.e.*, different Restaurant locations) than that contemplated by the Stalking Horse Agreements, in which case the Minimum Overbids may not directly cover the Bid Protections.  The Debtor will therefore take all such potential results into consideration in determining whether to name one or more Successful Bidders, including the net proceeds received by the estate if one more Stalking Horse Bidders are entitled to payment of Bid Protections.  It is critical that the Debtor retains the flexibility to consider Bids for different combinations of Restaurant locations, and in such case will exercise its business judgment, in consultation with its professionals, the Prepetition Agent, and the Creditors' Committee, in determining which Bid or combination of Bids provide the highest and best value, and greatest total recovery, to the Debtor's estate and its creditors.

52.    In light of the foregoing, the Debtor submits that the proposed Bid Protections will not unduly burden the Debtor's estate or impair the interests of any parties in interest. Likewise, the Bid Protections will not chill bidding, are reasonable within the requirements of the business judgment rule and should therefore be approved.

## IV.    The Court Should Approve the Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases.

53.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  Pursuant to Bankruptcy Rule 6006(a), "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease, other than as part of a plan, is governed by [Bankruptcy] Rule 9014."  In turn, Bankruptcy Rule 9014 provides that "[i]n a contested matter

30

not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought."

54.     Here, each counterparty to a Proposed Assumed Lease will have an opportunity to file a written objection to the Cure Amount or the assignment of the Proposed Assumed Lease, or to challenge the ability of the Stalking Horse Bidder(s) or Successful Bidder(s) to provide adequate assurance.  To the extent any such objection is not resolved before the Sale Hearing, each counterparty to a Proposed Assumed Lease will have the opportunity to be heard at the Sale Hearing or at such other time as the Court deems appropriate.

55.     The Debtor therefore submits that the Assumption and Assignment Procedures proposed above, as well as the Cure Notice attached hereto as **Exhibit C**, are reasonable and sufficient under the circumstances and satisfy Bankruptcy Rules 6006(a) and 9014(a).

## V.     **The Court should Approve the Form and Manner of Sale Notice and Cure Notice.**

56.     Under Bankruptcy Rules 6004(a) and 2002(a) and (c), the Debtor is required to notify creditors of the Sale, including disclosing the terms and conditions of the Sale, and the deadlines for filing any objections thereto.  The Debtor submits that the notice procedures described above, and the form of Sale Notice attached hereto as **Exhibit D**, fully comply with the applicable Bankruptcy Rules and are reasonably calculated to provide timely and adequate notice of the Sale and Sale Hearing to the Debtor's creditors and all other interested parties that are entitled to notice, as well as to those parties that have expressed a bona fide interest in acquiring the Purchased Assets.

## **RESERVATION OF RIGHTS**

57.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim,

or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  To the contrary, the Debtor expressly reserves its rights to contest any such claim.  Likewise, if this Court grants the relief sought herein, any payment made pursuant to this Court's Order is not intended and should not be construed as an admission as to the validity of any claim, a waiver of the Debtor's rights to dispute such claim subsequently, or an admission that the entity paid is entitled to such payment by law.

## **NOTICE**

58.     The Debtor will provide notice of this Motion to: (a) all known creditors of the Debtor, (b) all equity holders of the Debtor, (c) entities known to have expressed an interest in a transaction with respect to some or all of the Purchased Assets; (d) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Purchased Assets; (e) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtor has or may have any tax liability; (f) the Securities and Exchange Commission; (g) counsel to the Prepetition Agent; (h) counsel to PLKI; (i) counsel to the Creditors' Committee; (j) the Attorney General for the State of Florida; (k) the Office of the United States Trustee for Region 21; and (l) those parties who have filed the appropriate notice requesting notice of all pleadings filed in this chapter 11 case.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

59.     The Debtor has not previously sought the relief requested herein from this Court or any other court.

32

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter the Bidding

Procedures Order, granting the relief requested herein and such other and further relief as the Court

may deem just and proper.

Dated: March 13, 2026                    Respectfully submitted,

**COLE SCHOTZ, P.C.**
*Attorneys for the Debtor Sailormen, Inc.*
2121 SW 3rd Ave, Suite 200
Miami, FL 33129
Telephone: 305-374-4848
Email: lsalazar@coleschotz.com
Secondary Email: Alee-Sin@coleschotz.com
Secondary Email: CS-eservice-miami@coleschotz.com

By: */s/ Luis Salazar*
          Luis Salazar
          Florida Bar No. 147788

-and-

1201 Wills Street, Suite 320
Baltimore, MD 21231
Telephone: 410-230-0660
Facsimile: 410-406-6067
Gary H. Leibowitz, Esq. (admitted *pro hac vice*)
Maryland Bar No. 24717
Email: GLeibowitz@coleschotz.com
Irving Walker, Esq. (admitted *pro hac vice*)
Maryland Bar No. 00179
Email: IWalker@coleschotz.com
H.C. Jones, III, Esq. (admitted *pro hac vice*)
Maryland Bar No. 20064
Email: HJones@coleschotz.com
Natalie Gibson (admitted *pro hac vice*)
Maryland Bar No. 31350
Email: Ngibson@coleschotz.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this day, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that true and correct copies of the foregoing were served on all parties identified on the attached Service List on March 13, 2026, via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Luis Salazar*
Luis Salazar

## SERVICE LIST

**Electronic Notice List**
**(Via CM/ECF ONLY):**

- **Eric N Assouline**    ena@assoulineberlowe.com, ah@assoulineberlowe.com
- **Terence G Banich**    terence.banich@katten.com
- **Paul J. Battista**    pjbattista@venable.com, cascavone@venable.com;jnunez@venable.com;imalcolm@venable.com;heburke@venable.com;imalcolm@ecf.courtdrive.com
- **Seth N Benes**    seth@lwlawfla.com, claudia@lwlawfla.com;Pleadings@lwlawfla.com
- **Stephen C Breuer**    stephen@breuer.law, genna@breuer.law,stephen@ecf.courtdrive.com,mia@breuer.law
- **Joseph P. Briggett**    jbriggett@bakerdonelson.com, jbowers@bakerdonelson.com
- **Jacqueline Calderin**    jc@agentislaw.com, bankruptcy@agentislaw.com;nsocorro@agentislaw.com
- **Helbert Antonio Canales-Rojas**    hcanalesrojas@bakerdonelson.com, mymarks@bakerdonelson.com
- **Ronald S Canter**    rcanter@roncanterllc.com
- **Lisa Caryl Cohen**    lcohen@ruffcohen.com
- **Matthew McDonnell Couch**    mcouch@moorheadlaw.com
- **Kathleen DiSanto**    kdisanto@bushross.com, bankruptcy.eservice@bushross.com;kdisanto@ecf.courtdrive.com
- **James M Donohue**    jdonohue@ausley.com, sshaffer@ausley.com
- **Michael P Dunn**    michael.dunn@dunnlawpa.com, rbasnueva@dunnlawpa.com;tudani@dunnlawpa.com;lrodriguez@dunnlawpa.com;mflores@dunnlawpa.com
- **Raye C Elliott**    raye.elliott@akerman.com, jennifer.meehan@akerman.com;ava.hill@akerman.com
- **Brian T FitzGerald**    fitzgeraldb@hillsboroughcounty.org, connorsa@hillsboroughcounty.org;stroupj@hillsboroughcounty.org
- **Kevin A Forsthoefel**    kforsthoefel@ausley.com, kreffitt@ausley.com
- **David L. Gay**    dgay@carltonfields.com, cguzman@carltonfields.com;efile@ecf.inforuptcy.com;miaecf@cfdom.net
- **Mark A Gilbert**    mark.gilbert@colemantalley.com
- **Joe M. Grant**    jgrant@loriumlaw.com, jenna-munsey-6083@ecf.pacerpro.com;jyoung@loriumlaw.com;acabello@loriumlaw.com
- **Jordi Guso**    jguso@bergersingerman.com, fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.courtdrive.com
- **Stephanie L Hauser**    slh@lklsg.com, ame@lklsg.com
- **Malinda L Hayes**    malinda@mlhlawoffices.com, hayes.malindab120631@notify.bestcase.com;hayes.malindab120631@notify-prod.bestcase.com;yamile@mlhlawoffices.com
- **Samuel W Hess**    shess@slp.law, dwoodall@slp.law;pmouton@slp.law;shess@ecf.courtdrive.com;mortman@slp.law
- **Michael S Hoffman**    mhoffman@lessnehoffman.law, mhoffman@ecf.courtdrive.com

- **Erin M Hoskins**    ehoskins@bergersingerman.com, efile@bergersingerman.com;efile@ecf.courtdrive.com
- **Jason Ward Johnson**    jjohnson@gunster.com, dmowery@gunster.com
- **Amrit S Kapai**    akapai@dunnlawpa.com, rbasnueva@dunnlawpa.com;tudani@dunnlawpa.com;lrodriguez@dunnlawpa.com;mflores@dunnlawpa.com
- **Matthew S Kish**    mkish@sbwh.law, mlarhzal@sbwh.law;r65072@notify.bestcase.com
- **Harris J. Koroglu**    hkoroglu@shutts.com, mcabo@shutts.com;bvelapoldi@shutts.com;fsantelices@shutts.com
- **Brett D Lieberman**    brett@elrolaw.com, eservice@elrolaw.com;tisha@elbizlaw.com;virginia@elbizlaw.com;denissis@elbizlaw.com
- **William J Maguire**    william@maguire-law.com, assistant@maguire-law.com
- **Paul N Mascia**    pmascia@nardellalaw.com, klynch@nardellalaw.com;msayne@nardellalaw.com;ibennett@nardellalaw.com
- **Kenneth Mather**    kmather@gunster.com, tbacchus@gunster.com;mweaver@gunster.com
- **Brian K. McMahon**    briankmcmahon@gmail.com
- **Glenn D Moses**    gmoses@venable.com, cascavone@venable.com;ipmalcolm@venable.com;jnunez@venable.com;imalcolm@ecf.courtdrive.com;btraina@venable.com
- **Joel F. Newell**    newellj@ballardspahr.com, phxlsateam@ballardspahr.com
- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov
- **Gregory Ohl**    gregory.ohl@colemantalley.com, janet.valdes@colemantalley.com
- **Thomas S Onder**    tonder@stark-stark.com
- **Chad S Paiva**    trustee.paiva@gmail.com, michaelbollingpa@gmail.com,simone@fenderbollingpaiva.com
- **Eric S Pendergraft**    ependergraft@slp.law, dwoodall@slp.law;mortman@slp.law;bshraibergecfmail@gmail.com;pmouton@slp.law
- **L William Porter III**    bporter@lathamluna.com
- **Stephen B Porterfield**    stephen.porterfield@dentons.com, jan.pack@dentons.com;candice.stanford@dentons.com
- **Robert J. Powell**    rpowell@moorheadlaw.com, heidi@moorheadlaw.com;bbangle@moorheadlaw.com
- **Timothy R Qualls**    stalevich@yvlaw.net, tqualls@yvlaw.net
- **Jordan L Rappaport**    office@rorlawfirm.com, 1678370420@filings.docketbird.com
- **David A Ray**    dar@trippscott.com, draycmecf@gmail.com;dar@trippscott.com;aaa@trippscott.com;bankruptcy@trippscott.com
- **Alexis S Read**    asr@alexisreadlaw.com, asr@readlawpllc.com
- **Ricardo A Reyes**    rar@tobinreyes.com, rreid@tobinreyes.com;eservice@tobinreyes.com;mhorton@tobinreyes.com
- **Dana Lee Robbins-Boehner**    drobbins@burr.com, mguerra@burr.com;kkearney@burr.com

- **Richard R Robles**    rrobles@roblespa.com,
  paralegal@roblespa.com;lawclerk@roblespa.com;assistant@roblespa.com;r49546@notify.bestcase.com
- **Eric A Rosen**    erosen@fowler-white.com, CAfilings@fowler-white.com
- **Gail M. Ruiz**    gailruiz@att.net
- **Luis Salazar**    lsalazar@coleschotz.com, luis-salazar-4791@ecf.pacerpro.com;lsalazar@coleschotz.com;JCeide@coleschotz.com;LLorenzo@coleschotz.com;Alee-sin@coleschotz.com;DFernandez@coleschotz.com;EVazquez@coleschotz.com
- **Jeffrey N Schatzman**    notices@schatzmanlaw.com,
  g2251@notify.cincompass.com;schatzman.jeffreyn.b105574@notify.bestcase.com
- **Steven D Schneiderman**    Steven.D.Schneiderman@usdoj.gov
- **David B Shemano**    dshemano@shemanolaw.com,
  mkolcun@robinskaplan.com;cweiner@robinskaplan.com
- **Bradley S Shraiberg**    bss@slp.law,
  dwoodall@slp.law;dwoodall@ecf.courtdrive.com;pmouton@slp.law;mortman@slp.law
- **R Scott Shuker**    rshuker@shukerdorris.com,
  atillman@shukerdorris.com;mfranklin@shukerdorris.com;lstricker@shukerdorris.com;wtownsend@shukerdorris.com
- **Eric J Silver**    esilver@stearnsweaver.com,
  jless@stearnsweaver.com;fsanchez@stearnsweaver.com;cgraver@stearnsweaver.com;mfernandez@stearnsweaver.com
- **Paul Steven Singerman**    singerman@bergersingerman.com,
  hmoreno@bergersingerman.com;efile@bergersingerman.com;efile@ecf.courtdrive.com
- **Jason Slatkin**    jslatkin@loriumlaw.com, ecf.jslatkin@loriumlaw.com
- **David R Softness**    david@softnesslaw.com
- **Nicolaos Soulellis**    nsoulellis@gunster.com,
  tbacchus@gunster.com;mweaver@gunster.com
- **Gavin N Stewart**    bk@stewartlegalgroup.com
- **Lauren Stricker**    lstricker@shukerdorris.com,
  atillman@shukerdorris.com;mdorris@shukerdorris.com;mfranklin@shukerdorris.com;rshuker@shukerdorris.com;wtownsend@shukerdorris.com
- **James S Telepman**    jst@cohennorris.com
- **Seth P Traub**    straub@shumaker.com, dmccabe@shumaker.com
- **John J Wiles**    bankruptcy@evict.net