UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11

SAILORMEN, INC.,                                          Case No. 26-10451-RAM

    Debtor.[1]

_____ /

## **SUPPLEMENT TO MOTION TO APPROVE KEY EMPLOYEE INCENTIVE PLAN**

Sailormen, Inc. (the "Debtor") hereby supplements its *Expedited Motion to Approve Key Employee Incentive Plan* [Dkt. No. 469] (the "Motion").[2] In support of the Motion, the Debtor states:

## **INTRODUCTION**

The KEIP resulted from roughly two-and-a-half months of negotiations. During that time, in reliance that the Debtor would ultimately seek approval of the KEIP, the KEIP Participants drove down the Debtor's costs while input prices rose and increased sales while brand demand dropped. The KEIP results from good faith negotiations between the Debtor, BMO Bank, N.A. ("BMO"), Popeye's Louisiana Kitchen, Inc. ("PLK"), and the Debtor's CEO David Damato. Neither the Committee nor any creditor filed a substantive objection to the KEIP. To deny approval of the KEIP will deny the KEIP Participants' the benefit of their good faith reliance in proceeding to implement strategies to achieve the KEIP Milestones while the KEIP remained under negotiation. The KEIP is a sound exercise of the Debtor's business judgment and benefits creditors

---

[1] The Debtor in this Chapter 11 case and the last four digits of its federal tax identification number are Sailormen, Inc. (5214). The location of the Debtor's corporate headquarters and the Debtor's service address in this chapter 11 case is Miami, Florida.

[2] Capitalized terms not otherwise defined herein shall have the meaning given to them in the Motion.

1

and the estate through driving financial metrics which, in turn, will drive sale proceeds. Accordingly, the Debtor requests the Court approve the KEIP.

## BACKGROUND

1.      The Debtor filed the Motion on April 30, 2026. On May 15, 2026, the United States Trustee filed an objection to the Motion [Dkt. No. 538] (the "Objection").

2.      The United States Trustee asserts the Debtor has set the bar too low because the Debtor already meets the KEIP Milestones. It follows, the United States Trustee argues, that the KEIP Participants need do nothing other than merely remain employed, removing any incentivizing effect from the KEIP.

3.      While the Debtor filed the Motion on April 30, the Debtor began work on the KEIP contemporaneously with the Petition Date. In spite of the KEIP not being finalized, the KEIP Participants pushed for greater performance in the good faith reliance that the KEIP would result. The Court should not now punish the KEIP Participants for that reliance and their success.

4.       The initial version of the KEIP provided for a $1,500,000.00 pool solely for Mr. Damato tied to the outcome of the sale of the Debtor's assets. The Debtor and its CRO rejected that proposal on the grounds that the proposed pool was excessive and did not provide benefits to enough employees. The Debtor and its CRO, with advice from the Debtor's investment banker, engaged in extensive, good faith negotiations with Mr. Damato, BMO, and PLK. Those negotiations produced proposals, which the Debtor rejected, for plans with pools of $1.2 million, $900,000, and $750,000, all solely for Mr. Damato. Finally, shortly before the filing of the Motion, the negotiations resulted in the KEIP which provided for a reduced pool and increased participation. The Debtor did not file the Motion until the Debtor obtained those consents.

However, the Debtor pushed management to stretch to reach the KEIP Milestones in reliance on the eventuality that the Debtor would seek approval of the KEIP.

5.        Notwithstanding that the KEIP remained under negotiation, the KEIP Participants undertook the challenge of improving the Debtor's financial metrics. During the first four weeks of this case, the Debtor had average net weekly store level sales of $3.80 million. In January 2026, the Debtor's Prime Cost was 59.8%.  At that time, the Sales Milestone of $3.90 million and Prime Cost Milestone of 57.0% were aggressive goals. That the Debtor is currently meeting those metrics does not diminish the efforts required to place the Debtor in its current financial position. While the Debtor has met the KEIP Milestones, the underlying costs of food and paper have skyrocketed, and the sales of Popeye's brand-wide have declined. In other words, as the price of inputs have risen, the KEIP Participants have cut expenses, and while brand demand has decreased, the KEIP Participants have increased sales.

6.        Adding to the challenges faced by the KEIP Participants, the Debtor's COO and two regional managers left the company during the bankruptcy. The remaining four regional managers had to increase their duties to cover the two regions now left rudderless, and the Debtor's other management had to step up to compensate for a lost executive. Mr. Damato had to assume the COO's roles in addition to his responsibilities as CEO. The Debtor's finance team has also had to pull extra hours to provide the financial information necessary to run a large, complex bankruptcy while also running a large, complex enterprise. If the Court does not approve the KEIP, the Debtor may lose other regional managers at a time when the Debtor cannot afford to do so.

7.        At the hearing on this Motion, the Debtor will present the testimony of David Baker in support of the KEIP. Attached hereto as **Exhibit A** are charts showing the Debtor's performance of the KEIP Milestones during the pendency of the bankruptcy.

**ARGUMENT**

8.      Only the United States Trustee has filed a substantive objection to the KEIP. The United States Trustee argues for a minority position requiring a showing of business judgment plus "whether the payments serve the interests of creditors and the debtor's estate" derived from *Pilgrim's Pride*. *In re Pilgrim's Pride Corp.*, 401 B.R. 220 (Bankr. N.D. Tex. 2009).

9.      A majority of courts have determined that § 503(c)(3) imparts the same business judgment test as § 363(b) following the seminal case of *Dana Corp*. *See, e.g., In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006) ("*Dana II*"); *In re Walter Energy, Inc.*, Case No. 15-02741-TOM11, 2015 WL 9583521, at *4 (Bankr. N.D. Ala. Dec. 28, 2015); *In re Patriot Coal Corp.*, 492 B.R. 518, 531 (Bankr. E.D. Mo. 2013); *In re Global Home Products, LLC*, 359 B.R. 778, 786 (Bankr. D. Del. 2007); *See also*, *In re Alpha Natural Resources, Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("a majority of courts outside the Fourth Circuit agree that the 'facts and circumstances' test of § 503(c)(3) is identical to the business judgment test under § 363(b)(1)").

10.      When looking to whether the Debtor satisfies the business judgment test, courts inquire as to: whether the plan is calculated to achieve the desired performance; whether the costs are reasonable in light of the debtor's finances; diligence efforts in investigating the need for a plan; and whether independent counsel reviewed and authorize the plan. *Dana II*, 358 B.R. at 576-77.

11.      As detailed in the Motion, the Debtor has met those factors. In addition, the KEIP resulted from months of negotiations between the Debtor, Mr. Damato, BMO, and PLK, reflecting extensive diligence efforts conducted with input from multiple independent, outside parties. Throughout that process, the CRO represented the Debtor, ensuring the Debtor acted independent from its CEO. The fact that the Committee has not objected to the KEIP underscores the fact that

4

that process produced a reasonable outcome. While the United States Trustee argues the KEIP is a "layup," the Court has the benefit of hindsight that the KEIP actually incentivized the desired outcome. The KEIP is also necessary to improve morale of an overtaxed workforce when the Debtor cannot hire due to its bankruptcy and to position the Debtor for its sale process. As discussed in the Motion, the Debtor's bankruptcy counsel, Investment Banker, and CRO have reviewed and authorized the KEIP—and the Debtor received the independent input of the Committee, BMO, and PLK.

12.    Even if the Court applies the heightened standard from *Pilgrim's Pride*, the Debtor meets that standard. No creditor has filed a substantive objection to the Motion. The Committee has not been shy to voice its opposition in this case. Yet, the Committee "supports the Debtor's efforts to pursue a value-maximizing sale for the benefit of creditors and does not oppose the proposed key employee incentive plan." Dkt. No. 539. The Committee only seeks to reserve its rights as to the source of funds from which the Debtor will generate the KEIP Pool. BMO, who on a good day is $40 million undersecured, supports the KEIP as the best way to maximize the value of the Debtor's assets.

13.    The KEIP also benefits creditors as a whole. The KEIP incentivizes the KEIP Participants to improve the Debtor's financial metrics which, in turn, will cause the Debtor to command better prices at auction. Accordingly, all constituencies will benefit. Additionally, without the KEIP, the Debtor risks more management defections on the eve of the Debtor's sale. To be clear, the KEIP is primarily incentivizing. However, even incentivizing plans may have some retentive effect. *See Dana II*, 358 B.R. at 572 ("merely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature"). Any further defections of regional managers at this late stage would imperil the success of a sale

5

process. Accordingly, the KEIP benefits creditors as a whole because it helps to ensure a successful sale process both through driving the Debtor's financial metrics and through ensuring the full buy-in of the Debtor's central leadership.

WHEREFORE, the Debtor requests the Court grant the Motion.

Dated: May 19, 2026                              Respectfully submitted,

                                                 **SHRAIBERG PAGE, P.A.**
                                                 *Attorneys for the Debtor Sailormen, Inc.*
                                                 2385 NW Executive Center Drive, Suite 300
                                                 Boca Raton, Florida 33431
                                                 Telephone: 561-443-0800
                                                 Facsimile: 561-998-0047
                                                 Email: bss@slp.law
                                                 Email: shess@slp.law

                                                 By: */s/ Bradley S. Shraiberg*
                                                        Bradley S. Shraiberg
                                                        Florida Bar No. 121622
                                                        Samuel W. Hess
                                                        Florida Bar No. 1044184


### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing by CM/ECF to all parties registered to receive such service in this case on May 19, 2026.

                                                 */s/ Bradley S. Shraiberg*
                                                 Bradley S. Shraiberg

6

# EXHIBIT A

**Sailormen Inc**

Performance overview

| Year | Period | Week | Net Sales | Net Sales (MM) |
|---|---|---|---|---|
| 2026 | P1 | P1W1 | $ 3,707,422 | $ 3.71 |
| 2026 | P1 | P1W2 | $ 3,674,567 | $ 3.67 |
| 2026 | P1 | P1W3 | $ 3,623,710 | $ 3.62 |
| 2026 | P1 | P1W4 | $ 3,678,480 | $ 3.68 |
| 2026 | P2 | P2W1 | $ 3,928,582 | $ 3.93 |
| 2026 | P2 | P2W2 | $ 3,985,550 | $ 3.99 |
| 2026 | P2 | P2W3 | $ 3,752,995 | $ 3.75 |
| 2026 | P2 | P2W4 | $ 4,073,413 | $ 4.07 |
| 2026 | P3 | P3W1 | $ 4,381,356 | $ 4.38 |
| 2026 | P3 | P3W2 | $ 4,204,434 | $ 4.20 |
| 2026 | P3 | P3W3 | $ 4,203,150 | $ 4.20 |
| 2026 | P3 | P3W4 | $ 4,153,863 | $ 4.15 |
| 2026 | P4 | P4W1 | $ 4,127,569 | $ 4.13 |
| 2026 | P4 | P4W2 | $ 4,211,805 | $ 4.21 |
| 2026 | P4 | P4W3 | $ 4,137,220 | $ 4.14 |
| 2026 | P4 | P4W4 | $ 4,545,299 | $ 4.55 |
| 2026 | P5 | P5W1 | $ 4,322,839 | $ 4.32 |
| 2026 | P5 | P5W2 | $ 4,272,264 | $ 4.27 |
| 2026 | P5 | P5W3 | $ 3,969,397 | $ 3.97 |



Sailormen Inc Net Sales (in millions)

| | P1W1 | P1W2 | P1W3 | P1W4 | P2W1 | P2W2 | P2W3 | P2W4 | P3W1 | P3W2 | P3W3 | P3W4 | P4W1 | P4W2 | P4W3 | P4W4 | P5W1 | P5W2 | P5W3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales (MM) | $3.71 | $3.67 | $3.62 | $3.68 | $3.93 | $3.99 | $3.75 | $4.07 | $4.38 | $4.20 | $4.20 | $4.15 | $4.13 | $4.21 | $4.14 | $4.55 | $4.32 | $4.27 | $3.97 |

## Sailormen Inc

Performance overview

| Year | Period | Food Cost | Paper Cost | Total COGS | COGS % | Wages | Benefits | Total Labor | Labor % | Prime Cost | % Prime |
|------|--------|-----------|------------|------------|--------|-------|----------|-------------|---------|------------|---------|
| 2025 | P12 | $ 5,315,909 | $ 473,802 | $ 5,789,712 | 33.6% | $ 4,034,766 | $ 689,233 | $ 4,723,999 | 27.4% | $ 10,513,711 | 61.0% |
| 2025 | P13 | $ 4,844,127 | $ 452,894 | $ 5,297,021 | 32.6% | $ 3,820,260 | $ 718,199 | $ 4,538,459 | 27.9% | $ 9,835,480 | 60.5% |
| 2026 | P1 | $ 4,664,303 | $ 449,608 | $ 5,113,911 | 32.3% | $ 3,756,174 | $ 601,361 | $ 4,357,535 | 27.5% | $ 9,471,446 | 59.8% |
| 2026 | P2 | $ 4,593,105 | $ 393,661 | $ 4,986,765 | 30.9% | $ 3,519,929 | $ 536,335 | $ 4,056,264 | 25.1% | $ 9,043,029 | 56.1% |
| 2026 | P3 | $ 4,949,630 | $ 419,827 | $ 5,369,456 | 31.1% | $ 3,659,989 | $ 539,491 | $ 4,199,480 | 24.3% | $ 9,568,937 | 55.4% |
| 2026 | P4 | $ 5,005,300 | $ 436,983 | $ 5,442,283 | 31.5% | $ 3,666,990 | $ 547,308 | $ 4,214,298 | 24.4% | $ 9,656,581 | 55.8% |



Sailormen Inc - Prime Cost Trend %

| | P12 2025 | P13 2025 | P1 2026 | P2 2026 | P3 2026 | P4 2026 |
|---|---|---|---|---|---|---|
| % Prime | 61.0% | 60.5% | 59.8% | 56.1% | 55.4% | 55.8% |
| Labor % | 27.4% | 27.9% | 27.5% | 25.1% | 24.3% | 24.4% |
| COGS % | 33.6% | 32.6% | 32.3% | 30.9% | 31.1% | 31.5% |