UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

SAILORMEN, INC.,                                              Case No. 26-10451-RAM

        Debtor.                                              Chapter 11

_____/

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF
POPEYES LOUISIANA KITCHEN, INC. AS TO THE DEBTOR'S (A) MOTION FOR
ENTRY OF AN ORDER AUTHORIZING AND APPROVING (I) THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS AND (II) THE ASSIGNMENT AND
ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES [ECF NO. 396]; AND (B) NOTICE OF POSSIBLE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION WITH SALE [ECF NO. 543]**

       Popeyes Louisiana Kitchen, Inc. ("Popeyes"), through its undersigned counsel, files this Limited Objection and Reservation of Rights (this "Limited Objection") to the Debtor's (A) *Motion of the Debtor and Debtor-in-Possession for Entry of an Order Authorizing and Approving (I) the Sale of all or Substantially all of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Sale Motion") [ECF No. 396] and (B) *Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale* (the "Cure Notice") [ECF No. 543, Exhibit G], and respectfully states as follows:

**PRELIMINARY STATEMENT**

       Sailormen, Inc. (the "Debtor") operates 119 POPEYES® restaurants (the "Restaurants") under separate franchise agreements (the "Franchise Agreements") with Popeyes.  In connection with the proposed sale of substantially all of its assets (the "Assets") pursuant to the Sale Motion and the Cure Notice, the Debtor seeks to assume and assign the Franchise Agreements to certain

"Successful Bidders" (defined in the Bid Procedures Order (as defined below)).  In order to assume and assign such Franchise Agreements, the Debtor is required to comply with the applicable subsections of Section 365 of the Bankruptcy Code, including Section 365(c)(1).  As set forth below, Section 365(c)(1) of the Bankruptcy Code and applicable non-bankruptcy law prohibits the Debtor from assuming and assigning the Franchise Agreements without the consent of Popeyes as the franchisor.  Popeyes has participated in the process leading up to the hearing on the Sale Motion, including using its best effort to evaluate and approve, to the extent possible, prospective buyers for the Assets.  While Popeyes will continue to work in good faith with the major constituencies in this case leading up to the sale hearing, Popeyes reserves all of its right to object to and withhold its consent in respect of any proposed assumption and assignment of the Franchise Agreements under applicable law and 11 U.S.C. § 365(c)(1).

In addition, the Debtor is required under Section 365 of the Bankruptcy Code to cure all outstanding amounts owed to Popeyes in connection with any proposed assumption and assignment of the Franchise Agreements.  Pursuant to the Bid Procedures Order, the Debtor was required to serve notice of proposed cure amounts to counterparties to any executory contracts that were proposed to be assumed and assigned in connection with the Sale Motion.  On May 19, 2026, the Debtor filed and served the Cure Notice.  In the Cure Notice, the Debtor listed two amounts for the proposed cure amounts to owed to Popeyes, one for $4,052,935.00 and one for $2,613,267.59 (the "Proposed Popeyes Cure Amounts").  No additional details were provided by the Debtor in connection with the Proposed Popeyes Cure Amounts, including whether the amounts represented pre-petition cure amounts or post-petition cure amounts, and no breakdown of how such amounts related to any of the Franchise Agreements that are proposed to be assumed and assigned in connection with the Sale Motion.  As a result, Popeyes objects to the Proposed

2

Popeyes Cure Amounts and asserts that the proper cure amounts owed to Popeyes on a "Franchise Agreement by Franchise Agreement" basis is set forth in detail in the attached **Exhibit "A"** (the "Correct Popeyes Cure Amounts").

## **RELEVANT BACKGROUND**

1.       On January 15, 2026 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor operates its business and manages its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.       Popeyes is the Debtor's franchisor.  As of the Petition Date, the Debtor operated 136 POPEYES® Restaurants in the states of Florida and Georgia under the separate Franchise Agreements with Popeyes (the "Franchise Agreements").[1]

3.       On March 13, 2026, the Court entered a *Final Order (I) Authorizing the use of Cash Collateral Order; (II) Granting Adequate Protection; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* [ECF No. 327] (the "Final Cash Collateral Order").  Pursuant to the Final Cash Collateral Order, Popeyes agreed to provide significant financial accommodations to the Debtor through the deferral of over $4.4 million in post-petition royalties, advertising fees and other charges that have accrued to Popeyes under the Franchise Agreements (the "Deferred Obligations").[2]

---

[1] Since the Petition Date, the Debtor rejected the Franchise Agreements and related real property leases for 17 of those restaurants [ECF Nos. 309 and 328].

[2] In connection with Popeyes' agreement to the Deferred Obligations, the Final Cash Collateral Order required the Debtor's budget to include, among other things, an aggregate amount equal to $5,100,000 to be paid to Popeyes in 17 weekly payments of $300,000 per week, for the entire budget period in respect of obligations coming due under the Franchise Agreements from and after the week ending March 8, 2026 through June 30, 2026, to be allocated by Popeyes amongst the operating Restaurants each week based on each restaurant's pro-rata percentage of total sales. In partial consideration for the Deferred Obligations, the Debtor was directed to pay on a weekly basis all reasonable out-of-pocket fees, costs and expenses incurred by counsel and advisors to Popeyes up to the maximum amount per week of $40,000.

4.      On  March 20, 2026, the Court entered an *Order (I) Approving Bidding Procedures for the Sale of All or Substantially All the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (II) Approving the Form of Asset Purchase Agreement; (III) Authorizing the Debtor to Enter Into Stalking Horse Agreements and Approving Bid Protections for Stalking Horse Bidders; (IV) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (V) Scheduling an Auction For, and Hearing to Approve, the Sale of All or Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (VI) Approving the Form and Manner of Sale Notice; and (VII) Granting Related Relief* [ECF No. 378] ("Bidding Procedures Order").

5.      Among other things, the Bidding Procedures Order (i) approved the Bidding Procedures[3] and the form Asset Purchase Agreement, (ii) established June 11, 2026 as the Bid Deadline, (iii) scheduled the Auction for June 15, 2026, (iv) established June 17, 2026 at noon for filing objections to the Sale Motion and objections to the Cure Notice, and (v) set the Sale Hearing for June 18, 2026 at 9:30 a.m.

6.      On March 25, 2026, Debtor filed the Sale Motion [ECF No. 396], seeking, among other things, authorization to (i) sell substantially all of the Debtor's Assets, including the Franchise Agreements, free and clear to the successful bidders of the Assets and (ii) assume and assign certain executory contracts, including the Franchise Agreements, in connection with the sale.

**RESERVATION OF RIGHTS REGARDING ASSUMPTION
AND ASSIGNMENT OF FRANCHISE AGREEMENTS**

7.      Popeyes is supportive of the sale of the Debtor's Restaurants on a going concern

---

[3] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Bidding Procedures Order.

basis and has been working with the Debtor and other constituencies to approve proposed buyers. Popeyes has also made a bid to acquire 16 Restaurants in the Miami market, and participated in an auction that commenced on June 15, 2026 and was concluded on June 17, 2026. However, in order to protect its interests, Popeyes reserves all of its rights to object to the assumption and assignment of any of the Franchise Agreements in connection with any sale that the Debtor ultimately proposes to the Court at the hearing on the Sale Motion pursuant to applicable law and section 365(c)(1) of the Bankruptcy Code.

8.      Pursuant to 11 U.S.C. § 365(c)(1) and applicable law (the Lanham Act, codified in Chapter 22 of Title 15 of the United States Code), the Debtor cannot assume or assign any of the Franchise Agreements without the consent of Popeyes. *In re Wellington Vision, Inc.*, 364 B.R. 129, 134-37 (S.D. Fla. 2007); *In re Taylor Investment Partners II, LLC*, 533 B.R. 837, 843 (Bankr. N.D. Ga. 2015); *In re Ajranc Insurance Agency, Inc.*, 2021 WL 2774937 (Bankr. M.D. Fla. 2021); *In re Pinnacle Foods of California LLC*, 2024 WL 4481070 (Bankr. E.D. Calif. 2024); *In re Rupari Holding Corp.*, 573 B.R. 111, 117 (Bankr. D. Del. 2017); *In re The Travelot Co.*, 286 B.R. 447 (Bankr. S.D. Ga. 2002).

9.      Pursuant to 11 U.S.C. § 365(c)(1), Popeyes reserves the right to withhold its consent to assignment and assumption of any of the Franchise Agreements for any sales proposed by the Debtor at the hearing on the Sale Motion.

### LIMITED OBJECTION TO PROPOSED CURE AMOUNT

10.      May 18, 2026, the Debtor served the *Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale* (ECF No. 543) ("Cure Notice") on counterparties to executory contracts and unexpired leases, including

Popeyes.[4]

11. The Cure Notice attaches a schedule of the Debtor's leases and executory contracts that may be assumed and assigned in connection with the sale, along with the Debtor's proposed cure amounts for each agreement. The Cure Notice lists Popeyes as being due, in the aggregate as opposed to by each Franchise Agreement, the Proposed Popeyes Cure Amounts of $4,052,935.00 and $2,613,267.59 for a total Cure Amount of $6,666,202.59.

12. Popeyes objects the Cure Notice because the Proposed Popeyes Cure Amounts contain no details whatsoever as to how much is proposed to be owed to Popeyes under each individual Franchise Agreement as required by Section 365 of the Bankruptcy Code and the Bid Procedures Orders. Rather, Popeyes asserts that the Correct Popeyes Cure Amounts attached as **Exhibit "A"** hereto represents the pre-petition and post-petition amounts due to Popeyes under the Franchise Agreements, broken down on a restaurant by restaurant basis through May 31, 2026, with estimates through June 30, 2026, and accounts for the Deferred Obligations and reduced payments made to Popeyes under the Final Cash Collateral Order. As set forth therein, the total Correct Popeyes Cure Amount due to Popeyes is $6,527,227.

13. Popeyes shared the Correct Popeyes Cure Amount with the Debtor on June 8, 2026, including an excel spreadsheet that contains substantial detail on a restaurant-by-restaurant basis of all amounts due and owing, and expected to be due and owing through the anticipated closing date of June 30, 2026.

14. The Debtor must comply with Section 365(b)(1) of the Bankruptcy Code in order to assume and assign the Franchise Agreements, including the requirement that the Debtor cure all defaults thereunder, which include both monetary and non-monetary defaults. The monetary cure

---

[4] A copy of the Cure Notice can be found attached to the Debtor's Certificate of Service as Exhibit G at ECF No. 543.

obligation due to Popeyes in the aggregate (as broken down in the attached Correct Popeyes Cure Amount) is $6,527,227, subject however to final adjustments based on actual restaurant sales and any unpaid professional fees due to Popeyes under the Franchise Agreements through the closings of the sales of the Restaurants.

### ANY ASSUMPTION AND ASSIGNMENT OF THE FRANCHISE AGREEMENTS MUST INCLUDE A RELEASE IN FAVOR OF POPEYES

15.    The Franchise Agreements include a number of conditions precedent to assumption and assignment of such Franchise Agreements, including the requirement that the Debtor execute a general release in favor of Popeyes.  Specifically, paragraph 14.03 (E) of each Franchise Agreement, a copy of which is attached as **Exhibit "B"** hereto, requires as a condition for transfer:

> . . . Franchisee shall unconditionally release any and all claims Franchisee might have against Franchisor and its parent companies, subsidiaries, and affiliates as of the date of the transfer.

16.    It is settled law that an executory contract may not be assumed in part and rejected in part; an executory contract must be either assumed in its entirety or otherwise completely rejected.  *See In re G-I Holdings, Inc.*, 580 B.R. 388, 420 (Bankr. D.N.J. 2018); *AGV Prods, Inc. v. Metro-Godwyn-Mayer, Inc.*, 115 F. Supp. 2d 378, 390-391 (S.D.N.Y. 2000); *In re Beverage Canners Int'l Corp.,* 255 B.R. 89, 95 (Bankr.S.D.Fla.2000); *In re Yates Development, Inc.,* 241 B.R. 247, 252 (Bankr.M.D.Fla.1999).  As a result, any assumption of the Franchise Agreements by the Debtor requires that Popeyes receive a release from the Debtor as described above.

### FURTHER RESERVATION OF RIGHTS

17.    Popeyes reserves its rights to make such other and further objections as needed, including, but not limited to, supplement and/or amend this Limited Objection as a result of the auction being conducted by the Debtor, and to assert additional objections regarding adequate assurance of future performance under Section 365.

**WHEREFORE**, Popeyes Louisiana Kitchen, Inc., as the Debtor's franchisor, respectfully requests that this Court enter an order consistent with the foregoing Limited Objection, and for such further relief as the Court deems appropriate.

Dated: June 17, 2026.

**VENABLE LLP**
*Attorneys for Popeyes Louisiana Kitchen, Inc.*
801 Brickell Avenue, Suite 1500
Miami, Florida 33131
Telephone: 305.349.2300
Facsimile: 305.349.2310

By: */s/ Glenn D. Moses*
     Paul J. Battista, Esq.
     Florida Bar No. 884162
     Email: PJBattista@venable.com
     Glenn D. Moses, Esq.
     Florida Bar No. 174556
     Email: GMoses@venable.com

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on June 17, 2026, a true and correct copy of the foregoing document has been furnished via electronic mail by virtue of the Court's CM/ECF Filing System upon all interested parties registered to receive electronic notice on this matter.

By: */s/ Glenn D. Moses*
     Glenn D. Moses, Esq.

# EXHIBIT "A"

| PLK# | Address | City | State | Postal Code | Gross Cure Claims | Payment Allocation | Estimated Total Cure Claims |
|---|---|---|---|---|---|---|---|
| 140 | 5581 Soutel Dr | Jacksonville | Florida | 32219 | 84,337 | (41,245) | 43,092 |
| 166 | 3981 Columbia St | Orlando | Florida | 32805 | 80,711 | (39,091) | 41,620 |
| 405 | 8007 Normandy Blvd | Jacksonville | Florida | 32221 | 107,256 | (48,447) | 58,810 |
| 438 | 1902 N Main St | Jacksonville | Florida | 32206 | 96,727 | (46,700) | 50,027 |
| 716 | 121 NW Main Blvd | Lake City | Florida | 32055 | 47,027 | (22,299) | 24,728 |
| 918 | 813 Lake Bradford Rd | Tallahassee | Florida | 32304 | 84,610 | (38,471) | 46,139 |
| 1097 | 7507 Atlantic Blvd | Jacksonville | Florida | 32211 | 58,607 | (26,055) | 32,552 |
| 1369 | 6310 103rd St | Jacksonville | Florida | 32210 | 106,723 | (47,883) | 58,840 |
| 2048 | 605 Martin Luther King Jr Blvd | Savannah | Georgia | 31401 | 77,556 | (34,996) | 42,560 |
| 2049 | 3411 N Pace Blvd | Pensacola | Florida | 32505 | 92,967 | (41,785) | 51,182 |
| 2078 | 1509 University Blvd N | Jacksonville | Florida | 32211 | 56,650 | (25,071) | 31,580 |
| 2086 | 814 E Cervantes St | Pensacola | Florida | 32501 | 60,208 | (27,127) | 33,081 |
| 2110 | 5534 NW 7th Ave | Miami | Florida | 33127 | 121,854 | (54,897) | 66,956 |
| 2130 | 11205 SW 152nd St | Miami | Florida | 33157 | 103,475 | (46,455) | 57,020 |
| 2137 | 2490 NW 79th St | Miami | Florida | 33147 | 107,632 | (48,502) | 59,130 |
| 2153 | 108 S Kings Ave | Brandon | Florida | 33511 | 144,023 | (65,078) | 78,945 |
| 2175 | 711 N Navy Blvd | Pensacola | Florida | 32507 | 101,353 | (45,392) | 55,961 |
| 2176 | 3291 W Broward Blvd | Fort Lauderdale | Florida | 33312 | 150,461 | (68,455) | 82,005 |
| 2186 | 5245 W Colonial Dr | Orlando | Florida | 32808 | 147,825 | (67,004) | 80,821 |
| 2187 | 6725 W Sand Lake Rd | Orlando | Florida | 32819 | 110,193 | (48,763) | 61,430 |
| 2198 | 3285 NW 183rd St | Miami Gardens | Florida | 33056 | 167,940 | (76,503) | 91,438 |
| 2250 | 45 N Orange Blossom Trl | Orlando | Florida | 32805 | 91,485 | (40,819) | 50,666 |
| 2252 | 1713 S Pine Ave | Ocala | Florida | 34471 | 119,739 | (54,831) | 64,908 |
| 2256 | 2514 Bull St | Savannah | Georgia | 31401 | 84,011 | (37,796) | 46,215 |
| 2259 | 5715 Normandy Blvd | Jacksonville | Florida | 32205 | 88,536 | (39,606) | 48,930 |
| 2265 | 2337 W Green St | Tampa | Florida | 33607 | 91,163 | (41,601) | 49,562 |
| 2272 | 491 W Tennessee St | Tallahassee | Florida | 32301 | 72,763 | (33,173) | 39,590 |
| 2299 | 5700 Lake Underhill Rd | Orlando | Florida | 32807 | 123,460 | (55,730) | 67,730 |
| 2300 | 101 N Ridgewood Ave | Daytona Beach | Florida | 32114 | 143,681 | (64,504) | 79,177 |
| 2317 | 820 N Washington Blvd | Sarasota | Florida | 34236 | 128,622 | (58,880) | 69,742 |
| 2323 | 1695 NW 103rd St | Miami | Florida | 33147 | 130,337 | (58,780) | 71,556 |
| 2339 | 1355 W Sunrise Blvd | Fort Lauderdale | Florida | 33311 | 179,301 | (80,958) | 98,343 |
| 2347 | 460 W State Road 436 | Altamonte Springs | Florida | 32714 | 84,299 | (38,101) | 46,198 |
| 2348 | 324 W Vine St | Kissimmee | Florida | 34741 | 94,064 | (42,766) | 51,298 |
| 2350 | 4108 University Blvd S | Jacksonville | Florida | 32216 | 84,869 | (37,931) | 46,938 |
| 2366 | 2060 E Victory Dr | Savannah | Georgia | 31404 | 107,030 | (47,917) | 59,113 |
| 2450 | 12100 NW 7th Ave | North Miami | Florida | 33168 | 137,016 | (61,680) | 75,335 |
| 2459 | 2143 Edgewood Ave W | Jacksonville | Florida | 32209 | 85,249 | (39,004) | 46,246 |
| 2465 | 524 Atlantic Blvd | Neptune Beach | Florida | 32266 | 69,112 | (31,137) | 37,975 |
| 2500 | 116 W Merritt Island Cswy | Merritt Island | Florida | 32952 | 94,858 | (41,999) | 52,859 |

| PLK# | Address | City | State | Postal Code | Gross Cure Claims | Payment Allocation | Estimated Total Cure Claims |
|---|---|---|---|---|---|---|---|
| 2503 | 928 N Woodland Blvd | Deland | Florida | 32720 | 85,418 | (37,506) | 47,912 |
| 2519 | 1324 Dunn Ave | Jacksonville | Florida | 32218 | 87,163 | (39,186) | 47,977 |
| 2532 | 3390 1st St | Bradenton | Florida | 34208 | 31,020 | (15,135) | 15,885 |
| 2563 | 20690 NW 2nd Ave | Miami | Florida | 33169 | 203,687 | (85,071) | 118,616 |
| 2594 | 430 Blanding Blvd | Orange Park | Florida | 32073 | 85,269 | (37,974) | 47,295 |
| 2600 | 35988 Hwy 27 | Haines City | Florida | 33844 | 104,795 | (48,160) | 56,635 |
| 2606 | 1035 Lee Rd | Orlando | Florida | 32810 | 79,491 | (38,603) | 40,888 |
| 2646 | 1412 N Main St | Gainesville | Florida | 32601 | 103,103 | (46,323) | 56,780 |
| 2647 | 1501 NW 20th St | Miami | Florida | 33142 | 187,764 | (85,046) | 102,718 |
| 2648 | 233 W HIllsboro Blvd | Deerfield Beach | Florida | 33441 | 146,626 | (66,307) | 80,319 |
| 2689 | 613 N 14th St | Leesburg | Florida | 34748 | 91,830 | (41,228) | 50,602 |
| 2762 | 350 E Nine Mile Rd | Pensacola | Florida | 32514 | 72,204 | (31,891) | 40,313 |
| 2804 | 2660 S Hwy 17-92 | Sanford | Florida | 32771 | 94,682 | (42,537) | 52,145 |
| 2808 | 10132 San Jose Blvd | Jacksonville | Florida | 32257 | 63,887 | (30,923) | 32,964 |
| 2885 | 2225 W New Haven Ave | Melbourne | Florida | 32904 | 103,000 | (46,731) | 56,269 |
| 2895 | 3511 Thomasville Rd | Tallahassee | Florida | 32309 | 76,196 | (33,939) | 42,257 |
| 2896 | 402 E Main St | Apopka | Florida | 32703 | 104,605 | (47,614) | 56,991 |
| 2939 | 2005 S Frontage Rd | Plant City | Florida | 33563 | 88,983 | (40,157) | 48,825 |
| 3593 | 615 E Oglethorpe Ave (State Rd 84) | Hinesville | Georgia | 31313 | 96,016 | (42,318) | 53,698 |
| 3799 | 2561 Enterprise Rd | Orange City | Florida | 32763 | 137,800 | (62,252) | 75,548 |
| 4214 | 1050 S Walnut St | Starke | Florida | 32091 | 51,326 | (22,297) | 29,029 |
| 4261 | 12131 S Orange Blossom Trl | Orlando | Florida | 32837 | 62,308 | (27,885) | 34,423 |
| 4262 | 710 S State Road 19 | Palatka | Florida | 32177 | 81,504 | (35,896) | 45,608 |
| 4574 | 2119 Bemiss Rd | Valdosta | Georgia | 31602 | 75,662 | (33,555) | 42,107 |
| 4624 | 2865 E Pinetree Blvd | Thomasville | Georgia | 31792 | 86,716 | (38,560) | 48,156 |
| 4696 | 1000 NE 163rd St | Miami | Florida | 33162 | 170,481 | (77,250) | 93,231 |
| 4723 | 2201 E Hillsborough Ave | Tampa | Florida | 33610 | 111,771 | (50,934) | 60,837 |
| 4754 | 3499 W Oakland Park Blvd | Lauderdale Lakes | Florida | 33311 | 189,189 | (85,880) | 103,310 |
| 4806 | 25 6th St SW | Winter Haven | Florida | 33880 | 106,950 | (48,362) | 58,588 |
| 4822 | 107 S 25th St | Fort Pierce | Florida | 34947 | 96,877 | (47,322) | 49,555 |
| 4901 | 5950 Park Blvd N | Pinellas Park | Florida | 33781 | 75,607 | (34,276) | 41,330 |
| 4904 | 2550 US Highway 98 N | Lakeland | Florida | 33805 | 105,925 | (47,134) | 58,791 |
| 5321 | 2216 E Fletcher Ave | Tampa | Florida | 33612 | 95,101 | (43,324) | 51,777 |
| 5536 | 27101 S Dixie Hwy | Naranja | Florida | 33032 | 101,853 | (46,120) | 55,733 |
| 6089 | 18401 S Dixie Hwy | Cutler Bay | Florida | 33157 | 119,627 | (53,468) | 66,160 |
| 8782 | 2701 E Busch Blvd | Tampa | Florida | 33612 | 92,032 | (41,648) | 50,384 |
| 8981 | 5760 S Orange Blossom Trl | Orlando | Florida | 32839 | 86,453 | (38,660) | 47,793 |
| 11707 | 12001 East Colonial Road | Orlando | Florida | 32826 | 130,460 | (59,729) | 70,732 |
| 11853 | 1678 Taylor Road | Port Orange | Florida | 32128 | 66,245 | (29,092) | 37,153 |
| 12014 | 10923 W. Colonial Drive | Ocoee | Florida | 34761 | 117,376 | (53,058) | 64,318 |

| PLK# | Address | City | State | Postal Code | Gross Cure Claims | Payment Allocation | Estimated Total Cure Claims |
|---|---|---|---|---|---|---|---|
| 12571 | 1302 West Jefferson Street | Quincy | Florida | 32351 | 87,694 | (39,941) | 47,753 |
| 12573 | 4511 Saufley Field Rd | Pensacola | Florida | 32526 | 84,808 | (38,079) | 46,729 |
| 12641 | 4933 New Jesup Hwy | Brunswick | Georgia | 31520 | 74,290 | (32,745) | 41,545 |
| 12642 | 2996 Apalachee Pkwy | Tallahassee | Florida | 32301 | 122,337 | (55,215) | 67,121 |
| 12643 | 2496 Blanding Blvd | Middleburg | Florida | 32068 | 76,984 | (33,753) | 43,231 |
| 12649 | 230 West Mitchell Hammock Road | Oviedo | Florida | 32765 | 63,347 | (28,397) | 34,950 |
| 12677 | 2159 S Byron Butler Pkwy | Perry | Florida | 32348 | 48,777 | (21,149) | 27,628 |
| 12678 | 3870 Ferdon Blvd. | Crestview | Florida | 32536 | 82,422 | (35,940) | 46,482 |
| 12711 | 605 N Krome Ave. | Homestead | Florida | 33030 | 130,234 | (58,811) | 71,424 |
| 12937 | 7762 Argyle Forest Boulevard | Jacksonville | Florida | 32244 | 87,664 | (39,400) | 48,265 |
| 13001 | 4541 US-90 | Pace | Florida | 32571 | 77,738 | (34,301) | 43,437 |
| 13123 | 3707 US-301 | Ellenton | Florida | 34222 | 93,672 | (41,271) | 52,401 |
| 13133 | 45 Duval Station Rd | Jacksonville | Florida | 32218 | 124,864 | (55,825) | 69,038 |
| 13183 | 6401 North 9th Ave | Pensacola | Florida | 32504 | 62,736 | (27,499) | 35,237 |
| 13217 | 9309 Merrill Rd | Jacksonville | Florida | 32225 | 119,593 | (53,763) | 65,830 |
| 13243 | 4818 Augusta Road | Garden City | Georgia | 31408 | 84,214 | (37,224) | 46,991 |
| 13271 | 4946 South 25th Street | Fort Pierce | Florida | 34981 | 106,945 | (48,317) | 58,628 |
| 13362 | 1414 Tallahassee Hwy | Bainbridge | Georgia | 39819 | 75,732 | (33,558) | 42,175 |
| 13460 | 3716 Gulf Breeze Pkwy | Gulf Breeze | Florida | 32563 | 57,943 | (25,282) | 32,661 |
| 13482 | 1022 US-80 | Pooler | Georgia | 31322 | 80,680 | (35,282) | 45,399 |
| 13499 | 450047 State Road 200 | Callahan | Florida | 32011 | 56,267 | (24,571) | 31,696 |
| 13501 | 2123 Crawfordville Hwy | Crawfordville | Florida | 32327 | 57,560 | (25,130) | 32,430 |
| 13565 | 9025 S. US Highway 1 | Port St. Lucie | Florida | 34952 | 83,878 | (37,486) | 46,392 |
| 13567 | 1243 Main St | Chipley | Florida | 32428 | 61,772 | (27,270) | 34,501 |
| 13582 | 427 West Noble Avenue | Williston | Florida | 32696 | 81,069 | (36,467) | 44,602 |
| 13603 | 2850 W 9 Mile Rd | Pensacola | Florida | 32534 | 102,501 | (45,511) | 56,990 |
| 13624 | 5695 NW 23rd St | Gainesville | Florida | 32653 | 74,346 | (33,195) | 41,151 |
| 13646 | 6800 Red Rd | South Miami | Florida | 33143 | 86,163 | (38,992) | 47,171 |
| 13664 | 15655 NW US Hwy 441 Alachua | Alachua | Florida | 32615 | 57,451 | (25,250) | 32,201 |
| 13739 | 397 US 84 | Cairo | Georgia | 39828 | 52,786 | (23,059) | 29,727 |
| 13765 | 2062 State Road 19 | Tavares | Florida | 32778 | 90,474 | (40,663) | 49,811 |
| 13766 | 9144 103rd Street | Jacksonville | Florida | 32210 | 87,365 | (38,765) | 48,600 |
| 13847 | 1765 Norman Drive Valdosta, | Valdosta | Georgia | 31601 | 71,387 | (31,663) | 39,725 |
| 14080 | 801 W Base St, | Madison | Florida | 32340 | 54,528 | (24,153) | 30,375 |
| 14213 | 3700 N. Monroe St., | Tallahassee | Florida | 32303 | 84,627 | (37,769) | 46,858 |
| 14214 | 6329 Dr. ML King Jr Street N | St. Petersburg | Florida | 33702 | 67,588 | (30,484) | 37,104 |
| 14479 | 2015 N Wickham Rd | Melbourne | Florida | 32935 | 74,399 | (33,308) | 41,091 |
| 14722 | 6781 Dunn Ave | Jacksonville | Florida | 32219 | 90,906 | (40,400) | 50,506 |
| 14801 | 11840 SR 64 E | Bradenton | Florida | 34212 | 66,745 | (29,330) | 37,415 |
| Total | | | | | 11,329,223 | (5,100,000) | 6,229,223 |
| Professional Fees | | | | | 298,004 | - | 298,004 |
| **Grand Total** | | | | | **11,627,227** | **(5,100,000)** | **6,527,227** |

# EXHIBIT "B"



**POPEYES LOUISIANA KITCHEN
FRANCHISE AGREEMENT**


**Between**

**POPEYES LOUISIANA KITCHEN, INC.**

**and**

**SAILORMEN, INC.**

Popeyes Franchise Agreement
Exhibit D (03/2024)
PLK#2350

## KEY CONTRACT DATA

## RESTAURANT # 2350

## Effective Date of Franchise Agreement: January 20, 2025

**Franchisee:** SAILORMEN, INC, a Florida corporation

## Franchised Restaurant Number and Location of Franchised Restaurant (Section 1.01):

PLK#2350
4108 University Blvd S Jacksonville, Florida 32216 - USA

## Other Key Terms:

| | |
|---|---|
| **Term duration (Section 2.01):** | ✘ 10 years<br><br>February 18, 2025 (the "Commencement Date") and expire on February 17,2035 |
| **Initial Franchise Fee (Section 3.01.A.):** | ✘ $25,000<br><br>☐ See Development Incentive Addendum |
| **Royalty (Section 3.01.B.):** | ✘ Five percent (5%) of weekly Gross Sales<br><br>☐ See Development Incentive Addendum |
| **Advertising Contribution (Section 3.02):** | Four percent (4%) of weekly Gross Sales |
| **Managing Owner (Section 6.04)** | Chad Cohen |
| **Managing Director (Section 6.06)** | David Damato |
| **Frequency for Franchised Restaurant Renovation (Section 10.01.C.):** | ☐ shall in no event be more often than once every six (6) years<br><br>✘ December 31, 2026 |
| **Transfer Fee (Section 14.03.K):** | $7,500 |
| **Transfer Fee Deposit (Section 14.03.K.):** | $1,000 |
| **Address for Legal Notice to Franchisee (Article XX):** | 9500 S Dadeland Blvd. Suite 800, Miami FL 33156 USA<br><br>Attention: Chad Cohen |

Popeyes Franchise Agreement
Exhibit D (03/2024)
PLK#2350

ii

**POPEYES LOUISIANA KITCHEN
FRANCHISE AGREEMENT**

## TABLE OF CONTENTS

I.     APPOINTMENT; OPENING OF FRANCHISED RESTAURANT ................................ 2

II.    TERM ................................................................................................................ 4

III.   FEES ................................................................................................................. 6

IV.   ACCOUNTING AND RECORDS ...................................................................... 9

V.    PROPRIETARY MARKS ................................................................................... 11

VI.   ORGANIZATION OF FRANCHISEE ............................................................... 13

VII.  CONFIDENTIAL OPERATING STANDARDS MANUAL ........................................ 16

VIII. TRAINING ....................................................................................................... 17

IX.   DUTIES OF THE FRANCHISOR ..................................................................... 19

X.    DUTIES OF THE FRANCHISEE ...................................................................... 19

XI.   INSURANCE ................................................................................................... 31

XII.  CONFIDENTIAL INFORMATION ................................................................... 33

XIII. COVENANTS .................................................................................................. 34

XIV. TRANSFERABILITY OF INTEREST ............................................................... 36

XV.  TERMINATION ............................................................................................... 40

XVI. EFFECT OF TERMINATION OR EXPIRATION ............................................... 43

XVII. TAXES, PERMITS, AND INDEBTEDNESS ...................................................... 45

XVIII. INDEPENDENT CONTRACTOR AND INDEMNIFICATION ............................ 46

XIX. APPROVALS AND WAIVERS ........................................................................ 48

XX.  NOTICES ........................................................................................................ 48

XXI. SEVERABILITY AND CONSTRUCTION ....................................................... 49

XXII. ENTIRE AGREEMENT:  SURVIVAL .............................................................. 50

XXIII. ACKNOWLEDGMENTS ................................................................................. 50

XXIV. APPLICABLE LAW; VENUE ......................................................................... 51

Docusign Envelope ID: 081AE440-A859-4304-A84C-A1D171208B2D

EXHIBIT "A" – PROTECTED AREA

EXHIBIT "B" – FRANCHISEE'S MANAGING OWNER, OWNERSHIP STRUCTURE, AND MANAGING DIRECTOR

## LIST OF ATTACHMENTS

The items checked below are hereby incorporated into and are made a part of this Franchise Agreement

    ☐    Development Incentive Program Addendum to the Popeyes Louisiana Kitchen Franchise Agreement

    ☐    Top Operator Development Incentive Addendum to the Popeyes Louisiana Kitchen Franchise Agreement

    ☒    Renewal Amendment to Franchise Agreement

    ☐    Amendment to Franchise Agreement Required by the State of Hawaii

    ☐    Amendment to Franchise Agreement Required by the State of Illinois

    ☐    Amendment to Franchise Agreement Required by the State of Maryland

    ☐    Amendment to Franchise Agreement Required by the State of Minnesota

    ☐    Amendment to Franchise Agreement Required by the State of North Dakota

    ☐    Amendment to Franchise Agreement Required by the State of New York

    ☐    Amendment to Franchise Agreement Required by the State of Rhode Island

    ☐    Amendment to Franchise Agreement Required by the State of Washington

# POPEYES LOUISIANA KITCHEN
## FRANCHISE AGREEMENT

**THIS AGREEMENT** (the "**Agreement**") is made as of the effective date set forth on the Key Contract Data page, by and between **POPEYES LOUISIANA KITCHEN, INC.**, a Minnesota corporation, having its principal place of business at 5707 Blue Lagoon Drive, Miami, Florida 33126, U.S.A. (**"Franchisor"** or **"Popeyes"**), and the party identified as the franchisee on the Key Contract Data page (**"Franchisee"**).

## WITNESSETH:

**WHEREAS,** Franchisor has developed and owns a unique system for opening and operating restaurants specializing in the preparation, merchandising, advertising and sale of "Louisiana" style menu items that include spicy chicken, biscuits, fried shrimp and other seafood, red beans and rice and other quick-service menu items developed and owned by Franchisor (the **"Popeyes System"** or **"System"**) and utilizing the Proprietary Marks (**"Popeyes Restaurant(s)"**);

**WHEREAS,** the distinguishing characteristics of the Popeyes System include the names "Popeyes" and "Popeyes Louisiana Kitchen"; specially designed buildings, distinctive interior and exterior layouts, trade dress, decor, color schemes, and furnishings; confidential food and beverage formulas and recipes; specialized menus; and standards and specifications for equipment, equipment layouts, products, operating procedures, and training programs, all of which may be changed, improved, and further developed by Franchisor from time to time;

**WHEREAS,** Franchisor identifies the Popeyes System by means of certain trade names, service marks, trademarks, logos, emblems, and other indicia of origin, including the marks "Popeyes", "Popeyes Chicken and Biscuits" and "Popeyes Louisiana Kitchen" and such other trade names, service marks, trademarks and trade dress as are now, or may hereafter, be designated by Franchisor for use in connection with the Popeyes System (collectively referred to as the **"Proprietary Marks"**);

**WHEREAS,** Franchisor continues to develop, use, and control the use of such Proprietary Marks in order to identify for the public the source of services and products marketed thereunder in the Popeyes System and to represent the System's high standards of quality, appearance, and service;

**WHEREAS,** Franchisee wishes to be assisted, trained, and licensed by Franchisor as a Popeyes franchisee and licensed to use, in connection therewith, the Proprietary Marks;

**WHEREAS,** Franchisee understands the importance of the Popeyes System and Franchisor's high and uniform standards of quality, cleanliness, appearance, and service, and the necessity of opening and operating Popeyes Restaurants in conformity with the Popeyes System;

**NOW, THEREFORE,** the parties hereto agree as follows:

## I.    APPOINTMENT; OPENING OF FRANCHISED RESTAURANT

1.01.    Franchisor grants to Franchisee a franchise to open and operate a POPEYES® Restaurant at the location set forth on the Key Contract Data page attached hereto and incorporated by reference herein, (the **"Franchised Restaurant"**) only upon the terms and conditions herein contained, and a license to use in connection therewith the Proprietary Marks and the Popeyes System.

1.02.    Protected Area.

A.    Subject to the terms and conditions of this Agreement and provided Franchisee is not otherwise in default of this Agreement and/or any other Agreement between Franchisor (or any parent, subsidiary or affiliate of Franchisor) and Franchisee (or any parent, subsidiary or affiliate of Franchisee), Franchisor shall not establish, nor franchise another to establish a POPEYES® Restaurant, for the term of  this Agreement, within a geographic  area immediately surrounding the Franchised Restaurant equal to the lesser of:  (i) a one (1) mile radius around the Franchised Restaurant and (ii) an area encompassing a population (residential and workplace) of 50,000 people (the **"Protected Area"**), without Franchisee's prior written consent. The area described in **Exhibit "A"** of this Agreement reflects a one (1) mile radius surrounding the Franchised Restaurant and may include area outside of Franchisee's Protected Area.

B.    The provisions of the above Section 1.02.A. shall not apply to Alternative Venues (as defined below). Alternative Venues do not receive Protected Areas. Alternative Venues are defined as Popeyes Restaurants operated in any of the following types of locations: (i) transportation facilities (including airports, train stations, bus stations, etc.); (ii) toll road plazas; (iii) educational facilities (including schools, colleges and universities); (iv) institutional feeding facilities (including  hospitals, hotels, and corporate cafeterias); (v) government institutions and facilities; (vi) enclosed shopping malls; (vii) military bases; (viii) casinos; (ix) amusement, recreation and theme parks; and (x) stadiums, arenas, and convention centers. Additionally, the provisions of the above Section 1.02.A. do not prohibit Franchisor or its affiliates from operating or permitting others to operate in the Protected Area: (a) Popeyes Restaurants that are operating as of the effective date of this Agreement as set forth on the Key Contract Data page; (b) Popeyes Restaurants that were previously operated and closed as of the effective date of this Agreement as set forth on the Key Contract Data page, provided that (i) the premises of such restaurants were most recently operated as a Popeyes Restaurant and (ii) such restaurants reopen within three (3) years of their respective closing dates; and (c) Popeyes Restaurants to be operated pursuant to Franchise Agreements already executed at the time of this Agreement.

1.03.    Limited Exclusivity.  Except as expressly set forth herein: (i) the franchise granted to Franchisee under this Agreement is non-exclusive, and grants to Franchisee the rights to establish and operate the Franchised Restaurant at only the specific location set forth on the Key Contract Data page; (ii) no exclusive, protected or other territorial rights within or outside the market where the Franchised Restaurant is located are hereby granted or to be inferred; and (iii) Franchisor and/or its affiliates have the right to operate and grant as many other franchises for the

Popeyes Franchise Agreement                    2
Exhibit D (03/2024)
PLK#2350

operation of Popeyes Restaurants, anywhere in the world, as they shall, in their sole discretion elect.

    1.04.   <u>Right to Open the Franchised Restaurant.</u>

    A.    Prior to opening the Franchised Restaurant (or re-opening the Franchised Restaurant in the case of a transfer of an existing Franchised Restaurant), Franchisor reserves the right to conduct a final inspection of the Franchised Restaurant and its premises to determine if Franchisee has complied with this Agreement. Franchisor shall not be liable for delays or loss occasioned by its inability to complete its inspection prior to Franchisee's scheduled opening date. Franchisee shall not open the Franchised Restaurant for business without the express written authorization of Franchisor, which may be withheld unless Franchisee has satisfied the following conditions:

    1.    Franchisee is not in material default under this Agreement or any other agreements with Franchisor.

    2.    Franchisee is current on all monetary obligations due Franchisor and has paid Franchisor the balance of the initial fees required by this Agreement and any amendment to this Agreement.

    3.    Franchisee has constructed the Franchised Restaurant substantially in accordance with plans approved by Franchisor and with applicable laws, ordinances and local codes.

    4.    Franchisee has decorated the interior of the Franchised Restaurant and purchased or leased and installed all specified and required fixtures, equipment, furnishings and signs substantially in accordance with Franchisor's standards and specifications and only from suppliers designated or approved by Popeyes, which may include Franchisor.

    5.    Franchisee has obtained a certificate of occupancy and all other required building, utility, health, sign, sanitation, safety or fire department certificates, and other permits and licenses applicable to the Franchised Restaurant. If requested by Franchisor, Franchisee shall submit a copy of the certificate of occupancy to Franchisor.

    6.    Franchisee has hired and trained a staff in accordance with the requirements of this Agreement.

    7.    Franchisee has purchased an opening inventory for the Franchised Restaurant of only authorized and approved products and other materials and supplies.

8.      If Franchisee leases the location of the Franchised Restaurant, Franchisor has been furnished with a copy of a fully executed lease for the location of the Franchised Restaurant.

9.      Franchisee has furnished to Franchisor copies of all insurance policies required by this Agreement or such other evidence of insurance coverage and payment of premiums as Franchisor reasonably may request.

## II.    TERM

2.01.    Except as otherwise provided in this Agreement, the initial term of this Franchise Agreement (the **"Term"**) shall be for the period of time set forth on the Key Contract Data page, which shall commence on the date set forth on the Key Contract Data page (as determined by Franchisor). Franchisee agrees and shall be obligated to operate the Franchised Restaurant and perform hereunder for the full Term of this Agreement. Notwithstanding anything set forth below, if Franchisee continues to operate the Franchised Restaurant after the end of the Term without express written authorization from Franchisor to do so and does not renew this franchise in accordance with this Section, Franchisee shall be deemed to be operating such Franchised Restaurant on a month-to-month basis under the terms and conditions of this Agreement and Franchisor may terminate this Agreement at any time after the end of the Term upon thirty (30) days prior written notice.

2.02.    Franchisee may, at its option, renew this franchise for one (1) additional period of ten (10) years (the **"Renewal Term"**), provided that, at the time of renewal:

A.      Franchisee gives Franchisor written notice of such election to renew not less than six (6) months nor more than twelve (12) months prior to the end of the initial Term;

B.      Franchisee executes Franchisor's then-current standard form of franchise agreement, which may differ from this Agreement as to ownership requirements and include a higher royalty fee and a higher advertising contribution, if any, than that contained in this Agreement; and the term of which shall be the renewal term as specified in Section 2.02. hereof, but shall contain no further renewal rights except as provided in Section 2.03. hereof;

C.      Franchisee executes a general release in a form prescribed by Franchisor of any and all claims against Franchisor and its parent companies, subsidiaries, and affiliates, and their respective officers, directors, agents, and employees;

D.      Franchisee is in "good standing" and not otherwise in default of any provision of this Agreement, or any amendment hereof or successor hereto, or any other agreement between Franchisee and Franchisor, or any subsidiary or affiliate of Franchisor, and Franchisee has fully and faithfully performed all of Franchisee's obligations throughout the term of this Agreement.  For the purposes of this Agreement, Franchisee shall be considered in "good standing" if Franchisee is in compliance with the terms and conditions of this Agreement and the following conditions:

Popeyes Franchise Agreement                           4
Exhibit D (03/2024)
PLK#2350

1.      Any and all amounts owed to Franchisor and/or its affiliates under any agreement between Franchisor and Franchisee, are current (*i.e.,* there are no amounts delinquent), including Royalty, Advertising Contribution, lease payments, promissory note payments, etc., and all related documents, reports and financial statements have been provided as required by Franchisor;

2.      Franchisee's operation of any and all restaurants and/or other businesses operated under any agreement between Franchisee and Franchisor (or any parent, subsidiary or affiliate of Franchisor) are in compliance with the standards set forth in the respective franchise agreements and manuals applicable to such restaurants and/or businesses, or as otherwise set forth in writing;

3.      Franchisee does not, at such time, operate any franchised restaurant which has failed to meet Franchisor's minimum quality, service and/or cleanliness standards applicable to such restaurant;

4.      Franchisee is in compliance with all the material terms and conditions of any and all agreements between Franchisee and Franchisor, including any franchise agreement, development agreement, lease agreement, promissory note, etc.;

5.      There is, at such time, no pending or threatened litigation between Franchisee and Franchisor (or any parent, subsidiary of affiliate of Franchisor); and

6.      Franchisee meets all then-current financial ratios that Franchisor uses to evaluate new franchisees for financial approval.

E.      Franchisee has paid or otherwise satisfied all monetary obligations owed by Franchisee to Franchisor and its subsidiaries and affiliates and any indebtedness of Franchisee which is guaranteed by Franchisor, and Franchisee has timely paid or otherwise satisfied these obligations throughout the term of this Agreement;

F.      Franchisee agrees, at its sole cost and expense, to reimage, renovate, refurbish and modernize the Franchised Restaurant, within the timeframe required by Franchisor, including the building design, parking lot, landscaping, equipment, signs, interior and exterior decor items, fixtures, furnishings, trade dress, color scheme, presentation of trademarks and service marks, supplies and other products and materials to meet Franchisor's then-current standards, specifications and design criteria for Popeyes Restaurants, as contained in the then-current franchise agreement, the Manual, or otherwise in writing, including such structural changes, remodeling and redecoration and such modifications to existing improvement as may be necessary to do so; and

G.      Franchisee shall pay to Franchisor a renewal fee in an amount equal to fifty percent (50%) of Franchisor's then-current standard, initial franchise fee when Franchisee signs the franchise agreement for the Renewal Term.

Popeyes Franchise Agreement                          5
Exhibit D (03/2024)
PLK#2350

2.03.   Provided Franchisee is in "good standing" (as defined above) and not otherwise in default under the terms of this Agreement and/or any other agreement between Franchisee and Franchisor (or any parent, subsidiary or affiliate of Franchisor), Franchisee may, at any time during the term hereof, or during the Renewal Term, purchase an option (the **"Supplemental Term Option"**) for an additional ten (10) year renewal term commencing immediately following the Renewal Term (the **"Supplemental Renewal Term"**), upon the following terms and conditions:

      A.   Franchisee shall pay a fee (the **"Option Fee"**) to Franchisor in an amount equal to fifty percent (50%) of Franchisor's then-current standard, initial franchise fee when Franchisee signs the franchise agreement for the Supplemental Renewal Term;

      B.   Franchisee shall execute an amendment to the Franchise Agreement in the form required by Franchisor which shall:  (i) add the Supplemental Term Option and the terms upon which such option may be exercised to the Franchise Agreement; and (ii) incorporate Franchisor's then-current renewal conditions into the Franchise Agreement (provided, however, Franchisor's then-current renewal conditions shall not impose the payment of a renewal fee in addition to the Option Fee); and

      C.   The Supplemental Term Option must be purchased no later than six (6) months prior to the end of the Renewal Term.  There shall be no right to extend the Franchise Agreement beyond the Supplemental Renewal Term.

## III.   FEES

3.01.   In consideration of the franchise granted to Franchisee herein, Franchisee shall pay to Franchisor the following:

      A.   An initial franchise fee equal to the amount set forth as the "Initial Franchise Fee" on the Key Contract Data page (**"Initial Franchise Fee"**) payable prior to the opening of the Franchised Restaurant for business to the public.  Such Initial Franchise Fee shall be fully earned by Franchisor upon payment by Franchisee.   Franchisor may require Franchisee to utilize wire transfers as a means of paying the Initial Franchise Fee.

      B.   A recurring, non-refundable royalty fee equal to the amount set forth as the "Royalty" on the Key Contract Data page (**"Royalty"**) during the term of this Agreement, payable weekly (or on such other basis as may be set forth in the Manual or otherwise agreed to in writing by Franchisor) on the Gross Sales of the preceding week.

3.02.   In addition to the payments provided for in Section 3.01 hereof, Franchisee, recognizing the value of advertising and the importance of the standardization of advertising and promotion to the goodwill and public image of the System, agrees to pay to the Popeyes Advertising Fund (**"Advertising Fund"**) a recurring, non-refundable advertising fund contribution (**"Advertising Contribution"**) in an amount to be determined by Franchisor, in its sole discretion, not to exceed the amount set forth as the "Advertising Contribution" on the Key Contract Data page for the preceding week, payable weekly (or on such other basis as may be set

forth in the Manual or otherwise agreed to in writing by Franchisor).  The Advertising Contribution shall be expended by Franchisor in accordance with the following conditions and limitations:

A.      The Advertising Fund, all contributions thereto, and any earnings thereon, shall be used exclusively for national, regional, and/or local advertising and promotional materials and market research for the Popeyes System including maintaining, administering, directing, producing and preparing market research, advertising, marketing materials and/or promotional activities for the Popeyes System.  All reasonable costs incurred by Franchisor or charged to Franchisor by third parties for market research and the production and dissemination of advertising, marketing and promotional materials may be charged to the Advertising Fund.

B.      All sums paid by Franchisee to the Advertising Fund shall be maintained in an account separate from other funds of Franchisor and shall not be used to defray any of Franchisor's expenses except as provided herein, and as Franchisor may incur in activities reasonably related to the administration or direction of the Advertising Fund and advertising and marketing programs for franchisees and the Popeyes System.  The Advertising Fund and its earnings shall not otherwise inure to the benefit of Franchisor.  Franchisor shall maintain a separate bookkeeping account for the Advertising Fund.

C.      The selection of media and locale for media placement shall be at the sole discretion of Franchisor.

D.      Franchisor, upon request, shall provide Franchisee with an annual accounting of receipts and disbursements of the Advertising Fund.

E.      It is anticipated that all contributions to and earnings of the Advertising Fund will be expended in accordance with the terms hereof during the taxable year in which contributions and earnings are received.  If, however, excess amounts remain in the Advertising Fund at the end of a taxable year, all expenditures in the following taxable year(s) shall be made first out of accumulated earnings from previous years, next out of earnings in the current year, and finally from contributions.

F.      The Advertising Fund is not, and shall not be, an asset of Franchisor. Although the Advertising Fund is intended to be of perpetual duration, Franchisor maintains the right to terminate the Advertising Fund; provided, however, that the Advertising Fund shall not be terminated until all monies in the Advertising Fund have been expended for the purposes stated herein.

G.      Franchisee understands that such advertising and marketing is intended to maximize the public's awareness of the Franchised Restaurants and the System, and that Franchisor accordingly undertakes no obligation to insure that any individual Franchisee benefits directly or on a pro rata basis from the placement, if any, of such advertising or marketing in its local market.  Franchisee further acknowledges that its failure to derive any such benefit, whether directly or indirectly, shall not be cause for Franchisee's nonpayment or reduction of the required contributions to the Advertising Fund.

H.     For each Popeyes Restaurant operated by Franchisor, Franchisor shall pay to the Advertising Fund an Advertising Contribution in an amount equal to the standard amount required to be paid by franchisees for any franchised Popeyes Restaurants opened on the same date as the Popeyes Restaurant opened by Franchisor.

3.03.    For the purposes of this Agreement, the term **"Gross Sales"** shall mean all revenues generated by Franchisee's business conducted upon, from or with respect to the Franchised Restaurant, whether such sales are evidenced by cash, check, credit, charge, account, barter or exchange.  Gross Sales shall include monies or credit received from the sale of food and merchandise, from tangible property of every kind and nature, promotional or otherwise, and for services performed from or at the Franchised Restaurant, including such off-premises services as catering and delivery.  Gross Sales shall not include the sale of food or merchandise for which refunds have been made in good faith to customers, the sale of equipment used in the operation of the Franchised Restaurant, nor shall it include sales, meals, use or excise tax imposed by a governmental authority directly on sales and collected from customers; provided that the amount for such tax is added to the selling price or absorbed therein, and is actually paid by Franchisee to such governmental authority.

3.04.    Franchisee's payment of Royalty and Advertising Contributions shall be in accordance with the following terms and requirements:

A.     Franchisee shall participate in Franchisor's then-current electronic funds transfer program authorizing Franchisor to utilize a pre-authorized bank draft system.  All Royalty and Advertising Contributions applicable to the Gross Sales and other amounts owed under this Agreement, including interest charges must be received by Franchisor or credited to Franchisor's account by pre-authorized bank debit before 5:00 p.m. on the 5th day after the end of each fiscal week, or at a later point specified by Franchisor from time to time (**"Due Date"**).  On each Due Date, Franchisor will transfer from the Franchised Restaurant's commercial bank operating account (**"Account"**) the amount reported to Franchisor in Franchisee's remittance report or determined by Franchisor by the records contained in the POS System and the BOH System (as defined below) of the Franchised Restaurant.

B.     Franchisee shall: (i) comply with payment procedures specified by Franchisor in the Manual or otherwise in writing; (ii) a minimum of five (5) business days prior to the opening date, deliver to Franchisor an authorization in such form as Franchisor may designate to initiate debit entries and/or credit correction entries to the Account for payments of the Royalty, Advertising Contributions and other amounts payable under this Agreement, including any interest charges; (iii) promptly upon request, perform those acts and sign and deliver those documents as may be necessary to accomplish payment by electronic funds transfer as described in this Section 3.04; and (iv) make sufficient funds available in the Account for withdrawal by electronic funds transfer no later than the Due Date for payment thereof.

C.    Failure by Franchisee to have sufficient funds in the Account shall constitute a default of this Agreement pursuant to Section 15.03. Additionally, Franchisor may assess and debit from the Account a reasonable administrative charge for each notification of insufficient funds. Franchisee shall not be entitled to set off, deduct or otherwise withhold any Royalty, Advertising Contributions, interest charges or any other monies payable by Franchisee under this Agreement on grounds of any alleged non-performance by Franchisor of any of its obligations or for any other reason.

3.05.    Notwithstanding the provisions of Section 3.04, Franchisor reserves the right to modify, at its option, the method by which Franchisee pays the Royalty, Advertising Contributions and other amounts owed under this Agreement, including interest charges, upon receipt of written notice from Franchisor.

3.06    If any monetary obligations owed by Franchisee to Franchisor and its subsidiaries and affiliates are more than seven (7) days overdue, Franchisee shall, in addition to such obligations, pay to Franchisor a sum equal to one and one-half percent (1.5%) of the overdue balance per month, or the highest rate permitted by law, whichever is less, from the date said payment is due.

## IV.    ACCOUNTING AND RECORDS

4.01.    <u>Accurate Books and Records</u>.  During the Term of this Agreement, Franchisee shall maintain and preserve, for at least three (3) years from the dates of their preparation, full, complete and accurate books, records and accounts in accordance with generally accepted accounting principles and in the form and the manner prescribed by Franchisor from time-to-time in the Manual or otherwise in writing.  These records shall include daily and weekly sales tapes (including non-resettable readings), daily and weekly sales mix tapes, meals, sales and other tax returns, duplicate deposit slips and other evidence of Gross Sales and all other business transactions.

4.02.    <u>Royalty Reports</u>.  Franchisee shall submit to Franchisor, no later than the date each weekly Royalty payment is due during the Term of this Agreement, a report on forms prescribed by Franchisor, accurately reflecting all Gross Sales during the preceding week and such other forms, reports, records, financial statements or information as Franchisor may reasonably require in the Manual, or otherwise in writing.  Franchisor may require Franchisee to submit such written reports in addition to the Gross Sales information transmitted to Franchisor by Franchisee's POS and BOH Systems (as defined below).

4.03.    <u>Periodic Statements</u>.  Franchisee shall, at its expense, submit to Franchisor:  (i) each Period (as defined below), month or quarter, as determined by Franchisor, within thirty (30) days following the end of each Period, month or quarter of the Term hereof, profit and loss statements with such detail and in a format as Franchisor may reasonably require; and (ii) quarterly, within thirty (30) days following the end of each quarter during the Term hereof, an unaudited financial statement including an income statement, balance sheet and statement of cash flow, with such detail and in a format as Franchisor may reasonably require (**"Quarterly Statement"**), together with a certificate executed by Franchisee stating that such financial statement is true and accurate.

Upon Franchisor's request, Franchisee shall submit to Franchisor, with each Quarterly Statement, copies of any state or local sales tax returns (**"Sales Tax Returns"**) filed by Franchisee for the period included in the Quarterly Statement. In the event Franchisee prepares financial statements on the basis of thirteen (13), four (4) week periods (**"Periods"**), the Quarterly Statements shall be submitted within thirty (30) days following the end of the fourth (4th), seventh (7th), tenth (10th) and thirteenth (13th) Periods.

4.04. <u>Annual Financial Statements</u>. Franchisee shall, at its expense, submit to Franchisor within ninety (90) days following the end of each calendar or fiscal year during the Term of this Agreement, an unaudited financial statement for the preceding calendar or fiscal year, including an income statement, balance sheet and statement of cash flow, with such detail and in a format as Franchisor may reasonably require, together with a certificate executed by Franchisee certifying that such financial statement is true and accurate (**"Annual Financial Statements"**) and such other information in such form as Franchisor may reasonably require. Upon written request from Franchisor, the foregoing Annual Financial Statement shall include a profit and loss statement and balance sheet for the Franchised Restaurant, and shall be prepared in accordance with generally accepted accounting principles. In the event Franchisee defaults under this Agreement, Franchisor may require, upon written notice to Franchisee, that all Annual Financial Statements submitted thereafter include a "Review Report" prepared by an independent Certified Public Accountant.

4.05. <u>Other Reports</u>. Franchisee shall also submit to Franchisor, for review or auditing, such other forms, financial statements, reports, records, information and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time-to-time in the Manual or otherwise in writing. If Franchisee has combined or consolidated financial information relating to the Franchised Restaurant with that of any other business or businesses, including a business licensed by Franchisor, Franchisee shall simultaneously submit to Franchisor, for review or auditing, the forms, reports, records and financial statements (including the Quarterly Statements and Annual Financial Statements) which contain the detailed financial information relating to the Franchised Restaurant, separate and apart from the financial information of such other businesses. Franchisee hereby authorizes all of its suppliers and distributors to release to Franchisor, upon Franchisor's request, any and all of its books, records, accounts or other information relating to goods, products and supplies sold to Franchisee and/or the Franchised Restaurant.

4.06. <u>Franchisor's Right of Audit</u>. Franchisor or its designated agents or auditors shall have the right at all reasonable times to audit, review and examine by any means, including electronically through the use of telecommunications devices or otherwise, at its expense, the books, records, accounts, and tax returns of Franchisee related to the Franchised Restaurant. If any such audit, review or examination reveals that Gross Sales have been understated in any report to Franchisor, Franchisee shall immediately pay to Franchisor the Royalty and Advertising Contribution due with respect to the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate of one and one-half percent (1.5%) per month. If any such understatement exceeds two percent (2%) of Gross Sales as set forth in the report, Franchisee shall, in addition, upon demand, reimburse Franchisor for any and all costs and expenses connected with such audit, review or examination (including reasonable accounting and

attorneys' fees). The foregoing remedies shall be in addition to any other rights and remedies Franchisor may have.

4.07. <u>Financial Ratios</u>. Franchisee shall at all times meet all then current financial ratios Franchisor uses to evaluate Popeyes franchisees for financial approval to expand in the Popeyes System, and Franchisee's failure to meet such financial ratios shall constitute a default of this Agreement pursuant to Section 15.03.

## V. PROPRIETARY MARKS

5.01. It is understood and agreed that the franchise granted herein to use Franchisor's Proprietary Marks applies only to use in connection with the operation of the Franchised Restaurant franchised in this Agreement at the location designated in Section I hereof, and includes only such Proprietary Marks as are now designated or which may hereafter be designated, in the Manual or otherwise in writing as a part of the System (which might or might not be all of the Proprietary Marks pertaining to the System owned by Franchisor), and does not include any other mark, name, or indicia of origin of Franchisor now existing or which may hereafter be adopted or acquired by Franchisor.

5.02. With respect to Franchisee's use of the Proprietary Marks pursuant to this Agreement, Franchisee acknowledges and agrees that:

A. Franchisee shall not use the Proprietary Marks as part of Franchisee's corporate or other business name;

B. Franchisee shall not hold out or otherwise use the Proprietary Marks to perform any activity or incur any obligation or indebtedness in such manner as might, in any way, make Franchisor liable therefore, without Franchisor's prior written consent;

C. Franchisee shall execute any documents and provide such other assistance deemed necessary by Franchisor or its counsel to obtain protection for the Proprietary Marks or to maintain the continued validity of such Proprietary Marks; and

D. Franchisor reserves the right to substitute different Proprietary Marks for use in identifying the System and the franchised businesses operating thereunder, and Franchisee agrees to immediately substitute Proprietary Marks upon receipt of written notice from Franchisor.

5.03. Franchisee expressly acknowledges Franchisor's exclusive right to use the mark "Popeyes" for restaurant services, fried chicken, and other related food products; the building configuration; and the other Proprietary Marks of the System. Franchisee agrees not to represent in any manner that it has any ownership in the Proprietary Marks or the right to use the Proprietary Marks except as provided in this Agreement. Franchisee further agrees that its use of the Proprietary Marks shall not create in its favor any right, title, or interest in or to the Proprietary Marks, and that all of such use shall inure to the benefit of Franchisor.

5.04.    Franchisee acknowledges that the use of the Proprietary Marks outside the scope of this license, without Franchisor's prior written consent, is an infringement of Franchisor's exclusive right to use the Proprietary Marks, and during the term of this Agreement and after the expiration or termination hereof, Franchisee covenants not to, directly or indirectly, commit an act of infringement or contest or aid in contesting the validity or ownership of Franchisor's Proprietary Marks, or take any other action in derogation thereof.

5.05.    Franchisee shall promptly notify Franchisor of any suspected infringement of, or challenge to, the validity of the ownership of, or Franchisor's right to use, the Proprietary Marks licensed hereunder.    Franchisee acknowledges that Franchisor has the right to control any administrative proceeding or litigation involving the Proprietary Marks.    In the event Franchisor undertakes the defense or prosecution of any litigation relating to the Proprietary Marks, Franchisee agrees to execute any and all documents and to do such acts and things as may, in the opinion of counsel for Franchisor, be necessary to carry out such defense or prosecution.    Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Marks in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for its out-of-pocket costs in doing such acts and things, except that Franchisee shall bear the salary costs of its employees.

5.06.    Franchisee understands and agrees that its license with respect to the Proprietary Marks is non-exclusive to the extent that Franchisor has and retains the right under this Agreement:

A.    To grant other licenses for the Proprietary Marks, in addition to those licenses already granted to existing franchisees;

B.    To develop and establish other franchise systems for the same, similar, or different products or services utilizing proprietary marks not now or hereafter designated as part of the System licensed by this Agreement, and to grant licenses thereto, without providing Franchisee any right therein; and

C.    To develop and establish other systems for the sale, at wholesale or retail, of similar or different products utilizing the same or similar Proprietary Marks, without providing Franchisee any right therein.

5.07.    Franchisee acknowledges and expressly agrees that any and all goodwill associated with the System and identified by the Proprietary Marks used in connection therewith shall inure directly and exclusively to the benefit of Franchisor and is the property of Franchisor, and that upon the expiration or termination of this Agreement or any other agreement, no monetary amount shall be assigned as attributable to any goodwill associated with any of Franchisee's activities in the operation of the Franchised Restaurant granted herein, or Franchisee's use of the Proprietary Marks.

5.08.    Franchisee understands and acknowledges that each and every detail of the Popeyes System is important to Franchisee, Franchisor, and other franchisees in order to develop and maintain high and uniform standards of quality and services, and hence to protect the reputation and goodwill of Popeyes Restaurants.    Accordingly, Franchisee covenants:

A. To operate and advertise the Franchised Restaurant, at Franchisee's own expense, under the name "Popeyes Louisiana Kitchen," without prefix or suffix;

B. To adopt and use the Proprietary Marks licensed hereunder solely in the manner prescribed by Franchisor; and

C. To observe such reasonable requirements with respect to trademark registration notices as Franchisor may from time to time direct in the Manual or otherwise in writing.

5.09. In order to preserve the validity and integrity of the Proprietary Marks licensed herein and to assure that Franchisee is properly employing the same in the operation of the Franchised Restaurant, Franchisor or its agents shall at all reasonable times have the right to inspect Franchisee's operations, premises, and Franchised Restaurant and make periodic evaluations of the services provided and the products sold and used therein. Franchisee shall cooperate with Franchisor's representatives in such inspections and render such assistance to the representatives as may reasonably be requested.

## VI. ORGANIZATION OF FRANCHISEE

6.01. Franchisee makes the following representations, warranties and covenants to Franchisor:

A. If Franchisee is a legal entity such as a business corporation, partnership, limited liability company or other legal entity, Franchisee represents, warrants and agrees that: (i) Franchisee is duly organized, in good standing, and validly existing under the laws of the state of its organization; (ii) Franchisee is duly qualified to transact business in (and is in good standing in) the state in which the Franchised Restaurant is located; (iii) Franchisee's governing documents permit execution of this Agreement and the development and operation of the Franchised Restaurant; (iv) unless waived in writing by Franchisor, Franchisee's governing documents shall at all times provide that Franchisee's activities are restricted to those necessary solely for the development, ownership and operation of the Franchised Restaurant in accordance with this Agreement and any other agreements entered into with Franchisor or its affiliates; and (v) one owner of Franchisee is and shall be the chief executive officer or managing member of Franchisee, holding such office or offices as may be necessary to maintain and exercise the actual power and authority actively to direct the affairs of Franchisee.

B. If Franchisee is an individual, a group of individuals or a partnership comprised solely of individuals, Franchisee makes the following additional representations and warranties: (i) each individual has executed this Agreement; (ii) each individual shall be jointly and severally bound by, and personally liable for the timely and complete performance and a breach of, each and every provision of this Agreement; and (iii) notwithstanding any transfer to a business entity formed for convenience of ownership, each individual shall continue to be jointly and severally bound by, and personally liable

Popeyes Franchise Agreement
Exhibit D (03/2024)
PLK#2350

13

for the timely and complete performance and a breach of, each and every provision of this Agreement.

6.02.    Franchisee shall furnish to Franchisor, upon execution or any subsequent transfer of this Agreement, as applicable, true and complete copies of the articles or certificate of incorporation, articles of organization, membership agreement, partnership agreement, bylaws, subscription agreements, buy-sell agreements, voting trust agreements and all other documents relating to the ownership, organization, capitalization, management and control of Franchisee and all amendments thereto and a list of shareholders, members or owners showing the percentage interest of each.  When any of these governing documents are modified or changed, Franchisee promptly shall provide copies to Franchisor.  Franchisee may not change the form of its entity unless Franchisor mutually agrees in writing that such a change is warranted.  Franchisee shall promptly furnish Franchisor, on a regular basis, with certified copies of such business records material to the Franchised Restaurant as Franchisor may require from time to time in the Manual or otherwise in writing.

6.03.    Restrictive Legend.

A.    If Franchisee is a corporation, Franchisee shall maintain stop-transfer instructions against the transfer, on its records, of any securities with voting rights, subject to the restrictions of this Agreement, and each stock certificate of the corporate Franchisee representing each share of stock, shall have conspicuously endorsed upon it the following legend: "Any assignment or transfer of this stock is subject to the restrictions imposed on assignment by the Popeyes Louisiana Kitchen Franchise Agreement with Popeyes Louisiana Kitchen, Inc. dated [INSERT AGREEMENT DATE] to which the corporation is a party."

B.    If Franchisee is a limited liability company, each membership or management certificate shall have conspicuously endorsed upon its face the following statement: "Any assignment or transfer of an interest in this limited liability company is subject to the restrictions imposed on assignment by the Popeyes Louisiana Kitchen Franchise Agreement with Popeyes Louisiana Kitchen, Inc. dated [INSERT AGREEMENT DATE] to which the limited liability company is a party."

C.    If Franchisee is a partnership, Franchisee's written partnership agreement shall provide that ownership of an interest in the partnership is held, and that further assignment or transfer thereof, is subject to all restrictions imposed on assignment by this Agreement.

6.04.    Franchisee represents, warrants, and covenants to Franchisor that the information set forth on **Exhibit "B"** is and will be, true, correct, and complete at all times during the Term (including the identity of all of the individuals with an ownership interest in Franchisee, the amount of such ownership interest, and other information specified).  Without limiting the generality of the foregoing, Franchisee acknowledges its understanding of Franchisor's requirement that an individual "Managing Owner" be named and be granted the authority by Franchisee to bind Franchisee in any dealings with Franchisor and its affiliates and to direct any action necessary to

ensure compliance with this Agreement and any other agreements relating to the Franchised Restaurant. The Managing Owner shall, at all times, (a) own ten percent (10%) or more of the legal or beneficial interest in Franchisee (or alternatively, have the right to receive ten percent (10%) or more of the operating profits of the Franchised Restaurant), and (b) meet Franchisor's then current criteria for Managing Owners. Clause (a) of the immediately preceding sentence of this Section 6.04 shall not apply if Franchisee was a publicly held entity or a wholly-owned subsidiary of a publicly held entity as of the date of the first franchise related agreement between Franchisee and Franchisor. Franchisee represents, warrants, and covenants to Franchisor that the Managing Owner designated on the Key Contract Data page and in **Exhibit "B"** has, and will have throughout the Term, the authority to bind Franchisee in any dealings with Franchisor and its affiliates and to direct any action necessary to ensure compliance with this Agreement and any other agreements relating to the Franchised Restaurant. Franchisee agrees to furnish Franchisor with such evidence as Franchisor may request from time to time for the purpose of assuring Franchisor that the Managing Owner's authority remains as represented in this Agreement. Franchisee shall promptly advise Franchisor in writing of any proposed change to the information set forth on the Key Contract Data page and in **Exhibit "B"** and thereafter comply with the applicable provisions of this Agreement. No change in the Managing Owner may be made without the prior written consent of Franchisor. If Franchisor provides consent to a change in Managing Owner, such new Managing Owner shall execute an Owner's Guaranty unless waived by Franchisor in its sole discretion or unless otherwise provided in accordance with Section 6.05 herein. If the Managing Owner dies or becomes incapacitated, then within sixty (60) days thereafter, Franchisee shall name a new Managing Owner approved by Franchisor pursuant to Franchisor's then current criteria for approving Managing Owners.

6.05. Unless Franchisee is a publicly-held entity, all of Franchisee's officers, directors and all holders of a legal or beneficial interest in Franchisee of ten percent (10%) or more shall jointly and severally guarantee Franchisee's payment and performance under this Agreement and also shall bind themselves to the terms of this Agreement pursuant to an Owner's Guaranty, in a form acceptable to Franchisor. Franchisor reserves the right, in its sole discretion, from time to time upon consideration of certain circumstances presented by Franchisee such as for family estate planning purposes, to waive the requirement that some or all of the previously described individuals execute the Owner's Guaranty. Franchisor reserves the right to require any guarantor to provide personal financial statements to Franchisor from time to time.

6.06. Franchisee acknowledges its understanding of Franchisor's requirement that an individual "Managing Director" be identified by Franchisee to Franchisor and be approved by Franchisor. The term **"Managing Director"** shall be defined as a person who has been approved by Franchisor, in its sole discretion, as the individual who possesses the operational experience, skills, and other criteria set forth in this Section 6.06. The Managing Director is identified on the Key Contract Data page and in **Exhibit "B"** attached hereto. Unless waived in writing by Franchisor, the Managing Director shall meet all of the following qualifications:

A. The Managing Director shall, at all times, have the authority to direct full control over the day-to-day activities, including operations, of the Franchised Restaurant and those other Franchised Restaurants operated by Franchisee in the same geographic area as the Franchised Restaurant, including, without limitation, control over the standards of

Popeyes Franchise Agreement
Exhibit D (03/2024)
PLK#2350

15

operation and financial performance and authority to ensure compliance with the Manual, this Agreement, and the terms of any lease or other agreements related to the Franchised Restaurant.

B.  The Managing Director shall devote full-time and best efforts to supervising the operation of the Franchised Restaurant and those other Franchised Restaurants operated by Franchisee in the same geographic area as the Franchised Restaurant and shall not engage in any other business or activity, directly or indirectly, that requires substantial management responsibility.

C.  The Managing Director shall maintain his primary residence within a reasonable driving distance of the Franchised Restaurant.

D.  The Managing Director shall successfully complete all modules of PTP, as defined in Section 8.01 of this Agreement, that are applicable to a Managing Director and any additional training required by Franchisor.

E.  The Managing Director otherwise meets Franchisor's then current criteria for Managing Directors as communicated by Franchisor to the Popeyes System from time to time.

F.  Franchisor shall have approved the Managing Director, and not have later withdrawn that approval.

G.  If the Managing Director no longer qualifies as such, Franchisee shall designate another qualified person to act as Managing Director within 30 days after the date the prior Managing Director ceases to be qualified. Franchisee's designee to become the Managing Director must be approved by Franchisor and must successfully complete all modules of PTP that are applicable to a Managing Director.

## VII.    CONFIDENTIAL OPERATING STANDARDS MANUAL

7.01.    In order to protect the reputation and goodwill of Franchisor and the Popeyes System and to maintain uniform standards of operation under Franchisor's Proprietary Marks, Franchisee shall operate the Franchised Restaurant in accordance with Franchisor's Brand Standards Manual, its Brand Training Standards, and such other operating standards, specifications, procedures and techniques prescribed by Franchisor from time to time (collectively, whether made available to Franchisee via electronic communication (including the internet) or via hard copy, and all amendments and updates thereto, the **"Manual"**).

7.02.    Franchisee shall at all times treat the Manual, and the information contained therein, as confidential, and shall use all reasonable efforts to keep such information secret and confidential.  Franchisee shall not, at any time, without Franchisor's prior written consent, copy, duplicate, record, or otherwise make the Manual available to any unauthorized person or entity.

7.03.    The Manual shall at all times remain the sole property of Franchisor.

7.04.    In order for Franchisee to benefit from new knowledge, information, methods and technology adopted and used by Franchisor in the operation of the System, Franchisor may from time to time revise the Manual by bulletin, video, the Internet, electronic mail or by other written or electronic communication (including an online learning management system designated by Franchisor).  Franchisee shall review, understand, adhere to and abide by all such revisions. Franchisee acknowledges and agrees that (i) Franchisor retains the right to modify, add to, or rescind any requirement, standard, or specification set forth in the Manual in order to adapt the Popeyes System to changing conditions, competitive circumstances, business strategies, business practices, and technological innovations and other changes that Franchisor deems appropriate in its business judgment, and (ii) Franchisee shall comply with such modifications, additions, or rescissions. Notwithstanding the foregoing, no new requirement, standard or specification set forth in the Manual or otherwise, may act as a unilateral amendment to any express term, condition, or provision of this Agreement.

7.05.    If Franchisee desires to print a physical copy of the Manual (subject to Franchisor's prior written consent, as provided above), Franchisee agrees at all times to keep such copy current and up-to-date, and in the event of any dispute as to the contents of such copy, the terms of the Manual maintained by Franchisor shall be controlling.

7.06.    The Manual is intended to further the purposes of this Agreement, and is specifically incorporated, by reference, into this Agreement.  Except as otherwise set forth in this Agreement, in the event of a conflict between the terms of this Agreement and the terms of the Manual, the terms of this Agreement shall control.  Franchisee acknowledges and agrees that any required standards set forth in this Agreement and the Manual exist to protect Franchisor's interests in the Popeyes System and the Proprietary Marks and not for the purpose of establishing any control or duty to take control over those matters that are reserved to Franchisee (including the day-to-day operation of the Franchised Restaurant and the conduct and management of Franchisee's employees).

## VIII.  TRAINING

8.01.    If the Franchised Restaurant is Franchisee's first Popeyes Restaurant, a minimum of five (5) designated management employees of Franchisee (including the Managing Director) must complete, to Franchisor's satisfaction, the Popeyes Training Program as described in the Manual for their applicable management roles at the Franchised Restaurant (**"PTP"**), prior to Franchisee's opening or taking possession of the Franchised Restaurant.  If the Franchised Restaurant is not Franchisee's first Popeyes Restaurant (i.e. Franchisee owns and operates one or more Popeyes Restaurants as of the effective date of this Agreement as set forth on the Key Contract Data page), and if Franchisee already has an approved Managing Director who has completed PTP for his or her applicable management role in the Franchised Restaurant, then a minimum of three (3) designated management employees of Franchisee must complete, to Franchisor's satisfaction, PTP for their applicable management roles at the Franchised Restaurant, prior to Franchisee's opening or taking possession of the Franchised Restaurant.  The exact number of Franchisee's management employees required to complete PTP for their applicable

management roles at the Franchised Restaurant shall be determined by Franchisor in its sole discretion.

8.02.    PTP consists of a blended learning approach and curriculum, including online (including via an online learning management system designated by Franchisor), in-restaurant, and training at locations designated by Franchisor.  Franchisor reserves the right to amend or modify existing PTP modules at any time, and Franchisor also reserves the right to roll out to the System new or additional PTP modules.  Whether the completion of a particular module is obligatory for a manager to achieve Popeyes Certified Manager status shall be determined by Franchisor in its discretion.  The fees, costs, and expenses of conducting any PTP module shall be borne by Franchisee.  The cost to facilitate PTP training at a franchisee-operated Popeyes Restaurant may vary from franchisee to franchisee and must be paid by Franchisee prior to trainees entering PTP.  Similarly, the cost to facilitate PTP training at other locations designated by Franchisor may also vary and must be paid by Franchisee prior to trainees entering PTP training.  The administration of PTP shall be in such format designated by Franchisor in the Manual or otherwise in writing.

8.03.    If Franchisee's management employees complete PTP to Franchisor's satisfaction, Franchisor will issue certificates of completion for these trainees. A management employee (including the Managing Director) that successfully completes the designated segments of PTP for his or her applicable management role at the Franchised Restaurant is designated as a "**Popeyes Certified Manager**". Throughout the term of the Franchise Agreement, Franchisee shall employ at the Franchised Restaurant at least one (1) restaurant general manager and three (3) or more shift managers who have satisfactorily completed all modules of PTP for their applicable management role at the Franchised Restaurant and who have a current ServSafe Food Safety Certification (or state/local mandated equivalent certification).  Franchisee must enroll a qualified replacement in PTP for any Popeyes Certified Manager who ceases active employment at the Franchised Restaurant within thirty (30) days after the former employee's last day of employment. The replacement employee must complete all available modules of PTP for his or her applicable management role at the Franchised Restaurant within six months of being hired in a management position at the Franchised Restaurant.

8.04.    PTP is conducted at a Certified Training Restaurant (as defined below) with at least one Certified Training Manager (as defined below), whether such restaurant is company-operated or franchisee-operated, and at such other training locations designated by Franchisor; provided, that, if the Franchised Restaurant is not Franchisee's first Popeyes Restaurant (i.e. Franchisee owns and operates one or more Popeyes Restaurants as of the effective date of this Agreement as set forth on the Key Contract Data page), then PTP may be conducted at either a Certified Training Restaurant or another location approved by Franchisor so long as at least one Certified Training Manager is present and conducting the PTP in question.  As used in this Agreement, (i) a "**Certified Training Manager**" shall mean an individual designated by (and having the qualifications set by) Franchisor (as more particularly set forth in the Manual or otherwise in writing), and (ii) a "**Certified Training Restaurant**" shall mean a Popeyes Restaurant designated by (and having the qualifications set by) Franchisor (as more particularly set forth in the Manual or otherwise in writing).

8.05.    Franchisor reserves the right to test any and all Popeyes Certified Managers on an annual basis, and may require such individuals to attend and complete additional training at a training facility designated by Franchisor, and at Franchisee's sole cost and expense, in the event they fail to achieve a satisfactory score on such test. Additionally, Franchisor may make available to Franchisee or Franchisee's employees, from time to time, such additional training programs as Franchisor, in its sole discretion, may choose to conduct. Attendance at said training programs may be mandatory. The fees, costs, and expenses of conducting such additional training programs (including instruction and required materials) shall be borne by Franchisee. All other fees, costs, and expenses during the training period, including travel (including daily transportation to and from training), accommodations, meals, uniforms, and employee wages and benefits (including any routine or emergency medical services) shall also be borne by Franchisee.

## IX.    DUTIES OF THE FRANCHISOR

9.01.    Franchisor will make available to Franchisee such continuing advisory assistance in the operation of the Franchised Restaurant, in person or by electronic or written bulletins made available from time to time, as Franchisor may deem appropriate.

9.02.    Franchisor, in its sole discretion, may provide opening assistance to Franchisee at the Franchised Restaurant.

9.03.    Franchisor will make available to Franchisee standard plans and specifications to be utilized only in the development of Franchisee's Construction Plans for the Franchised Restaurant.  Franchisee may not modify or deviate from such standard plans and specifications or Franchisee's approved equipment plan (including any modifications or deviations that may be required by local or state laws, regulations or ordinances) without Franchisor's prior written consent.

9.04.    Franchisor will make the Manual available to Franchisee electronically via electronic mail, the internet or other electronic format.

9.05.    Franchisor will continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all Popeyes Restaurants, to protect and enhance the reputation of the Popeyes System and the demand for the products and services of the System. Franchisor will establish uniform criteria for approving suppliers; make every reasonable effort to disseminate its standards and specifications to prospective suppliers of Franchisee upon the written request of Franchisee, provided that Franchisor may elect not to make available to prospective suppliers the standards and specifications for such food formulas or equipment designs deemed by Franchisor in its sole discretion to be confidential; and may conduct periodic inspections of the premises and evaluations of the products used and sold at the Franchised Restaurant and in all other Popeyes Restaurants.

9.06.    Franchisor will provide training to Franchisee as set forth in Section VIII hereof.

## X.    DUTIES OF THE FRANCHISEE

Popeyes Franchise Agreement
Exhibit D (03/2024)
PLK#2350

19

Franchisee understands and acknowledges that every detail of the System is important to Franchisor, Franchisee and other franchisees in order to develop and maintain high and uniform operating standards, to increase the demand for Popeyes products and services, and to protect the reputation and goodwill of Franchisor.  Accordingly, Franchisee agrees that:

10.01. Franchisee shall maintain, at all times during the term of this Agreement, at Franchisee's expense, the premises of the Franchised Restaurant and all fixtures, furnishings, signs, systems and equipment (**"improvements"**) thereon or therein, in conformity with Franchisor's high standards and public image and to make such additions, alterations, repairs, and replacements thereto (but no others, without Franchisor's prior written consent) as may be required by Franchisor, including the following:

A.      Franchisee agrees to keep the Franchised Restaurant in the highest degree of sanitation and repair (including such periodic repainting, repairs or replacement of impaired equipment, and replacement of obsolete signs, all as Franchisor may reasonably direct) and to maintain at the Franchised Restaurant at all times a facilities maintenance program created and internally administered by Franchisee (or a professional facilities maintenance company selected and retained by Franchisee) that is commercially reasonable based upon the Franchised Restaurant's particular circumstances (including the age and overall condition of the Franchised Restaurant, including its furniture, fixtures and equipment); for avoidance of doubt, Franchisee shall not be required to retain or pay for an outside professional facilities maintenance company so long as Franchisee has adequate resources and properly trained personnel to create and administer the facilities maintenance program internally, all as determined by Franchisor in Franchisor's good faith, using Franchisor's commercially reasonable discretion;

B.      Franchisee agrees to meet and maintain the highest governmental standards and ratings applicable to the operation of the Franchised Restaurant;

C.      At its sole cost and expense, Franchisee agrees to complete a full reimaging, renovation, refurbishment and modernization of the Franchised Restaurant, within the time frame required by Franchisor as set forth in the "Frequency for Franchised Restaurant Renovation" on the Key Contract Data page, (provided, however, Franchisor may require Franchisee to submit reimaging plans and obtain Franchisor's approval of such plans twelve (12) months prior to the required completion date), including the building design, parking lot, landscaping, equipment, signs, interior and exterior decor items, fixtures, furnishings, trade dress, color scheme, presentation of trademarks and service marks, supplies and other products and materials, to meet Franchisor's then-current standards, specifications and design criteria for Popeyes Restaurants, including such structural changes, remodeling and redecoration and such modifications to existing improvements as may be necessary to do so (**"Franchised Restaurant Renovation"**).    However, notwithstanding the foregoing:

(i)      Franchisee shall not be required to perform a Franchised Restaurant Renovation if there are less than two (2) years remaining on the term of this Agreement.

(ii)    If Franchisor has provided to Franchisee written notice that Franchisee is required to complete a Franchised Restaurant Renovation on or before a date certain in accordance with the foregoing (the **"Required Renovation Date"**) and there are from the Required Renovation Date less than five (5) years but two (2) years or more remaining on the term of this Agreement, then Franchisee may, at its option, extend the term of this Agreement to a date selected by Franchisee that is up to five (5) years following the Required Renovation Date, provided that: (A) Franchisee gives Franchisor written notice of such election to extend not less than six months prior to the Required Renovation Date, or three months following receipt of written notice of the Required Renovation Date, whichever is later; (B) Franchisee is in good-standing (as defined in Section II of this Agreement); (C) prior to the Required Renovation Date, Franchisee executes an amendment to this Agreement to document the extended term; (D) concurrently with Franchisee's execution of such amendment, Franchisee pays to Franchisor an extension fee equal to Franchisor's then-current initial franchise fee, prorated for the extended term; and (E) Franchisee in fact completes such Franchised Restaurant Renovation on or before the Required Renovation Date.  At the end of such extended term, Franchisee may renew this franchise in accordance with the Renewal Term and Supplemental Term Option provisions of this Agreement.

Nothing in this Section 10.01(C) shall be deemed to limit Franchisee's other obligations, during the term of this Agreement, to operate the Franchised Restaurant in accordance with Franchisor's standards and specifications for the Popeyes System, including the obligations set forth in this Section X; and

10.02.  The Franchised Restaurant shall at all times be under the on-site supervision of the Managing Director or a Popeyes Certified Manager.  Franchisee or, if Franchisee is owned by more than one individual, the Managing Director shall remain active in overseeing the operations of the Franchised Restaurant, including regular, periodic visits to the Franchised Restaurant and sufficient communications with Franchisor to ensure that the Franchised Restaurant's operations comply with the operating standards as promulgated by Franchisor from time to time in the Manual or otherwise in written or oral communications. Following reasonable advance notice from Franchisor, from time to time, Franchisee shall attend in-person meetings with Franchisor's representatives to (among other things) review and discuss the operations and performance of the Franchised Restaurant and other Popeyes Restaurants operated by Franchisee and its affiliates, which meetings shall be at a location designated by Franchisor (which location may include Franchisor's corporate headquarters in Miami, Florida).

10.03.  Franchisee shall have sole authority and control over the day-to-day operations of the Franchised Restaurant. Without limiting the generality of the foregoing, Franchisee shall be solely responsible for (i) recruiting and hiring all employees of the Franchised Restaurant, (ii) the terms of such employees' employment and compensation, (iii) the proper training of such employees in the operation of the Franchised Restaurant (including in human resources and

Popeyes Franchise Agreement                                    21
Exhibit D (03/2024)
PLK#2350

customer relations), and (iv) Franchisee's compliance with all applicable employment and workplace-related laws (including with respect to such employees' wages, taxes, benefits, safety, work schedules, work conditions, assignments, discipline, and termination). Franchisee is an independent contractor and is not an agent, partner, joint venture, joint employer, or employee of Franchisor, and no fiduciary relationship between the parties exists. Franchisee shall be the sole and exclusive employer of its employees with the sole right to hire, discipline, discharge, and establish wages, hours, benefits, employment policies, and other terms and conditions of employment of Franchisee's employees. Franchisee shall have no right to bind or obligate Franchisor in any way nor shall Franchisee represent that it has any right to do so.  At no time shall Franchisee's employees be deemed to be Franchisor's employees or agents, and Franchisor shall have no right or obligation to direct Franchisee's employees or oversee Franchisee's employment policies or practices.

10.04.  Franchisee shall post a sign in a conspicuous location at the Franchised Restaurant that contains Franchisee's name and states that the Franchised Restaurant is independently owned and operated by Franchisee under a franchise agreement with Franchisor.

10.05.  Franchisee shall operate the Franchised Restaurant in conformity with such uniform methods, standards, and specifications as Franchisor may from time to time prescribe in the Manual or otherwise in writing, to insure that the highest degree of quality, service and cleanliness is uniformly maintained and to refrain from any deviation therefrom and from otherwise operating in any manner which reflects adversely on Franchisor's name and goodwill or on the Proprietary Marks, and in connection therewith:

     A.     Shall maintain in sufficient supply, and use at all times, only such ingredients, products, materials, supplies, and paper goods as conform to Franchisor's standards and specifications, and to refrain from deviating therefrom by using non-conforming items, without Franchisor's prior written consent;

     B.     Shall sell or offer for sale only such products and menu items that have been expressly approved for sale in writing by Franchisor, meet Franchisor's uniform standards of quality and quantity and as have been prepared in accordance with Franchisor's methods and techniques for product preparation; shall sell or offer for sale the minimum menu items specified in the Manual or otherwise in writing; shall refrain from any deviation from Franchisor's standards and specifications for serving or selling the menu items, without Franchisor's prior written consent; and shall discontinue selling or offering for sale such items as Franchisor may, in its discretion, disapprove in writing at any time;

     C.     Shall use the premises of the Franchised Restaurant solely for the purpose of conducting the business franchised hereunder, and to conduct no other business or activity thereon, whether for profit or otherwise, without Franchisor's prior written consent;

     D.     Shall keep the Franchised Restaurant open and in normal operation during such business hours as Franchisor may prescribe in the Manual or otherwise in writing;

E.      Shall permit Franchisor or its agents, at any time during ordinary business hours, to remove from the Franchised Restaurant samples of any ingredients, products, materials, supplies, and paper goods used in the operation of the Franchised Restaurant, without payment therefore, in amounts reasonably necessary for testing by Franchisor or an independent laboratory, to determine whether such samples meet Franchisor's then-current standards and specifications.  In addition to any other remedies it may have under this Agreement, Franchisor may require Franchisee to bear the cost of such testing if any such ingredient, products, materials, supplier or paper goods have been obtained from a supplier not approved by Franchisor, or if the sample fails to conform to Franchisor's specifications;

F.      Shall purchase, install and construct, at Franchisee's expense, all improvements, furnishings, signs and equipment specified in the approved standard plans and specifications, and such other furnishings, signs or equipment as Franchisor may reasonably direct from time to time in the Manual or otherwise in writing; and to refrain from installing or permitting to be installed on or about the premises of the Franchised Restaurant, without Franchisor's written consent, any improvements, furnishings, signs or equipment not first approved in writing as meeting Franchisor's standards and specifications;

G.      Shall comply with all applicable federal, state and local laws, regulations and ordinances pertaining to the operation of the Franchised Restaurant.  Franchisee shall notify Franchisor if the Franchised Restaurant is closed by order of the health department or other governmental authority within twenty-four (24) hours of such closure; and

H.      Shall grant Franchisor and its agents the right to enter upon the premises of the Franchised Restaurant at any time during ordinary business hours for the purpose of conducting inspections; cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from Franchisor or its agents, and without limiting Franchisor's other rights under this Agreement, take such steps as may be necessary immediately to correct the deficiencies detected during any such inspection, including immediately desisting from the further use of any equipment, promotional materials, products, or supplies that do not conform with Franchisor's then-current specifications, standards, or requirements.

10.06.  Franchisee shall purchase all ingredients, products, materials, supplies, and other items required in the operation of the Franchised Restaurant which are or incorporate trade-secrets of Franchisor, as designated by Franchisor (**"Trade-Secret Products"**) only from Franchisor or suppliers designated by Franchisor, and these Trade-Secret Products shall only be purchased for, used or sold, directly or indirectly, at the Franchised Restaurant.

10.07.  Franchisee shall purchase all ingredients, products, materials, supplies, including cleaning supplies, paper goods, and other items required for the operation of the Franchised Restaurant (including items required for limited time offers), except Trade-Secret Products, solely from suppliers who demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's reasonable standards and specifications for such items; who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; whose approval would not adversely impact the overall efficiencies of the Popeyes System; and who have been

Popeyes Franchise Agreement                                            23
Exhibit D (03/2024)
PLK#2350

approved in writing by Franchisor and such approval has not thereafter been revoked. If Franchisee desires to purchase any such items from an unapproved supplier, Franchisee shall submit to Franchisor a written request for approval, or shall request the supplier itself to seek approval. Franchisor shall have the right to require, as a condition of its approval, that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered, at Franchisor's option, either to Franchisor or to an independent laboratory designated by Franchisor for testing prior to granting approval. A charge not to exceed the cost and expenses actually incurred by Franchisor to conduct any inspection, including the actual cost of testing, shall be paid by the supplier or Franchisee. In addition, if the proposed supplier lacks its own current and approved form of third-party audit, Franchisor's reasonable cost of third-party audit fees shall also be paid by the supplier or Franchisee. Franchisor reserves the right, at its option, to reinspect the facilities and products of any such approved supplier from time to time and to revoke its approval upon failure of such supplier to continue to meet any of the foregoing criteria. Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier, nor to require Franchisor to make available to prospective suppliers, standards and specifications for formulas that Franchisor, in its sole discretion, deems confidential.

10.08. Franchisor shall have the right, in its sole discretion, to establish an advertising cooperative (**"Ad Co-op"**) in any designated market area, as defined by Nielsen Media Research, Inc. (**"DMA"**). In addition, an Ad Co-op for the DMA in which the Franchised Restaurant is located may be established upon the favorable vote of the owners of all Popeyes Restaurants (including non-franchised restaurants) within the same DMA. Each owner will be entitled to cast one (1) vote for each restaurant owned and operated by that owner within such DMA. If 80% of all votes entitled to be cast vote in favor of establishing an Ad Co-op, then such Ad Co-op shall be formed.

A. Once an Ad Co-op is established in the DMA in which the Franchised Restaurant is located, Franchisee shall become a member of such Ad Co-op upon commencement of operation of the Franchised Restaurant if the Ad Co-op is in existence at that time, or no later than thirty (30) days after the date on which the Ad Co-op commences operation. In no event shall Franchisee be required to be a member of more than one Ad Co-op with respect to the Franchised Restaurant.

B. If an Ad Co-op has been established, Franchisee shall contribute the amount established, from time to time, by the Ad Co-op for its members (the "**Co-op Contribution**"). The Co-op Contribution shall be sent to Franchisor by Franchisee together with the Advertising Contribution set forth in Section 3.02 herein, and will be allocated by Franchisor to the applicable Ad Co-op account, which will be administered by Franchisor.

C. Each Ad Co-op shall be organized and governed in a form and manner, and shall commence operations on a date, approved in advance by Franchisor in writing.

1. Each Cooperative shall be organized for the primary purpose of administering regional advertising programs and developing, subject to Franchisor's approval, standardized promotional materials for use by its members in local advertising.

Popeyes Franchise Agreement                    24
Exhibit D (03/2024)
PLK#2350

2.       No advertising or promotional plans or materials may be used by an Ad Co-op or furnished to its members without the prior approval of Franchisor, pursuant to the procedures and terms set forth in Section 10.07. hereof.

3.       Franchisee shall pay its required Co-op Contribution to Franchisor weekly, on Gross Sales for the preceding week, together with such statements or reports as may be required by Franchisor, or by the Ad Co-op with Franchisor's prior written approval.

D.       Franchisor, in its sole discretion, may grant an exemption to any franchisee for any length of time from the requirement of membership in an Ad Co-op, and/or from the obligation to contribute thereto (including a reduction, deferral or waiver of such contribution), upon written request of such franchisee stating reasons supporting such exemption. Franchisor's decision concerning such request for exemption shall be final. If an exemption is granted to a franchisee, such franchisee shall be required to expend on local advertising, on a monthly basis, the same amount as would otherwise be assessed by the Ad Co-op, as set forth in Section 10.08.B. hereof.

E.       Franchisor shall be a member of all Ad Co-ops in DMA's where Franchisor operates Popeyes Restaurants. Accordingly, Franchisor shall enjoy voting rights and shall make Co-op Contributions; provided, however, Popeyes Restaurants operated by Franchisor may be entitled to the same types of exemptions as provided to Franchisees in accordance with the terms of Section 10.08.D above.

10.09.  All local advertising by Franchisee shall be in such media, and of such type and format as Franchisor may approve; shall be conducted in a dignified manner; and shall conform to such standards and requirements as Franchisor may specify.  Franchisee shall not use any advertising or promotional plans or materials unless and until Franchisee has received written approval from Franchisor, pursuant to the procedures and terms set forth in Section 10.07. hereof.

10.10.  All advertising and promotional plans proposed to be used by Franchisee or the Ad Co-op, where applicable, except such plans and materials that have been previously approved by Franchisor shall be submitted to Franchisor for Franchisor's written approval (except with respect to prices to be charged) prior to any use thereof.  Franchisor shall use its best efforts to complete its review of Franchisee's proposed advertising and promotional plans within fifteen (15) days after Franchisor receives such plans.  If written approval is not received by Franchisee or the Ad Co-op from Franchisor within fifteen (15) days after receipt by Franchisor of such plans, Franchisor shall be deemed to have disapproved such plans.

10.11.  If Franchisee operates more than one (1) Franchised Restaurant, Franchisee shall have a supervisor, which may be Franchisee, if Franchisee is an individual, to supervise and coordinate the operation of the Franchised Restaurants (a **"Supervisor"**).  In addition to the foregoing, Franchisee shall employ an additional Supervisor upon the opening of Franchisee's eighth (8th) Franchised Restaurant and upon the opening of each successive seven (7) to ten (10) Franchised Restaurants thereafter.  Each Supervisor shall attend and successfully complete all

modules of PTP that are applicable to a Supervisor prior to assuming any supervisory responsibilities and shall meet such other standards as Franchisor may reasonably impose.

10.12.  If at any time the Franchised Restaurant is proposed to be operated by an entity or individual other than Franchisee, Franchisor reserves the right to review and approve the operating entity or individual and to require and approve an operating agreement prior to such party's assumption of operations.  Franchisor may, in its sole discretion, reject either the operating entity, the individual operator or the operating agreement.  If approved by Franchisor, the operating entity shall agree in writing to comply with all of Franchisee's obligations under the Franchise Agreement as though the operating entity were the franchisee designated therein, on such form as may be designated by Franchisor.  The operation of the Franchised Restaurant by any party other than Franchisee, without Franchisor's prior written consent, shall be deemed a default of this Agreement, for which Franchisor may terminate this Agreement pursuant to the provisions of Section 15.02. hereof.

10.13.  By signing this Agreement, Franchisee becomes a member of Supply Management Services, Inc. ("**SMS**"), formerly Popeyes Operators Purchasing Cooperative Association or POPCA, or any successor thereto, and shall remain a member in good standing of SMS throughout the term of this Agreement, and shall pay all reasonable membership fees assessed by SMS.

10.14.  <u>POS and BOH Systems; Other Systems</u>.

A.     Franchisee shall purchase, install and use a point-of-sale system ("**POS System**") and a back-of-house system ("**BOH System**"), in each case, that has been approved in writing by Franchisor and that meets Franchisor's specifications.  Franchisee agrees that Franchisor (or Franchisor's designated vendor) shall have the right to retrieve any data and information from Franchisee's POS System and its BOH System as Franchisor, in its sole discretion, deems appropriate, including electronically polling sales, menu mix, transaction-level data, inventory, labor and other data of the Franchised Restaurant; <u>provided</u>, <u>however</u>, Franchisor shall take necessary precautions to preserve and protect Franchisee's security and privacy rights in exercising its right hereunder. Franchisee shall subscribe to Franchisor's approved polling solution. Franchisee shall use and adhere to a standardized set of menu sales item price look-up codes (PLUs) and descriptors for every menu sales item in Franchisee's POS System and BOH System, including limited time offers.  Franchisor may revise its specifications for the POS System and the BOH System periodically.  Consequently, Franchisee must upgrade, update or add new features or components to Franchisee's POS System and its BOH System at such time(s) as such specifications are revised.  In addition to the foregoing, Franchisor may poll data and information from other systems installed at the Franchised Restaurant, including speed of service data from drive-thru timer systems. Further, Franchisee shall, at its sole cost and expense, integrate or otherwise permit the integration of the POS System and/or BOH System with such technological platforms designated by Franchisor from time to time (including websites and mobile applications designated by Franchisor).

B.     Franchisee must also, at its sole cost and expense: (a) maintain, use and/or operate a centralized or technology based methods of taking, processing, routing, and

delivering orders or receiving payment for such orders that may be mandated by Franchisor at any time during the Term in addition to the methods and technology Franchisor currently uses or authorizes (individually an "**Additional Ordering System**" and collectively "**Additional Ordering Systems**"); and (b) add or replace equipment, wiring, hardware and software in connection with the Additional Ordering Systems. To the extent any products and services related to an Additional Ordering System are owned by Franchisor or provided to Franchisee by Franchisor, Franchisor may charge up front and/or ongoing fees. Franchisor shall be the sole owner of all direct and related rights and assets, including software and hardware, intellectual property and all data generated by the Additional Ordering Systems, but excluding hardware or equipment Franchisee purchases directly for the purpose of gaining access to the Additional Order System. If Franchisor requires Franchisee to use an Additional Ordering System, then Franchisee shall comply with Franchisor's requirements for connecting to and utilizing such technology in connection with Franchisee's operation of the Franchised Restaurant. Franchisee will install and implement any Additional Ordering System required by Franchisor within the reasonable time specified by Franchisor.

C.      Franchisee must also, at its sole cost and expense: (a) maintain, use and/or operate technology for the purpose of communicating with customers of POPEYES Restaurants and the collection, processing, storage and use of POPEYES Restaurant customer data that may be mandated by Franchisor at any time during the Term in addition to the methods and technology Franchisor currently uses or authorizes (individually an "**Additional Digital System**" and collectively, the "**Additional Digital Systems**"); and (b) add or replace equipment, wiring, hardware and software in connection with the Additional Digital Systems. To the extent any products and services related to an Additional Digital System are owned by Franchisor or provided to Franchisee by Franchisor, Franchisor may charge up front and/or ongoing fees. Franchisor shall be the sole owner of all direct and related rights and assets, including software and hardware, intellectual property and all data generated by the Additional Digital Systems, but excluding hardware or equipment Franchisee purchases directly for the purpose of gaining access to an Additional Digital System. Franchisor may provide the data to third parties and use the data generated by the Additional Digital Systems (1) to analyze customer trends, (2) to market Franchisor-developed goods and products to all customers or specific customer(s), (3) to reward loyal or repeat customers, (4) to provide the data to third parties, and (5) for such other purposes as Franchisor deems appropriate in its sole discretion. Franchisee acknowledges and agrees that any amounts received by Franchisor from providing the data generated by the Additional Digital Systems to third parties shall be the sole property of Franchisor. If Franchisor requires Franchisee to use an Additional Digital System, then Franchisee shall comply with Franchisor's requirements for connecting to and utilizing such technology in connection with Franchisee's operation of the Franchised Restaurant. Franchisee will install and implement any Additional Digital System required by Franchisor within the reasonable time specified by Franchisor.

D.      Franchisee shall purchase, install and maintain a computer system, separate from the POS System and the BOH System, at the Franchised Restaurant that meets Franchisor's current standards and specifications for training, communications and access

Popeyes Franchise Agreement                                          27
Exhibit D (03/2024)
PLK#2350

to Internet-based resources provided by Franchisor (**"Computer System"**). Franchisor may periodically revise its specifications for the Computer System requiring Franchisee to promptly upgrade or update as necessary to meet Franchisor's then current standards and specifications.

10.15.  Prior to opening the Franchised Restaurant, Franchisee shall implement a Customer Service Response System Program (**"CSRSP"**) satisfactory to Franchisor, with a third party vendor approved by Franchisor in writing. The CSRSP (i) must include a 24/365 "Live Operator" customer hotline; and (ii) may, at Franchisee's option, include "mystery shopper" visits on a quarterly basis throughout the term of this Agreement. The results of the CSRSP shall be forwarded to Franchisor by Franchisee and/or the approved CSRSP vendor on a weekly basis.  Franchisee shall reimburse Franchisor for the cost of any remuneration or promotional materials provided to Franchisee's customers in response to complaints made to the hotline. Franchisor shall not use any unsatisfactory results of CSRSP as grounds for default under this Agreement or as the basis of a default action.  The foregoing shall not in any way limit the rights of Franchisor to enforce any provision hereunder, nor limit the ability of Franchisor to declare a default hereunder for any breach of this Agreement.

10.16.  Franchisee shall, in accordance with such requirements as Franchisor may from time to time prescribe in the Manual, participate in a guest feedback program offered through a third party service provider designated by Franchisor.  Components of the program may, among other things, require Franchisee to offer (or reimburse Franchisor for offering) such guest incentives for guest participation in the program as Franchisor may reasonably require.

10.17.  Franchisee shall not promote, offer or sell any products or other services related to the Franchised Restaurant through the internet or use the Proprietary Marks or any marks similar thereto in any internet domain name, electronic mail address or home page address, or in the operation of any internet web site without Franchisor's prior written consent.  In connection with any such consent, which Franchisor may grant or withhold, in Franchisor's sole discretion, Franchisor may establish such requirements as Franchisor deems appropriate, including, among others:  (i) Franchisor may require Franchisee to submit to Franchisor for Franchisor's prior written approval, a sample of any proposed internet web site used for or in connection with the Franchised Restaurant or the business of Franchisee (**"Web Site"**), domain name, home page address, format and visible (including proposed screen shots and any text, video clips, photographs, images, sound bites or other materials in which any party other than Franchisor has any ownership interest) and non-visible content (including meta-tags) in the form and manner that Franchisor may reasonably require; (ii) Franchisor may require Franchisee to establish hyperlinks to Franchisor's web site and others as Franchisor may require, and to obtain Franchisor's prior written approval of Franchisee's use of any other hyperlinks and/or other links; (iii) Franchisor may require Franchisee to submit to Franchisor for Franchisor's prior written approval any modifications to Franchisee's Web Site. Franchisor may revoke Franchisor's approval of Franchisee's Web Site at any time and require Franchisee to discontinue Franchisee's use of it and any domain names associated with it.  In addition to any other applicable requirements, Franchisee must comply with any standards and specifications Franchisor develops that are applicable to Web Sites as set forth in the Manual or otherwise in writing, which standards and specifications Franchisor may modify from time to time. Franchisor may designate the form and content of Franchisee's Web Site and may require that any

such Web Site be hosted by Franchisor or a third party whom Franchisor designates. Franchisor also may charge Franchisee a fee for developing, reviewing and approving Franchisee's Web Site and/or hosting it. In addition to the foregoing, Franchisee shall not use or permit any third party to use any of the Proprietary Marks in connection with any internet web site and/or as part of any internet domain name or electronic mail or home page address, unless such use is expressly approved by Franchisor in writing. Franchisee shall not, directly or indirectly, nor shall Franchisee instruct or authorize any third party to, engage in any online advertising for the Franchised Restaurant or the business of Franchisee, including but not limited to the purchase of keywords consisting of, containing or similar to any of the Proprietary Marks through any paid search program, without Franchisor's prior written consent, which Franchisor may grant or withhold, in Franchisor's sole discretion.

10.18. Franchisee shall not operate or create a social media site, page or group containing the Proprietary Marks using tools including, but not limited to, Facebook, MySpace, Twitter, YouTube, Instagram, Google+, Pinterest, Tumblr, SnapChat, Vine, or other social channels without Franchisor's prior written consent. Franchisor may, at any time, require any unapproved page, site or group be discontinued and deleted.

10.19. To the extent Franchisee opens or operates a Franchised Restaurant located on a military base, in a public educational institution, or in another government building or facility, or otherwise opens or operates a Franchised Restaurant in furtherance of a contract between Franchisor and the federal government, the following requirements shall apply to Franchisee:

A.    Franchisee will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Franchisee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. Franchisee agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause.

B.    Franchisee will, in all solicitations or advertisements for employees, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, sexual preference, age, disability, gender identity, genetic information, veteran status, national origin or other categories as provided by law.

C.    Franchisee will send to any labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice advising the labor union or workers' representative of the Franchisee's commitments under section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

D.      Franchisee will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

E.      Franchisee will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

F.      In the event of the Franchisee's non-compliance with the nondiscrimination clauses of this Agreement or with any of such rules, regulations, or orders, this Agreement may be canceled, terminated or suspended in whole or in part and the Franchisee may be declared ineligible for Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

G.      The Franchisee will include the provisions of paragraphs (A) through (G) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Franchisee will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the Franchisee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the Franchisee may request the United States to enter into such litigation to protect the interests of the United States.

10.20.  Franchisee shall comply with all applicable legal, regulatory, credit card brand requirements and brand standards regarding the use of information technology in Franchisee's business and restaurants.  Franchisee shall honor all credit, charge, courtesy or cash cards or other credit devices specified by Franchisor.  Franchisee shall also comply with the then current Payment Card Industry Data Security Standards (PCI/DSS) as those standards may be revised by the PCI Security Standards Council, LLC (see www.pcisecuritystandards.org) or successor organization, including (i) implementing (at Franchisee's expense) all security requirements that the PCI Security Standards Council (or its successor) requires of a merchant that accepts payment by credit and/or debit cards, and (ii) participating in (at Franchisee's expense) a standardized PCI/DSS compliance program that is provided by a PCI/DSS vendor, in each case, approved by Franchisor in its discretion.  Franchisee shall, at its expense, demonstrate full compliance through means which may include having an independent third party Qualified Security Assessor (QSA) conduct a PCI/DSS audit. In the event Franchisee is unable to demonstrate full compliance, Franchisor may require Franchisee to engage the services of an approved vendor to assist Franchisee to demonstrate full compliance on an ongoing basis.  Additionally, Franchisor may require Franchisee to use, and directly contract with, certain approved third-party vendors, and in some cases a single approved third-party vendor, for some or all of Franchisee's managed firewall, other

technology security compliance and/or card brand or government requirements related to the transmission/processing of credit card transactions and information. Franchisee shall immediately notify Franchisor if Franchisee becomes aware of any breach, or suspected breach, of card holder data, Personally Identifiable Information (PII), confidential information, or trade secrets related to its business or restaurants, whether notice is provided by Franchisee's credit card processor, law enforcement or any other party.

10.21. Franchisee shall comply with all other requirements set forth in this Agreement.

10.22. Franchisee agrees to contribute to The Popeyes Foundation, Inc. (the "Foundation") at least ONE THOUSAND DOLLARS ($1,000.00) for the Franchised Restaurant during each year for the duration of the Term at the time specified by the Foundation by participating in the in-restaurant fundraising programs specified by Franchisor or by a donation. Franchisee agrees to hold any money raised on behalf of the Foundation (the "Charitable Funds") in trust for the benefit of the Foundation until such Charitable Funds are distributed to the Foundation. Franchisee further agrees that (a) the Charitable Funds are not property of the Franchisee and (b) it shall not use the Charitable Funds for any purpose whatsoever, other than for turning over such Charitable Funds to the Foundation.

## XI. INSURANCE

11.01. <u>Insurance Program</u>. Franchisee shall be responsible for all loss or damage arising from or related to Franchisee's development and operation of the Franchised Restaurant, and for all demands or claims with respect to any loss, liability, personal injury, death, property damage or expense whatsoever occurring upon the premises of, or in connection with the development or operation of, the Franchised Restaurant. Franchisee shall procure, prior to commencement of construction of the Franchised Restaurant, and shall maintain in full force and effect during the Term of this Agreement at Franchisee's expense, an insurance policy or policies protecting Franchisee and Franchisor, and their officers, directors, agents and employees, against any loss, liability, or expense whatsoever from personal injury, death or property damage or casualty, including, fire, lightning, theft, vandalism, malicious mischief, and other perils normally included in an extended coverage endorsement arising from, occurring upon or in connection with the construction, operation or occupancy of the Franchised Restaurant, as Franchisor may reasonably require for its own and Franchisee's protection.

11.02. <u>Insurance Requirements</u>. Such policy or policies shall be written by an insurance company satisfactory to Franchisor and Franchisee shall maintain in full force and effect throughout the term of this Agreement that insurance which Franchisee determines is necessary or appropriate for liabilities caused by or occurring in connection with the development or operation of the Franchised Restaurant, which insurance shall include, at a minimum the following coverage:

A. Workers' Compensation Insurance, with statutory limits as required by the laws and regulations applicable to the employees of Franchisee who are engaged in the performance of their duties relating to the Franchised Restaurant, including any pre-opening training programs, as well as such other insurance as may be required by statute or regulation of the state in which the Franchised Restaurant is located.

B.    Employer's Liability Insurance, for employee bodily injuries and deaths, with limits as follows:

$1,000,000 Bodily Injury by Accident each accident;
$1,000,000 Bodily Injury by Disease policy limit; and
$1,000,000 Bodily Injury by Disease each employee.

C.    Commercial General Liability Insurance, covering claims for bodily injury, death and property damage, including Premises and Operations, Independent Contractors, Products and Completed Operations, Personal Injury, Contractual, and Broadform Property Damage liability coverages, with a limit of not less than $5,000,000 per occurrence.

D.    Commercial Automobile Liability Insurance must be provided with the following limit if Franchisee owns, hires or leases automobiles for use in the business:

Combined Single Limit of not less than $1,000,000 for bodily injury, death and property damage per occurrence,

E.    All Risk (special perils) Property Insurance, as required to meet the then current health and safety codes and other applicable laws on a replacement cost basis, without depreciation or co-insurance with limits as appropriate, covering the real property of Franchisee and any real property which Franchisee may be obligated to insure by contract. Such real property may include building, machinery, equipment, furniture, fixtures and inventory.

11.03. All such policies of insurance shall provide that the same shall not be canceled, modified or changed without first giving thirty (30) days' prior written notice thereof to Franchisor. No such cancellation, modification or change shall affect Franchisee's obligation to maintain the insurance coverages required by this Agreement. Except for Workers' Compensation Insurance, Franchisor shall be named as an Additional Insured on all such required policies. All liability insurance policies shall be written on an "occurrence" policy form. Franchisee shall be responsible for payment of any and all deductibles from insured claims under its policies of insurance. Franchisee shall not satisfy the requirements of this Section XI unless and until certificates of such insurance, including renewals thereof, have been delivered to and approved by Franchisor. Franchisee shall not self-insure any of the insurance coverages required by this Agreement, or non-subscribe to any State's applicable workmen's compensation laws without the prior written consent of Franchisor. Franchisor shall have the right, at any time during the term of this Agreement to increase the minimum limits of insurance coverage or otherwise modify the insurance requirements of this Agreement upon written notice in the Manual or as otherwise prescribed by Franchisor in writing. If Franchisee shall fail to comply with any of the insurance requirements herein, upon written notice to Franchisee by Franchisor, Franchisor may, without any obligation to do so, procure such insurance and Franchisee shall pay Franchisor, upon demand, the cost thereof plus interest at the maximum rate permitted by law, and a reasonable administrative fee designated by Franchisor.

11.04.  <u>Insurance Obtained by Franchisee Shall Be Primary to Franchisor's Own Insurance</u>.  Franchisee agrees that all insurance policies obtained by Franchisee shall be primary coverage, the applicable limits of which shall be exhausted before any benefits (defense or indemnity) may be obtained under any other insurance (including self-insurance) providing coverage to Franchisor.  Franchisee shall notify its insurers of this Agreement and shall use best efforts to obtain an endorsement on each policy it obtains pursuant to Sections 11.01. and 11.02. stating as follows:

> The applicable limits of this policy shall be applied and exhausted before any benefits may be obtained (whether for defense or indemnity) under any other insurance (including self-insurance) that may provide coverage to Franchisor.  All insurance coverage obtained by Franchisor shall be considered excess insurance with respect to this policy, the benefits of which excess insurance shall not be available until the applicable limits of this policy are exhausted.

11.05.  <u>No Limitation on Coverage</u>.  Franchisee's obligation to obtain and maintain the foregoing policy or policies of insurance in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section XVIII of this Agreement.

11.06.  <u>Issuance of Insurance</u>.  Franchisee must obtain the insurance required by this Agreement no later than fifteen (15) days before the date on which any construction is commenced.  The Franchised Restaurant shall not be opened for business prior to Franchisor's receipt of satisfactory evidence that all insurance required by this Agreement is in effect.  Upon obtaining such insurance, and on each policy renewal date thereafter, Franchisee shall promptly submit evidence of satisfactory insurance and proof of payment therefore to Franchisor, together with, upon request, copies of all policies and policy amendments.  The evidence of insurance shall include a statement by the insurer that the policy or policies will not be canceled or materially altered without at least thirty (30) days' prior written notice to Franchisor.

11.07.  <u>No Representations</u>.  Franchisee acknowledges that no requirement for insurance contained in this Agreement constitutes advice or a representation by Franchisor that only such policies, in such amounts, are necessary to protect Franchisee from losses in connection with its business under this Agreement.  Maintenance of the insurance required by this Agreement, and the performance by Franchisee of its obligations under this Section of the Agreement shall not relieve Franchisee of liability under the indemnification provisions or any other provisions of this Agreement.

## XII.    CONFIDENTIAL INFORMATION

12.01.  Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, persons, partnership, association, corporation or other entity, any confidential information, knowledge or know-how concerning the construction and methods of operation of the Franchised Restaurant which may be communicated to Franchisee, or of which Franchisee may be apprised, by virtue of Franchisee's operation under the terms of

Popeyes Franchise Agreement                         33
Exhibit D (03/2024)
PLK#2350

this Agreement. Such confidential information may be provided to Franchisee through a variety of resources, including the following: (a) the Manual (including Franchisor's Brand Standards Manual as well as its Brand Training Standards), (b) Franchisor's extranet (http://www.thescoop.popeyes.com), (c) Franchisor's online training solution and learning management system, and (d) such other resources provided by Franchisor in its discretion from time to time. Franchisee shall divulge such confidential information only to: (i) such employees of Franchisee as must have access to it in order to exercise the franchise rights granted hereunder and to establish and operate the Franchised Restaurant pursuant hereto; (ii) Franchisee's attorneys and certified public accountants on an as needed basis for legitimate business purposes of the Franchisee; and (iii) as Franchisee may be required by law, provided Franchisee shall give Franchisor prior written notice of any such required disclosure immediately upon receipt of notice by Franchisee in order for Franchisor to have the opportunity to seek a protective order or take such other actions as it deems appropriate under the circumstances.

12.02. Any and all information, knowledge, and know-how, including drawings, materials, equipment, recipes, prepared mixtures or blends of spices or other food products, and other data, which Franchisor designates as confidential, either specifically in writings of any kind, course of conduct, or which otherwise derives economic value, actual or potential, from not being generally known, and not ascertainable by proper means and in the subject of reasonable efforts, under the circumstances, to maintain secrecy, and any information, knowledge, or know-how which may be derived by analysis thereof, shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to Franchisee's attention prior to disclosure thereof by Franchisor; or which, at the time of disclosure thereof by Franchisor to Franchisee, had become a part of the public domain, through publication or communication by others; or which, after disclosure to Franchisee by Franchisor, becomes a part of the public domain, through publication or communication by others.

## XIII. COVENANTS

13.01. Franchisee covenants that, during the term of the Agreement, except as otherwise approved in writing by Franchisor, the Managing Director shall devote the Managing Director's full time, energy and best efforts to the management and operation of the Franchised Restaurant and any other Popeyes Restaurant owned by Franchisee for which he or she is the Managing Director.

13.02. Franchisee acknowledges that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including information regarding the operational, sales, promotional, and marketing methods, procedures and techniques of Franchisor and the System. Franchisee covenants that, during the term of this Agreement, Franchisee (who, unless otherwise specified, shall include, for purposes of this Section XIII, collectively and individually: (i) all officers, directors and holders of a legal or beneficial interest of ten percent (10%) or more of the securities with voting rights of Franchisee and of any corporation, directly or indirectly controlling Franchisee, if Franchisee is a corporation; and (ii) the general partner and any limited partners of Franchisee, including any corporation, and the officers, directors and holders of a legal or beneficial interest of ten percent (10%) or more of the securities with voting rights of a corporation which controls, directly or indirectly, any general or limited partner of Franchisee, if Franchisee is a partnership, and (iii) any members and managers and holders of a

Popeyes Franchise Agreement                                34
Exhibit D (03/2024)
PLK#2350

legal or beneficial interest of ten percent (10%) or more of the securities with voting rights of Franchisee and/or any corporation directly or indirectly controlling Franchisee, if Franchisee is a limited liability company) shall not, either directly or indirectly, for itself, or on behalf of, or in conjunction with, any person, persons, partnership, limited liability company, association, corporation, or other entity:

A.    Divert or attempt to divert any business or customer of the business franchised hereunder to any competitor by direct or indirect inducements or otherwise, or to do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System; or

B.    Own, maintain, operate, engage in, or have any interest in any quick service (either takeout, delivery, on premises consumption, or a combination thereof) restaurant or other business that specializes in the sale of chicken ("Disqualifying Restaurant"); provided, however, that the term "Disqualifying Restaurant" shall not apply to any business operated by Franchisee under a franchise agreement with Franchisor or an affiliate of Franchisor.

13.03. Franchisee covenants that Franchisee shall not, regardless of the cause for termination, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, association, corporation or other entity, for a period of two (2) years following the sale, assignment, transfer, termination or expiration of this Agreement, own, maintain, engage in, or have any interest in any Disqualifying Restaurant that is located within a radius of ten (10) miles of the location of the Franchised Restaurant specified on the Key Contract Data page.

13.04. At Franchisor's request, Franchisee shall require and obtain execution of a confidentiality and non-competition agreement containing (i) confidentiality obligations similar to those set forth in Section XII of this Agreement (including a prohibition against communicating, divulging or using for the benefit of any person, persons, partnership, association, corporation, or any other entity, any confidential information, knowledge, or know-how concerning the methods of operation of the Franchised Restaurant), and (ii) covenants similar to those set forth in this Section XIII (including covenants applicable upon the termination of a person's relationship with Franchisee), in each case, in a form satisfactory to Franchisor, including specific identification of Franchisor as a third party beneficiary of such obligations and covenants with the independent right to enforce them, from all officers, directors, and holders of a direct or indirect legal or beneficial ownership interest of ten percent (10%) or more in Franchisee.

The failure of Franchisee to obtain execution of such a confidentiality and non-competition agreement required by this Section 13.04. shall constitute a breach of this Agreement. A duplicate original of each such confidentiality and non-competition agreement shall be provided by Franchisee to Franchisor immediately upon execution.

13.05. Upon demand or termination of this Agreement, Franchisee shall (and shall instruct each officer and employee of Franchisee to) (a) return to Franchisor all of the Franchisor's confidential information in Franchisee's possession, or (b) certify to Franchisor in writing that

Franchisee has purged all confidential and proprietary information from Franchisee's computers and other data storage systems.

13.06. The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Section XIII, is held unreasonable or unenforceable by a court or agency having jurisdiction in a final decision, Franchisee expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant was separately stated in and made a part of this Section XIII.

A.    Right to Reduce Covenants. Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in Sections 13.02. and 13.03. of this Agreement, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof, and Franchisee agrees that it shall comply with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section XXII hereof.

B.    Injunctive Relief. The parties acknowledge that it will be difficult to ascertain with any degree of certainty the amount of damages resulting from a breach by Franchisee of any of the covenants contained in this Section XIII. It is further agreed and acknowledged that any violation by Franchisee of any of said covenants will cause irreparable harm to Franchisor. Accordingly, Franchisee agrees that upon proof of the existence of a violation of any of said covenants, Franchisor will be entitled to injunctive relief against Franchisee in any court of competent jurisdiction having authority to grant such relief, together with all costs and reasonable attorneys' fees incurred by Franchisor in bringing such action.

## XIV.    TRANSFERABILITY OF INTEREST

14.01. Transfer by Franchisor. This Agreement shall inure to the benefit of the successors and assigns of Franchisor. Franchisor shall have the right to transfer or assign its interest in this Agreement to any person, persons, partnership, association, corporation, or other entity. If Franchisor's assignee assumes all the obligations of Franchisor hereunder and sends Franchisee written notice of the assignment so attesting, Franchisee agrees promptly to execute a general release of Franchisor and its parent companies, subsidiaries, and affiliates from claims or liabilities of Franchisor under this Agreement.

14.02. Transfer by Franchisee. Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted this Agreement in reliance on Franchisee's business skill and financial capacity. Accordingly, neither (i) Franchisee, nor (ii) any immediate or remote successor to Franchisee, nor (iii) any individual, partnership, corporation or other legal entity which directly or indirectly owns any interest in Franchisee or in this Franchise Agreement, shall sell, assign, transfer, convey, donate, pledge, mortgage, or otherwise encumber any direct or indirect interest in this Agreement or in any legal entity which owns the Franchised Restaurant without the prior written consent of Franchisor. Acceptance by Franchisor of any Royalty, Advertising Contribution or any other

amount accruing hereunder from any third party, including any proposed transferee, shall not constitute Franchisor's approval of such party as a transferee or the transfer of this Franchise Agreement to such party.  Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor, shall be null and void, and shall constitute a breach of this Agreement, for which Franchisor may then terminate without opportunity to cure pursuant to Section 15.02.D. of this Agreement.

14.03.  Conditions for Consent.  Franchisor may grant or withhold its consent to any transfer referred to in Section 14.02., when requested, in its sole discretion; provided that prior to the time of any transfer consented to by Franchisor;

A.      All of Franchisee's accrued monetary obligations to Franchisor and its subsidiaries and affiliates shall have been satisfied;

B.      Franchisee shall have agreed to remain obligated under the covenants contained in Section XIII hereof as if this Agreement had been terminated on the date of the transfer;

C.      The transferee must be of good moral character and reputation, in the reasonable judgment of Franchisor;

D.      Franchisor shall have determined, to its satisfaction, that the transferee's qualifications meet Franchisor's then-current criteria for new franchisees;

E.      Franchisee and the transferee shall execute a written agreement, in a form satisfactory to Franchisor, pursuant to which the transferee shall assume all of the obligations of Franchisee under this Agreement and shall also assume any additional commitments of Franchisee, including an agreement by Franchisee to pay an Advertising Contribution in an amount exceeding four percent (4%) of Gross Sales.  Franchisee shall unconditionally release any and all claims Franchisee might have against Franchisor and its parent companies, subsidiaries, and affiliates as of the date of the transfer;

F.      The transferee shall execute the then-current form of Franchise Agreement and such other then-current ancillary agreements as Franchisor may reasonably require. The then-current form of Franchise Agreement may have significantly different provisions including a higher royalty fee and advertising contribution than that contained in this Agreement.  The then-current form of Franchise Agreement will expire on the expiration date of this Agreement and will contain the same renewal rights, if any, as are available to Franchisee under Sections 2.02. and 2.03. hereof;

G.      The transferee shall agree at its sole cost and expense, to (i) complete a Franchised Restaurant Renovation, within the time frame required by Franchisor, unless a Franchised Restaurant Renovation was completed within six (6) years prior to the date of the transfer and (ii) perform such other scope of work as may be determined by Franchisor;

H.      The transferee and such other individuals as may be designated by Franchisor in the Manual or otherwise in writing, must have successfully completed the training course then in effect for new franchisees.  If the Franchised Restaurant is the transferee's first Popeyes Restaurant, the transferee shall pay to Franchisor the then-standard training fee, if any;

I.      If the transferee is a partnership, the partnership agreement shall provide that further assignments or transfers of any interest in the partnership are subject to all restrictions imposed upon assignments and transfers in this Agreement;

J.      Franchisee shall, at Franchisor's option and request, execute a written guaranty of the transferee's obligations with respect to the Franchised Restaurant, which guaranty shall not exceed a period of three (3) years from the date of transfer; and

K.      Franchisee shall pay to Franchisor the transfer fee in the amount set forth on the Key Contract Data page (the "Transfer Fee"), however, no additional initial franchise fee or development fee shall be charged by Franchisor for a transfer.  If the transferee is a corporation or other business entity formed by Franchisee for the convenience of ownership and Franchisee is the sole shareholder or member of such business entity, no Transfer Fee shall be required.  A portion of the Transfer Fee in the amount set forth on the Key Contract Data page (the "**Transfer Fee Deposit**") is payable upon Franchisee's submission of its initial transfer application to Franchisor. The Transfer Fee Deposit is non-refundable in the event that the proposed transfer does not occur in accordance with the terms of approved transfer application.  If the proposed transfer occurs in accordance with the terms of the approved transfer application, the Transfer Fee Deposit will be applied to the total Transfer Fee due at the time of the closing of the transfer.

14.04.  Grant of Security Interest.  Franchisee shall grant no security interest in this Agreement unless the secured party agrees:  (i) that in the event of any default by Franchisee under any documents related to the security interest (A) Franchisor shall be provided with notice of default and given a reasonable time within which to cure said default, and (B) Franchisor shall have the right and option to be substituted as obligor to the secured party and to cure any default of Franchisee or to purchase the rights of the secured party upon payment of all sums then due to such secured party, except such amounts which may have become due as a result of any acceleration of the payment dates based upon Franchisee's default; and (ii) to such other requirements as Franchisor, in its sole discretion, deems reasonable and necessary to protect the integrity of the Proprietary Marks and the Popeyes System. Notwithstanding the above paragraph 14.04, in no event shall any secured party be entitled to (i) use or assign Franchisee's rights with respect to Franchisor's Proprietary Marks or (ii) use, assign, possess or have access to any trade secrets or confidential information of Franchisor.

14.05.  Transfer on Death or Mental Incapacity.  Upon the death or mental incapacity of any person with an interest in this Agreement, the Franchised Restaurant or Franchisee, the executor, administrator, or personal representative of such person shall transfer his or her interest to a third party approved by Franchisor within twelve (12) months after such death or mental incapacity.  Such transfer, including transfer by devise or inheritance, shall be subject to the same

conditions as any inter vivos transfer. However, in the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet the conditions in this Section XIV, the personal representative of the deceased shall have a reasonable time, but in no event more than eighteen (18) months from the deceased's death, to dispose of the deceased's interest in this Agreement and the business conducted pursuant hereto, which disposition shall be subject to all the terms and conditions for assignments and transfers contained in this Agreement. If the interest is not disposed of within twelve (12) or eighteen (18) months, whichever is applicable, Franchisor may terminate this Agreement.

14.06. <u>Right of First Refusal</u>. Any party holding an interest in this Agreement, the Franchised Restaurant or in Franchisee, and who desires to accept a bona fide offer from a third party to purchase such interest, shall notify Franchisor in writing of such offer within ten (10) days of receipt of such offer, and shall provide such information and documentation relating to the offer as Franchisor may require. Franchisor shall have the right and option, exercisable within thirty (30) days after receipt of the notice of offer and the furnishing of all reasonably requested information, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party. In the event that Franchisor elects to purchase the seller's interest, closing on such purchase must occur within sixty (60) days from the date of notice to the seller of the election to purchase by Franchisor. Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of an initial offer. Failure of Franchisor to exercise the option afforded by this Section 14.06. shall not constitute a waiver of any other provisions of this Agreement, including all of the requirements of this Section XIV, with respect to a proposed transfer. In the event the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase the interest in this Agreement, Franchisee, or the Franchised Restaurant proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time as to the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor, and his or her determination shall be binding upon the parties.

14.07. <u>Offerings by Franchisee</u>. Securities or partnership interests in Franchisee may be offered to the public, by private offering or otherwise, only with the prior written consent of Franchisor, which consent shall not be unreasonably withheld. All materials required for such offering by federal or state law shall be submitted to Franchisor for review prior to their being filed with any governmental agency; and any materials to be used in any exempt offering shall be submitted to Franchisor for review prior to their use. No offering of such securities shall imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating in the underwriting, issuance, or offering of securities by Franchisee; and Franchisor's review of any offering shall be limited solely to the subject of the relationship between Franchisee and Franchisor. Franchisee and the other participants in the offering shall fully indemnify Franchisor in connection with the offering. For each proposed offering, Franchisee shall pay to Franchisor a non-refundable fee of Five Thousand Dollars ($5,000), or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including legal and accounting fees. Franchisee shall give Franchisor written notice at least thirty (30) days prior to the date of commencement any offering or other transaction covered by this Section 14.07.

## XV.    TERMINATION

15.01.  Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by Franchisee or such a petition is filed against Franchisee and not opposed by Franchisee; or if Franchisee is adjudicated bankrupt or insolvent; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under the applicable law of any jurisdiction should be instituted by Franchisee or against Franchisee and not opposed by Franchisee; or if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas bond is filed); or if Franchisee is dissolved; or if execution is levied against Franchisee's property or business; or if suit to foreclose any lien or mortgage against the premises or equipment of any Franchised Restaurant developed hereunder is instituted against Franchisee and not dismissed within thirty (30) days; or if the real or personal property of any Restaurant developed hereunder shall be sold after levy thereon by any sheriff, marshal, or constable.

15.02.  Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder without affording Franchisee any opportunity to cure the default upon the occurrence of any of the following events:

A.      If Franchisee, at any time, ceases to operate the Franchised Restaurant or otherwise abandons the Franchised Restaurant, or loses the right to possess the premises of the Franchised Restaurant, or otherwise forfeits the right to do or transact business in the jurisdiction where the Franchised Restaurant is located; provided, however, that if, through no fault of Franchisee, the premises are damaged or destroyed by an event not within the control of Franchisee such that repairs or reconstruction cannot be completed within one-hundred eighty (180) days thereafter, then Franchisee shall have thirty (30) days after such event in which to apply for Franchisor's approval to relocate and/or reconstruct the premises, which approval shall not be unreasonably withheld, but may be conditioned upon the payment of an agreed minimum royalty to Franchisor during the period in which the Franchised Restaurant is not in operation;

B.      If Franchisee is convicted of or pleads guilty to a felony, a crime involving moral turpitude, or any other crime or offense that Franchisor believes is reasonably likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein;

C.      (i) If a threat or danger to public health or safety results from the construction, maintenance, or operation of the Franchised Restaurant or from the material violation of any health and safety laws, rules, or regulations, or (ii) if the Franchised Restaurant is closed as a result of a failed inspection by the health department and in the event of such closure Franchisor determines, in its sole discretion, that the failed inspection is the result of repeated or  material failure by Franchisee to comply with the requirements of the Franchise Agreement or the health department. Notwithstanding anything herein to

Popeyes Franchise Agreement                                 40
Exhibit D (03/2024)
PLK#2350

the contrary, in the event of a default described in this Section 15.02(C) Franchisor shall have the right, in addition to any other right or remedy available hereunder, to require, upon verbal notice from Franchisor to Franchisee, that the Franchised Restaurant be closed to the public and/or remain closed until the applicable food, health, or safety matters are cured. Failure to close the Franchised Restaurant upon such verbal notice shall be an act of default, and, if this act of default shall occur, Franchisor shall have the right to immediately terminate this Agreement, such termination to be effective immediately and with no opportunity to cure;

D.      If Franchisee, or any partner or shareholder of Franchisee purports to transfer any rights or obligations under this Agreement or any interest in Franchisee without Franchisor's prior written consent, contrary to the terms of Section XIV hereof;

E.      If Franchisee fails to comply with the in-term covenants in Section 13.02. hereof or fails to obtain execution of the covenants required under Sections 10.12. or 13.04. hereof;

F.      If, contrary to the terms of Section VII hereof, Franchisee discloses or divulges the contents of the Manual or any other confidential information provided to Franchisee by Franchisor;

G.      If an approved transfer is not effected as required by Section 14.05. hereof, following Franchisee's death or mental incapacity;

H.      If Franchisee knowingly maintains false books or records, or submits any false reports to Franchisor;

I.      If Franchisee or any individual, group, association, limited or general partnership, corporation or other business entity which directly or indirectly controls, is controlled by, or is under common control with Franchisee; or which directly or indirectly owns, controls, or holds power to vote ten percent (10%) or more of the outstanding voting securities of Franchisee; or which has in common with Franchisee one or more partners, officers, directors, trustees, branch managers, or other persons occupying similar status or performing similar functions (**"Affiliate"**) commits any act of default under any other Franchise Agreement, development agreement (except for failure to meet the development schedule thereunder), asset purchase agreement, promissory note or any other agreement entered into by Franchisee or an Affiliate of Franchisee, and Franchisor, or any parent, subsidiary, affiliate, predecessor or successor to Franchisor;

J.      If Franchisee defaults more than once in any twelve (12) month period under this Agreement for failure to substantially comply with any of the requirements imposed by this Agreement, whether or not cured after notice;

K.      If Franchisee refuses to permit Franchisor or its agents to enter upon the premises of the Franchised Restaurant to conduct any periodic inspection as set forth in Sections 5.09. and 10.05.H. hereof;

Popeyes Franchise Agreement                    41
Exhibit D (03/2024)
PLK#2350

L.      If Franchisee uses any of Franchisor's Proprietary Marks in any unauthorized manner or is otherwise in default of the provisions of Section V hereof;

M.      If Franchisee fails to meet the requirements of Section 10.20 hereof, including demonstrating full PCI/DSS compliance through means requested by Franchisor, as Franchisor may elect in its reasonable discretion;

N.      If Franchisee sells or offers for sale any products and menu items that have not been expressly approved for sale in writing by Franchisor, contrary to the terms of Section 10.05.B hereof;

O.      If Franchisee sells any approved products or menu items that deviate from Franchisor's standards and specifications for serving or selling such items, without Franchisor's prior written consent, contrary to the terms of Section 10.05.B hereof;

P.      If Franchisee continues to sell or offer for sale any products or menu items that Franchisor disapproves in writing at any time, contrary to the terms of Section 10.05.B; or

Q.      If (A) Franchisee, the Managing Owner or the Managing Director engages in conduct which is deleterious to or reflects unfavorably on Franchisee, the Franchisor's Proprietary Marks or the System by exhibiting a reckless disregard for the physical and mental well-being of employees, customers, Franchisor representatives or the public at large including, but not limited to, battery, assault, sexual harassment or other forms of threatening, outrageous, willfully discriminatory or unacceptable behavior, or (B) Franchisee, the Managing Owner, the Managing Director or any other owner of legal or beneficial interests in the Franchisee engages in conduct which, in Franchisor's sole judgment, adversely affects the reputation of the Franchised Restaurant, the System, or the goodwill associated with the Proprietary Marks.  An act of default under this Section 15.02.Q does not require any criminal action to be brought against Franchisee, the Managing Owner, the Managing Director or any other such owner of legal or beneficial interest in the Franchisee.

15.03. Except as provided in Sections 15.01. and 15.02. of this Agreement, upon any default by Franchisee which is susceptible of being cured, Franchisor may terminate this Agreement only by giving written Notice of Termination stating the nature of such default to Franchisee (i) at least five (5) days prior to the effective date of termination if the default is for failure to comply with the requirements of Sections XI or 17.02 hereof or for the failure to sell or offer for sale the minimum menu items specified in the Manual or otherwise in writing, as required by Section 10.05.B hereof, (ii) at least ten (10) days prior to the effective date of termination if the default is for failure to pay the Initial Franchise Fee, Royalty, Advertising Contributions (including Co-Op Contributions, if any are due and/or any other financial obligations owed to Franchisor by Franchisee), and (iii) at least thirty (30) days, prior to the effective date of termination for any other default; provided, however, that Franchisee may avoid termination by curing such default to Franchisor's satisfaction within the aforementioned five (5) day, ten (10) day or thirty (30) day period, as applicable.  If any such default is not cured within

the specified time, this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of the aforementioned five (5) day, ten (10) day or thirty (30) day period, as applicable, or such longer period as applicable law may require. Notwithstanding anything to the contrary set forth in this Agreement, Franchisee hereby acknowledges that any agreement between Franchisee and Franchisor relating to past due amounts accruing hereunder, (an **"Arrearage Agreement"**), including any promissory note or amendment to this agreement shall be deemed to be a material part of this agreement and shall be incorporated herein by reference. A default under any Arrearage Agreement shall be deemed a default of this Franchise Agreement, regardless of the reason Franchisee fails to pay the amount which is the subject of such Arrearage Agreement.

15.04. If any valid, applicable law or regulation of a competent governmental authority with jurisdiction over this Agreement requires a notice or cure period prior to termination longer than set forth in this Section 15, this Agreement will be deemed amended to conform to the minimum notice or cure period required by the applicable law or regulation.

15.05. Franchisee shall indemnify and hold Franchisor harmless for all costs, expenses and any losses incurred by Franchisor in enforcing the provisions hereof, or in upholding the propriety of any action or determination by Franchisor pursuant to this Agreement, or in defending any claims made by Franchisee against Franchisor, or arising in any manner from Franchisee's breach of or failure to perform any covenant or obligation hereunder, including reasonable litigation expenses and attorneys' fees incurred by Franchisor in connection with any threatened or pending litigation relating to any part of this Agreement, unless Franchisee shall be found, after due legal proceedings, to have complied with all of the terms, provisions, conditions and covenants hereof. For the avoidance of doubt, the indemnification provisions of this Section 15.05. shall survive the expiration or termination of this Agreement and be fully binding and enforceable as though such expiration or termination had not occurred.

## XVI.   EFFECT OF TERMINATION OR EXPIRATION

16.01. Upon termination or expiration of this Agreement, all rights granted herein shall forthwith terminate, and:

A.      Franchisee shall immediately cease to operate the Franchised Restaurant as a Popeyes Restaurant, and shall not thereafter, directly or indirectly, represent to the public that the restaurant is a Popeyes Restaurant;

B.      Franchisee shall immediately and permanently cease to use, by advertising or in any manner whatsoever, any menus, recipes, confidential food formulas, equipment, methods, procedures, and the techniques associated with the System, Franchisor's Proprietary Marks, and Franchisor's other trade names, trademarks and service marks associated with the Popeyes System. In particular, and without limitation, Franchisee shall cease to use all signs, furniture, fixtures, equipment, advertising materials, the Web Site, stationery, forms, packaging, containers and any other articles which display the Proprietary Marks and make such removals or changes in the premises as Franchisor shall request, so as to effectively distinguish the premises and the Franchised Restaurant from

Popeyes Franchise Agreement                               43
Exhibit D (03/2024)
PLK#2350

its former appearance and from any other Popeyes Restaurant. In the event Franchisee fails to comply with this section, Franchisee consents to Franchisor entering the premises (which includes the Franchised Restaurant) to make nonstructural changes at Franchisee's expense. Franchisee shall obtain, on behalf of itself and Franchisor, the right to enter the premises to effectuate the purposes of this Section;

C.     Franchisee agrees, in the event Franchisee continues to operate or subsequently begins to operate restaurants or other businesses, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks in conjunction with such other business which is likely to cause confusion or mistake or to deceive, and further agrees not to utilize any trade dress, designation of origin, description, or representation which falsely suggests or represents an association or connection with Franchisor;

D.     Franchisee agrees, upon termination or expiration of this Agreement or upon ceasing to operate the Franchised Restaurant at the location specified in Section I hereof for any reason, whether or not Franchisee continues to operate any business at such location, and whether or not Franchisee owns or leases the location, to make such modifications or alterations to the Franchised Restaurant premises immediately upon termination or expiration of this Agreement or cessation of operation of the Franchised Restaurant as may be necessary to prevent the operation of any businesses thereon by Franchisee or others in derogation of this Section XVI, and shall make such specified additional changes thereto as Franchisor may reasonably request for that purpose. The modifications and alterations required by this Section XVI shall include removal of all trade dress, Proprietary Marks and other indicia of the Popeyes System;

E.     Franchisee shall immediately pay all sums owing to Franchisor and its subsidiaries and affiliates. In the event of termination for any default by Franchisee, such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default;

F.     To the extent applicable, Franchisee shall immediately turn over to Franchisor (or, at Franchisor's direction, shall destroy) the Manual, all other manuals, records, files, instructions, correspondence and any and all other materials relating to the operation of the Franchised Restaurant in Franchisee's possession and all copies thereof (all of which are acknowledged to be Franchisor's property) and shall retain no copy or record of any of the foregoing, with the exception of such materials possessed by Franchisee pursuant to a separate valid and enforceable franchise agreement and Franchisee's copy of this Agreement, any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law; and

G.     Franchisee shall immediately delete or cause to be deleted the Web Site (if not within Franchisor's control) and transfer to Franchisor (if not already registered to Franchisor) the registration of all domain names used in connection with the Web Site, as well as any other domain names registered by or on behalf of Franchisor in connection with the Franchised Restaurant. Any rights granted by Franchisor to Franchisee with respect to

Popeyes Franchise Agreement                                              44
Exhibit D (03/2024)
PLK#2350

the Web Site, or any other website associated with the Franchised Restaurant, including any domain names, shall immediately cease upon termination or expiration of this Agreement, and Franchisor may, at any time upon or after termination or expiration of this Agreement, delete the Web Site (if within Franchisor's control) and cease or reassign usage of any domain names within Franchisor's control that may have benefited Franchisee.

16.02.  Franchisor shall have the right (but not the duty) to be exercised by notice of intent to do so within thirty (30) days after termination or expiration of this Agreement, to purchase any and all improvements, equipment, advertising and promotional materials, ingredients, products, materials, supplies, paper goods and any items bearing Franchisor's Proprietary Marks at current fair market value.  If the parties cannot agree on a fair market value within a reasonable time, an independent appraiser shall be designated by Franchisor, and his or her determination of fair market value shall be binding.  If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set-off all amounts due from Franchisee under this Agreement and the cost of the appraisal, if any, against any payment therefor.

16.03. In the event the premises are leased to Franchisee, Franchisee shall, upon termination of this Agreement and upon request by Franchisor, immediately assign, set over and transfer unto Franchisor, at Franchisor's sole option and discretion, said lease and the premises, including improvements.  Any such lease entered into by Franchisee shall contain a clause specifying the landlord's consent to assign such lease to Franchisor or its assignee in the event this Agreement is terminated.

16.04. Franchisee shall pay to Franchisor all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor in seeking recovery of damages caused by any action of Franchisee in violation of, or in obtaining injunctive relief for the enforcement of, any portion of this Section XVI.  Further, Franchisee acknowledges and agrees that any failure to comply with the provisions of this Section XVI, shall result in irreparable injury to Franchisor.

16.05.  All provisions of this Agreement which, by their terms or intent, are designed to survive the expiration or termination of this Agreement, shall so survive the expiration and/or termination of this Agreement.

16.06. Franchisee shall comply with the covenants contained in Section XIII of this Agreement.

16.07.  Franchisee shall execute such documents as Franchisor may reasonably require to effectuate termination of the franchise and Franchisee's rights to use the trademarks and systems of Franchisor.

## XVII.  TAXES, PERMITS, AND INDEBTEDNESS

17.01.  Franchisee shall promptly pay when due all taxes, accounts and other indebtedness of every kind incurred by Franchisee in the conduct of Franchisee's business and operation of the Franchised Restaurant under this Agreement.

17.02.  Franchisee, in the conduct of Franchisee's business and operation of the Franchised Restaurant, shall comply with all applicable laws and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the businesses operated under this Agreement, including licenses to do business, trade name registrations, sales tax permits and fire clearances.

17.03.  Notwithstanding the foregoing or anything else herein, the amount of all fees payable pursuant to this Agreement by the Franchisee does not include Indirect Tax and, in the event Indirect Tax applies on the fees payable pursuant to this Agreement, Franchisee will be responsible for such Indirect Tax either (i) through payment of the Indirect Tax to Franchisor or (ii) if Franchisee is required by law to deduct and pay the applicable Indirect Tax to the relevant Tax Authority, Franchisee will gross up the fees by the applicable Indirect Tax and remit payment of the applicable Indirect Tax amount to the relevant Tax Authority, without any deduction from fees payable under this Agreement. If there is an exemption in the territory of the Franchised Restaurant for the application of Indirect Taxes to any payments made by Franchisee to Franchisor or its designee, Franchisee will cooperate in good faith with Franchisor and take all reasonable steps necessary to ensure that Franchisor or its designee will be eligible for such exemption, including by applying for the exemption with the applicable Tax Authority.  "**Indirect Tax**" or "**Indirect Taxes**" means sales and use tax, goods and services tax, value added tax, ad valorem tax, excise tax, duty, levy or other governmental charges, and other obligations of the same or of a similar nature to any of the foregoing (together with any penalties, interest, or other similar amounts thereon) levied by a Tax Authority. "**Tax**" or "**Taxes**" means all taxes, however denominated, including any interest, penalties, or other additions that may become payable in respect thereof, imposed by any Taxing Authority. "**Tax Authority**" means any governmental authority having or purporting to have power to impose, administer or collect any Tax.

## XVIII. INDEPENDENT CONTRACTOR AND INDEMNIFICATION

18.01.  This Agreement does not constitute Franchisee an agent, legal representative, joint venturer, partner, employee or servant of Franchisor for any purpose whatsoever.  It is understood and agreed that Franchisee shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty, or representation on behalf of Franchisor or to incur any debt or any other obligation in Franchisor's name, and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action or by reason of any act or omission of Franchisee, or any claim or judgment arising therefrom.  Neither this Agreement nor Franchisor's course of conduct is intended, nor may anything in this Agreement (nor Franchisor's course of conduct) be construed, to state or imply that Franchisor is the employer of Franchisee's employees and/or independent contractors, nor vice versa.  The parties further agree that this Agreement does not create any fiduciary or special relationship between them.  In all public records, in relationships with other persons, and on letterhead and business forms, Franchisee shall indicate its independent ownership of the Franchised Restaurant and that Franchisee is a franchisee of Franchisor.

18.02.  During the term of this Agreement and any extensions hereof, Franchisee agrees to take such action as Franchisor deems reasonably necessary for Franchisee to inform and hold itself out to the public as an independent contractor operating the Franchised Restaurant pursuant to a

Popeyes Franchise Agreement                           46
Exhibit D (03/2024)
PLK#2350

franchise from Franchisor (including exhibiting a notice of that fact at the Franchised Restaurant in form and substance satisfactory to Franchisor), subject only to the conditions and covenants set forth in this Agreement. Franchisee shall have no right or power to, and shall not, bind or obligate Franchisor in any way or manner, nor shall Franchisee represent at any time that Franchisee has any right to do so. Without limiting the generality of the foregoing, Franchisee acknowledges that (i) Franchisor has no responsibility or obligation to ensure that the Franchised Restaurant is developed and operated in compliance with all applicable laws, ordinances, and regulations, and (ii) Franchisor shall have no liability in the event the development or operation of the Franchised Restaurant violates any applicable law, ordinance, or regulation.

18.03. Franchisee agrees to defend, indemnify and hold harmless Franchisor, its parent, subsidiaries and affiliates, and their respective officers, directors, employees, agents, successors and assigns from all claims, demands, losses, damages, liabilities, cost and expenses (including attorneys' fees and litigation expenses) resulting from, or alleged to have resulted from, or in connection with Franchisee's operation of the Franchised Restaurant, including any claim or actions based on or arising out of (i) Franchisee's violation of any applicable laws, rules, or regulations (including any applicable employment or workplace-related laws, rules, or regulations), (ii) the acts or omissions of Franchisee or any of its employees, or (iii) any injuries, including death to persons or damages to or destruction of property, sustained or alleged to have been sustained in connection with or to have arisen out of or incidental to the Franchised Restaurant, Franchisee's business and/or the performance of this Agreement by Franchisee, its agents, employees, and/or its subcontractors, their agents and employees, or anyone for whose acts they may be liable, regardless of whether or not such claim, demand, damage, loss, liability, cost or expense is caused in whole or in part by the negligence of Franchisor, Franchisor's representative, or the employees, agents, invitees, or licensees thereof. For the avoidance of doubt, the provisions of this Section 18.03. shall survive the expiration or termination of this Agreement and be fully binding and enforceable as though such expiration or termination had not occurred.

18.04. Franchisor shall advise Franchisee in the event Franchisor receives notice that a claim has been or may be filed with respect to a matter covered by this Agreement, and Franchisee shall immediately assume the defense thereof at Franchisee's sole cost and expense. In any event, Franchisor will have the right, through counsel of its choice, to control any matter to the extent it could directly or indirectly affect Franchisor and/or its parent, subsidiaries or affiliates or their officers, directors, employees, agents, successors or assigns. If Franchisee fails to assume such defense, Franchisor may defend, settle, and litigate such action in the manner it deems appropriate and Franchisee shall, immediately upon demand, pay to Franchisor all costs (including attorneys' fees and litigation expenses) incurred by Franchisor in affecting such defense, in addition to any sum which Franchisor may pay by reason of any settlement or judgment against Franchisor.

18.05. Franchisor's right to indemnity hereunder shall exist notwithstanding that joint or several liability may be imposed upon Franchisor by statute, ordinance, regulation or judicial decision.

18.06. Franchisee agrees to pay Franchisor all expenses attorneys' fees and court costs, incurred by Franchisor, its parent, subsidiaries, affiliates, and their successors and assigns to

remedy any defaults of or enforce any rights under this Agreement, effect termination of this Agreement or collect any amounts due under this Agreement.

## XIX. APPROVALS AND WAIVERS

19.01. Whenever this Agreement requires the approval of Franchisor, Franchisee shall make a timely written request to Franchisor therefore, and such approval or consent shall be in writing. Whenever this Agreement or any related agreement grants, confers or reserves to Franchisor the right to take action, refrain from taking action, or grant or withhold Franchisor's consent or approval, unless the provision specifically states otherwise, Franchisor may take into consideration Franchisor's good faith assessment of the long term interests of all stakeholders in the Popeyes System. When the terms of this Agreement specifically require that Franchisor not unreasonably withhold Franchisor's approval or consent, if Franchisee is in default of this Agreement (after applicable notice and cure period), any withholding of Franchisor's approval or consent will be considered reasonable.

19.02. Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee or any third party to which Franchisor would not otherwise be subject, by providing any waiver, approval, advice, consent, or suggestions to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefore.

19.03. No failure of Franchisor to exercise any power reserved to it in this Agreement, or to insist upon compliance by Franchisee with any obligation or condition in this Agreement, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with the terms of this Agreement. Waiver by Franchisor of any particular default shall not affect or impair Franchisor's right in respect to any subsequent default of the same or of a different nature, nor shall any delay, forbearance, or omission of Franchisor to exercise any power or rights arising out of any breach or default by Franchisee of any of the terms, provisions, or covenants of this Agreement, affect or impair Franchisor's rights, nor shall such constitute a waiver by Franchisor of any rights, hereunder or right to declare any subsequent breach or default. Subsequent acceptance by Franchisor of any payments due to it shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee of any terms, covenants, or conditions of this Agreement.

## XX. NOTICES

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered, sent by registered mail, or by other means which will provide evidence of the date received to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor: Popeyes Louisiana Kitchen, Inc.
5707 Blue Lagoon Drive
Miami, Florida 33126

Popeyes Franchise Agreement
Exhibit D (03/2024)
PLK#2350

48

Attention:  Head of Legal

Notices to Franchisee:         See Key Contract Data page

All written notices and reports permitted or required to be delivered by the provisions of this Agreement shall be addressed to the party to be notified at its most current principal business address of which the notifying party has been notified and shall be deemed so delivered:  (i) at the time delivered by hand; or (ii) if sent by registered or certified mail or by other means which affords the sender evidence of delivery, on the date and time of receipt or attempted delivery if delivery has been refused or rendered impossible by the party being notified.

## XXI.    SEVERABILITY AND CONSTRUCTION

21.01.  Except as expressly provided to the contrary herein, each section, paragraph, part, term, and/or provision of this Agreement shall be considered severable; and if, for any reason, any section, part, term, and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation, or have any other effect upon, such other portions, sections, parts, terms, and/or provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect to bind the parties hereto; and said invalid portions, sections, parts, terms, and/or provisions shall be deemed not to be part of this Agreement.

21.02. Except as has been expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor, Franchisor's officer, directors, and employees, and Franchisee's permitted and Franchisor's respective successors and assigns, any rights or remedies under or by reason of this Agreement.

21.03.  All captions in the Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.  In this Agreement, the words "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation".

21.04.  All references herein to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, where applicable, and all acknowledgments, promises, covenants, agreements and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all the parties hereto on behalf of Franchisee.

21.05. This Agreement may be executed in multiple counterparts, each of which when executed and delivered shall be deemed to be an original and all of which together shall constitute but one and the same agreement.  By entering into this Agreement, Franchisee expressly consents to transact business with Franchisor electronically and that, consistent with the Uniform Electronic Transactions Act and all other applicable state and federal laws, this Agreement may be executed by electronic signatures.  The parties to this Agreement agree that (i) the parties' electronic signatures are intended to authenticate this writing and to have the same force and effect as the use

Popeyes Franchise Agreement                        49
Exhibit D (03/2024)
PLK#2350

of manual signatures, and (ii) an electronically signed version of this Agreement shall constitute an original for all purposes.

## XXII.  ENTIRE AGREEMENT:  SURVIVAL

22.01.  This Agreement, the Key Contract Data page to this Agreement, the documents referred to herein, and the exhibits hereto, constitute the entire, full and complete agreement between Franchisor and Franchisee concerning the subject matter hereof and supersede any and all prior agreements.  Except for those permitted to be made unilaterally by Franchisor hereunder, no amendment, change, modification or variance of this Agreement shall be binding on either party unless in writing and executed by Franchisor and Franchisee.  Representations by either party, whether oral, in writing, electronic or otherwise, that are not set forth in this Agreement (other than those set forth in the Franchise Disclosure Document provided by Franchisor to Franchisee) shall not be binding upon the party alleged to have made such representations and shall be of no force or effect.  However, and notwithstanding the foregoing, no provision in this Agreement is intended to disclaim any representation made by Franchisor in the Franchise Disclosure Document provided by Franchisor to Franchisee.

**Franchisee has read this Section 22.01., and Franchisee acknowledges and agrees that neither it nor any of its owners, directors, officers, or employees has been induced by (and none of the foregoing are relying upon) any representation not contained in this Agreement or the Franchise Disclosure Document provided by Franchisor at least 14 days prior to the execution of any agreement with Franchisor or any affiliate or the payment of any money to Franchisor or any affiliate.**

22.02.  Notwithstanding anything herein to the contrary, upon the termination of this Agreement for any reason whatsoever (including the execution of a subsequent Franchise Agreement pursuant to the provisions of Sections 2.02.B. and 14.03.F.), or upon the expiration of the Term hereof, any provisions of this Agreement which, by their nature, extend beyond the expiration or termination of this Agreement, shall survive termination or expiration and be fully binding and enforceable as though such termination or expiration had not occurred.

## XXIII. ACKNOWLEDGMENTS

23.01.  Franchisee acknowledges that Franchisee has conducted an independent investigation of the Popeyes franchise and recognized that the business venture contemplated by this Agreement involves business risks and Franchisee's success will be largely dependent upon the ability of Franchisee as an independent business entity.  By signing below, Franchisee hereby acknowledges and certifies to Franchisor each of the following:

A.  FRANCHISOR EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE HAS NOT RECEIVED, ANY WARRANTY OR GUARANTY, EXPRESSED OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT;

B.  FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE HAS READ AND UNDERSTOOD THIS AGREEMENT, THE EXHIBITS HERETO, IF ANY, AND AGREEMENTS RELATING THERETO, IF ANY, AND THAT FRANCHISOR HAS ACCORDED FRANCHISEE AMPLE TIME AND OPPORTUNITY AND HAS ENCOURAGED FRANCHISEE TO CONSULT WITH ADVISORS OF FRANCHISEE'S OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT; AND

C.  FRANCHISEE RECOGNIZES AND UNDERSTANDS THAT IT MAY INCUR OTHER EXPENSES AND/OR OBLIGATIONS AS PART OF THE INITIAL INVESTMENT IN THE FRANCHISED RESTAURANT WHICH THE TERMS OF THIS AGREEMENT MAY NOT ADDRESS, AND WHICH INCLUDE: OPENING ADVERTISING, EQUIPMENT, FIXTURES, OTHER FIXED ASSETS, CONSTRUCTION, LEASEHOLD IMPROVEMENTS AND DECORATING COSTS AS WELL AS WORKING CAPITAL NECESSARY TO COMMENCE OPERATIONS.

## XXIV. APPLICABLE LAW; VENUE

24.01.  Applicable Law.  This Agreement takes effect upon its acceptance and execution by Franchisor and shall be interpreted and construed under the laws of the State of Florida which laws shall prevail in the event of any conflict of law (without regard to, and without giving effect to, the application of Florida choice of law or conflict of law rules) except to the extent governed by the U. S. Trademark Act of 1946, 15 U.S.C. § 1051, et seq. (the **"Lanham Act"**) as amended; provided, however, that if the covenants in Section XIII of this Agreement would not be enforceable under the laws of Florida, and the Franchised Restaurant is located outside of Florida, then such covenants shall be interpreted and construed under the laws of the state in which the Franchised Restaurant is located.  Nothing in this Section XXIV is intended by the parties to subject this Agreement to any franchise or similar law, rule, or regulation of the State of Florida to which this Agreement would not otherwise be subject.

24.02.  The parties agree that any action brought by Franchisee against Franchisor in any court, whether federal or state, shall be brought within such state and in the judicial district in which Franchisor has its principal place of business.  Any action brought by Franchisor against Franchisee in any court, whether federal or state, may be brought within the state and in the judicial district in which Franchisor has its principal place of business. Franchisee hereby consents to personal jurisdiction and venue in the state and judicial district in which Franchisor has its principal place of business.

24.03.  No right or remedy herein conferred upon or reserved to Franchisor is exclusive of any other right or remedy herein, or by law or equity provided or permitted; but each shall be cumulative of any other right or remedy provided in this Agreement.

24.04. Nothing herein contained shall bar Franchisor's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

24.05. Any and all claims and actions arising out of or relating to this Agreement (including the offer and sale of this franchise), the relationship of Franchisee and Franchisor, or Franchisee's operation of the Franchised Restaurant, brought by Franchisee shall be commenced within eighteen (18) months from the occurrence of the facts giving rise to such claim or action, or such claim or action shall be barred.

24.06. Franchisor and Franchisee hereby waive to the fullest extent permitted by law any right to or claim of any consequential, punitive, or exemplary damages against the other, and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have duly executed, sealed, and delivered this Agreement in multiple originals on the day and year first above-written.

**FRANCHISOR:**

**POPEYES LOUISIANA KITCHEN, INC.**

By: _Bryan Saul_

Name: Bryan Saul

Title: Sr. Director F&BD

**FRANCHISEE:**

**SAILORMEN, INC.**
A Florida Corporation

By: _Chad Cohen_

Name: Chad Cohen

Title: Managing Owner

[SIGNATURE PAGE TO FRANCHISE AGREEMENT]

## EXHIBIT "A"

### POPEYES LOUISIANA KITCHEN
### FRANCHISE AGREEMENT

### PROTECTED AREA

### To be inserted at a future date.

The area shown above consists of a one mile radius surrounding the Franchised Restaurant. In accordance with the provisions of 1.02.A. of the Franchise Agreement, Franchisee's actual Protected Area is a geographic area immediately surrounding the Franchised Restaurant equal to the lesser of (i) a one (1) mile radius and (ii) an area encompassing a population (residential and workplace) of 50,000 people.

Popeyes Franchise Agreement
Exhibit D (03/2024)
PLK#2350

## EXHIBIT "B"

## POPEYES LOUISIANA KITCHEN
## FRANCHISE AGREEMENT

## FRANCHISEE'S MANAGING OWNER,
## OWNERSHIP STRUCTURE, AND MANAGING DIRECTOR

Franchisee represents, warrants, and covenants that the following information is true, correct, and complete at all times during the Term of this Agreement:

1.    The Managing Owner, who is authorized to sign this Agreement any other agreements between Franchisee and Franchisor, is as follows:

| MANAGING OWNER | PHONE NUMBER AND ADDRESS |
|---|---|
| Chad Cohen | 575 Lexington Ave., 28th Floor, New York, NY 10022 USA |

2.    All of the owners of all issued and outstanding shares, membership interests, or other equity of Franchisee are set forth below (including the number and type of shares, membership interests, or equity held by such owner):

| OWNER | NUMBER AND CATEGORY |
|---|---|
| Interfoods of America, Inc. | 100% voting stock |
| Chicken Run Holdings, LLC | By virtue of 100% ownership in Interfoods of America, Inc. |
| CSIP VI Corporation Acquisition, LP | By virtue of 63.9274% membership interest in Chicken Run Holdings, LLC |
| Kara Nordstrom | By virtue of 10% membership interest in Chicken Run Holdings, LLC |
| Mark Reneiri | By virtue of 10% membership interest in Chicken Run Holdings, LLC |
| CS Adjacent Investment Partners Parallel, LP | By virtue of 5.2269% membership interest in Chicken Run Holdings, LLC |
| Jonathan Marmolejos | By virtue of 5% membership interest in Chicken Run Holdings, LLC |
| CS Adjacent Investment Partners, LP | By virtue of 4.3456% membership interest in Chicken Run Holdings, LLC |
| CSFC Financing I, LLC. | By virtue of 1.5% membership interest in Chicken Run Holdings, LLC |

3.    The Managing Director is as follows:

| MANAGING DIRECTOR | PHONE NUMBER AND ADDRESS |
|---|---|
| David Damato | (305) 670-0746 - 9500 South Dadeland Blvd., Suite 800, Miami, FL 33156 USA |

Popeyes Franchise Agreement                                     1
Exhibit D (03/2024)
PLK#2350